## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| In re: | Case No. 15-13485-MER |
| FRESH PRODUCE HOLDINGS, LLC, | Chapter 11 |
| Debtor. | |

**EMERGENCY MOTION OF DEBTOR TO APPROVE COMPREHENSIVE SALE PROCESS RELATING TO GOING OUT OF BUSINESS SALE AND SALE TO THE HIGHEST BIDDER AND TO (A) APPROVE AGENCY AGREEMENT, BID PROCEDURES AND BID PROTECTIONS, (B) SCHEDULE A SALE HEARING, (C) APPROVE THE FORM AND MANNER OF NOTICE RELATED THERETO, (D) AUTHORIZE SALE FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; AND (E) GRANT RELATED RELIEF**

### I.   SUMMARY OF RELIEF REQUESTED

By this Motion, Fresh Produce Holdings, LLC ("**FPH**" or the "**Debtor**")[1] requests the entry of two orders:

*First*, the Debtor requests entry of an order on an expedited basis, substantially in the form attached hereto as **Exhibit A** ("**Bid Procedures Order**"):

　　　　i.　　　approving a comprehensive sale process relating to a Liquidation Transaction (defined herein) and a Going Concern Transaction (defined herein) (as the case may be, an "**Asset Transaction**");

　　　　ii.　　　approving the Agency Agreement between the Debtors and Yellen Partners, LLC ("**Stalking Horse Liquidator**"), attached hereto as **Exhibit B** (the "**Agency Agreement**"), subject to higher or better bids which may be received at the Auction (defined herein);

---

[1] This Motion affects FPH's affiliated debtors:  Fresh Produce Retail, LLC (Case No. 15-13415-MER); Fresh Produce Sportswear, LLC (Case No. 15-13416-MER); Fresh Produce of St. Armands, LLC (Case No. 15-13417-MER); FP Brogan-Sanibel Island LLC (Case No. 15-13420-MER); and Fresh Produce Coconut Point, LLC (Case No. 15-13421-MER) (the "**Affiliated Debtors**" and together with FPH, the "**Debtors**").  The location of the Debtors' service address is:  2865 Wilderness Place, Boulder, Colorado 80301.

iii.     approving certain bid protections, including a $70,000 breakup fee and an expense reimbursement of up to $20,000 to Stalking Horse Liquidator;

iv.     approving the Bidding Procedures set forth herein with respect to an Asset Transaction;

v.     scheduling a hearing on approval of the Asset Transaction (the "**Sale Hearing**") on or before May 12, 2015;

vi.     approving the form and manner of the notice of sale (the "**Notice**," attached hereto as **Exhibit C**); and

vii.     under a Liquidation Transaction, waiving the need to comply with (a) any state and local laws, statutes, rule and ordinances regarding liquidation sales, and (b) any provisions or contractual restrictions in any of the Debtors' leases or agreements regarding liquidation sales.

*Second*, following the Auction and in connection with the Asset Transaction, the Debtor requests entry of an order pursuant to sections 105(a) and 363(b), (f), and (m) of the Bankruptcy Code (i) approving the Asset Transaction with the party submitting the highest or otherwise best bid at the Auction, (ii) authorizing a sale free and clear of all liens, claims and encumbrances, and (iii) authorizing the Debtor to pay the secured debt owed to Wells Fargo Bank, N.A. ("**Wells**") from the sale proceeds without further order of the Court, and (iv) granting related relief (the "**Sale Order**").

The Debtor further requests waiver of the fourteen day stay imposed by Bankruptcy Rules 6004(h) and 6006(d).

## REASON FOR EMERGENCY HEARING

The Debtors are retailers that design, manufacture and market women's and children's lifestyle clothing made in the United States.  Time is of the essence in order to maximize value

of the Debtors' Assets (defined below) through the Sale.  In total, the Debtors' peak selling season at the retail store level is the time period from February through April.  After April, the Debtors' retail store sales begin to decline, thereby potentially reducing valuations that buyers place on the Assets.  While historical retail sale volumes begin to decline precipitously after April, the period of May through July represents the next highest three month selling period.  Most buyers (including going-concern buyers) will look to take advantage of some or all of that selling season.  Therefore, a closing date within the next 30-45 days is likely to produce the highest valuation on the Debtors' Assets.  Indeed, parties that are bidding on the inventory have indicated there will be a steep decrease in their offers should closing date extend beyond May 15, 2015.  To that end, Stalking Horse Liquidator has informed the Debtors that it must have Court approval of the Agency Agreement no later than May 13, 2015 in order to maximize the value of the Assets.  A longer sale process is not only likely to result in a lower purchase price for the Assets, it will result in higher occupancy and administrative costs to the Debtors, and is unlikely to yield new buyers as known financial and strategic buyers were notified as part of the Debtors' prepetition marketing efforts.

### SUMMARY OF TERMS OF AGENCY AGREEMENT AND SALE PROCESS

The Debtors, through their advisors, and in consultation with Wells, engaged in a fulsome marketing effort for the sale of substantially all of the Debtors' assets (the "**Assets**").  The Debtors contacted over 50 parties to serve as buyer for a going concern transaction for the Assets (a "**Going Concern Transaction**") and, in the alternative, for the liquidation of all of the Debtors' Assets (a "**Liquidation Transaction**").  None of the parties contacted could commit to a Going Concern Transaction prior to the Petition Date.  As a result of the competitive process implemented by the Debtors, it was ultimately determined that the proposal submitted by Stalking Horse Liquidator was the most favorable offer for the Debtors and their estates and

presented the best opportunity to maximize value for the estates, while preserving the Debtors' option to pursue a higher and better Going Concern Transaction or Liquidation Transaction.

Accordingly, on April 4, 2015, the Debtors entered into the Agency Agreement with Stalking Horse Liquidator.  The reason the agreement is called an Agency Agreement is that the Stalking Horse Liquidator will act as Debtors' agent in conducting "going out of business", "store closing", "sale on everything", "everything must go "and similar themed sales (the "**Sale**") on behalf of the Debtors at the Debtors' store locations.  Stalking Horse Liquidator will pay to Debtors a guaranteed payment of 86% of the aggregate cost value of the merchandise being sold. The current expectation is that this will result in a guaranteed payment to Debtors of approximately $5.6 million, based on projected inventory levels at closing.  In addition, Stalking Horse Liquidator will fund expenses of the Sale, including, but not limited to, rent, payroll, utilities, and advertising.  In the event that proceeds from the sale exceed the guaranteed payment plus expenses and a 6% sales commission to Stalking Horse Liquidator, Debtors will receive 60% of any additional excess proceeds.  In addition, Stalking Horse Liquidator will liquidate the Debtors' fixtures, furniture and equipment, as well as non-finished good and non-first quality inventory, for a 15% commission.  In exchange for its willingness to serve as a stalking horse bidder, and the risks associated with the same,  the Stalking Horse Liquidator will receive the Bid Protections (defined below).  The Agency Agreement is subject to higher and better bids.

The Debtors contemplate a marketing process on a dual track:

      i.      the Debtors will market a Liquidation Transaction and seek higher and otherwise better liquidation bids than the  bid set forth in Stalking Horse Liquidator's Agency Agreement, and, at the same time,

ii. the Debtors will market a Going Concern Transaction pursuant to section 363 of the Bankruptcy Code with financial and strategic buyers, many of whom have already been contacted.  In the event that a potential purchaser seeks to purchase some or all of the Debtors' operations as part of a Going Concern Transaction, the Debtors have preserved the option of pursuing such a Going Concern Transaction.

In further support of this Motion, the Debtors respectfully represent as follows:

## II.   JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. §§ 105, 363 and 365.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.   BACKGROUND

### A.      General Background

2.      On April 2, 2015 (the "**Affiliated Debtors' Petition Date**"), the Affiliated Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

3.      On April 4, 2015 (the "**Petition Date**"), FPH filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

6.      The Debtors are retailers that design, manufacture, market and sell women's and children's lifestyle clothing made in the United States.  The Debtors operate twenty-seven retail stores located nationwide (twenty-five full price, two off-price stores), and have approximately

400 wholesale customers, a company branded ecommerce platform, and a finishing, fulfillment and distribution center located in Gardena, CA.  The Debtors lease all retail locations.

7.      The Debtors have a single secured lender, Wells.  As of the Petition Date, Wells is owed approximately $3,941,572.76, exclusive of fees and expenses.

**B.      Events Leading to the Filing of the Chapter 11 Cases and the Debtors' Decision to Conduct the Sale**

8.      In early 2015, the Debtors' management and advisors performed an analysis of the Debtors' operations and financial performance to identify potential capital sources or a sale of the company.   In February 2015, the Debtors engaged Alliance Management ("**Financial Advisor**") to assist in this process and serve as their financial advisor.  Specifically:

- On or around March 2, 2015, the Debtors and Financial Advisor began compiling targeted buyer/investor list as well as due diligence information.

- On or around March 6, 2015, the Debtors and Financial Advisor sent investment summaries to 53 parties, comprised of strategic investors, financial investors with retail holdings, financial investors with opportunistic focus, and liquidators.  The Debtors called for bids to be received by March 27, 2015.

- Also on or around March 6, 2015, the Debtors and Financial Advisor populated an electronic data room.  The data room includes extensive, detailed due diligence materials, including details regarding the Debtors' business and assets.

- The Debtors and Financial Advisor held initial management meetings with seven parties, consisting of two potential going concern buyers and five potential liquidators.

- One of the potential going concern buyers performed three Boulder headquarter site visits and attended management meetings.  Five liquidators performed site visits to the Gardena, CA warehouse.

- As of March 27, 2015 bid deadline, 22 NDA's were executed by parties.  However, seven of these 22 parties completed due diligence and decided not to proceed.  Thus, 15 parties remain interested in the opportunity.

- Of the 15 remaining parties, three liquidators submitted LOI's and/or proposals to the Debtors.

- The Debtors received no going concern bids. However, the Debtors are currently in active discussions with at least three potential going-concern buyers and one additional liquidator that did not submit a bid by the bid deadline. The remaining parties continue to perform initial due diligence.

9.     Based on this process, the Debtors realized that pursuit of a new capital infusion needed to be coupled with a potential sale of the company as a going concern or a liquidation sale of the Debtors' Assets. The Debtors filed their Chapter 11 petitions to complete this process.

10.    The Debtors, in consultation with their advisors and Wells, determined that to achieve a value maximizing bid from the liquidation specialists, it was in the best interest of all parties to select Stalking Horse Liquidator as the liquidation agent for conducting the Sale, which process involved negotiation of the Agency Agreement.

11.    As indicated above, the Debtors, through their advisors, also contacted several other financing and strategic buyers, who expressed an interest in a Going Concern Transaction, but none of these parties could commit to financing or a Going Concern Transaction prior to the Petition Date. Accordingly, the Debtors intend to continue to solicit interest from these parties to achieve competing going concern bids as more fully discussed below.

## C.     Entry into the Agency Agreement

12.    As discussed above, the Debtors and their advisors engaged in discussions with various national liquidation firms that specialize in, among other things, large scale liquidation of merchandise, inventory, and other goods of similar type and scale to serve as a potential agent for the Debtors in conducting the Sale of all of the Debtors' Assets, including their merchandise and inventory (the "**Merchandise**"), their owned furniture, fixtures, and equipment therein (the "**Owned FF&E**") and all other assets of the Debtors (the "**Other Assets**") at the Debtors'

remaining 27 stores and central distribution facility, and otherwise assisting the Debtors with the Liquidation Transaction.

13.     The Debtors determined that the proposal submitted by Stalking Horse Liquidator, subject to higher and better offers, presented the best opportunity to maximize value for the estate through the Sale, while preserving the Debtors' option to pursue a higher and better Going Concern Transaction.

14.     The Debtors engaged in negotiations with Stalking Horse Liquidator and, ultimately, the parties were able to reach an agreement regarding the terms of the Agency Agreement, pursuant to which Stalking Horse Liquidator will conduct the Sale and liquidate the Assets.   The Agency Agreement was negotiated in good faith and at arm's length, and the Debtors believe the terms thereof are fair and reasonable.

15.     Although the Debtors respectfully refer the parties to the Agency Agreement in its entirety, certain of the material terms are set forth below:[2]

> A.     Expenses of the Sale:  During the Sale Term, the Agent shall be unconditionally responsible for all Expenses listed in section 4.1 of the Agency Agreement arising during the Sale Term, including (subject to certain limitations set forth in the Agency Agreement) actual Occupancy Expenses (up to per diem, per location category amounts), Store-level Retained Employee wages and commissions, payroll taxes and benefits (subject to an agreed upon cap on such payroll taxes and benefits).  *See* Agency Agreement § 4.1.

> B.     Guaranteed Amount:  As a guaranty of the Agent's performance, in addition to the payment of Expenses, the Agent guarantees that the Debtors shall receive an amount (the "**Guaranteed Amount**") equal to eighty-six percent (86%) of the aggregate Cost Value of the Merchandise, subject to certain adjustments.  *See* Agency Agreement § 3.1.

> C.     Owned FF&E:  Any furniture, fixtures and equipment (including, but not limited to, machinery, rolling stock, office equipment and personal property), and conveyor systems and racking owned by the Debtors and located at the Stores, the

---

[2] Capitalized terms used in this summary shall have the meanings ascribed to them in the Agency Agreement.  This summary of the Agency Agreement is for summary purposes only and is qualified in its entirety by the terms and provision of the Agency Agreement.

Distribution Center and/or the Debtors' corporate offices shall be sold by the Agent for a fifteen percent (15%) commission. *See* Agency Agreement § 15.

D. <u>Payment Date</u>: On the first business day prior to the Sale Commencement Date, the Agent shall pay to Wells as the Debtors' designee, an amount (the "**Initial Guaranty Payment**") equal to eighty percent (80%) of estimated Guaranteed Amount. The balance of the Guaranteed Amount shall be paid by wire transfer to Wells on the earlier of (x) the second business day following the issuance of the Final Inventory Report, and (y) thirty days after the Sale Commencement Date. *See* Agency Agreement § 3.3(b).

E. <u>Breakup Fee and Expense Reimbursement</u>: The Agency Agreement provides for Stalking Horse Liquidator to receive (i) a break-up fee of $70,000 (the "**Break-Up Fee**") plus (ii) its reasonable and documented actual out of pocket costs not to exceed $20,000 (the "**Expense Reimbursement**" and together with the Break-Up Fee, the "**Bid Protections**"), if, among other things, Stalking Horse Liquidator is not approved as the Successful Bidder by the Court after completion of the Auction. The Bid Protections shall be entitled to priority as a superpriority administrative expense claim pursuant to section 507 of the Bankruptcy Code, senior to all other administrative expense superpriority or priority claims, and shall be paid in cash within five days of entry of the Sale Order approving a Competing Bid. The Break Up Fee represents approximately 1.25% of the estimated guaranteed amount to be paid by Stalking Horse Liquidator and is well within the customary range of approximately 3%. The Bid Protections are designed to foster bidding while at the same time compensating Stalking Horse Liquidator for, among other things, (a) the risk it took in entering into the Agency Agreement subject to higher and better offers without any assurances that its Liquidation Transaction will ultimately be consummated and (b) exposing its bid to the market. The Bid Protections will enable the Debtors to procure a far more favorable agreement than it would have absent the Bid Protections. *See* Agency Agreement § 16.13.

## IV.  SALE OF ASSETS

16.   To seek to maximize the value of the Debtors' assets, by this Motion the Debtor requests authority to conduct an auction (the "**Auction**") for an Asset Transaction.

17.   The Debtors believe that conducting the proposed Liquidation Transaction will provide maximum value to the Debtors' estates in the event that a Going Concern Transaction cannot be consummated. Specifically, the Agency Agreement will establish a minimum bid for the Auction and a complete set of offer terms with respect to the Assets, against which competing bids and terms may be measured.

18.     In the event that the Debtors do not receive a higher and/or better bid for a Going Concern Transaction at the Auction, the Debtors propose to commence the Sale immediately following entry of an order approving the Liquidation Transaction to the highest and best bidder, and thereby stem any further losses resulting from the continued operation of the Debtors' business. The Debtors believe that any delay in commencing the Sale will diminish value for several important reasons. First, delays in the liquidation process could cause the Debtors' inventory to become out of season, thus reducing the value of the Merchandise. Second, commencing the Sale expeditiously to coincide with the Debtors' peak season will result in maximum value for the Assets.

19.     As a necessary part of this process, the Debtor requests the further authorization to conduct the Sale notwithstanding any contrary state or local statutes, rules or ordinances purporting to govern or restrict the conduct of "store closing", "going-out-of- business", "sale on everything", "everything must go" or similarly themed sales. In addition, the Debtor also requests authorization to conduct the sales notwithstanding any provisions in the retail leases purporting to restrict the Debtors' ability to conduct the Sale.

20.     The Debtor further requests authority to use the proceeds of the Sale to pay the secured debt owed to Wells without further order of the Court.

### A.     The Bidding Procedures

21.     The Debtor hereby requests that the Court approve the following bidding procedures (including the payment of the Bid Protections as summarized above) (the "**Bidding Procedures**"):

### (i)       Notice

22.       Within one (1) business day following the entry of the Bid Procedures Order, the Debtor will serve the Notice, in the form attached as Exhibit C, on:  (a) the Office of the United States Trustee for the District of Colorado, (b) the Debtors' 30 largest unsecured creditors, (c) counsel to Wells, (c) all parties known to be asserting a lien in the Debtors' assets, (d) each of the Debtors' landlords, (e) the Internal Revenue Service, (f) the Securities and Exchange Commission, (g) the Office of the Attorney General for each of the states in which the Debtors operate, (h) cities and counties where the stores are located, (i) various federal and state tax and consumer protection authorities, (j) potential bidders, and (k) all entities entitled to notice pursuant to Bankruptcy Rule 2002.

### (ii)       Participation Requirements

23.       The Debtors will cooperate and provide access to potential bidders who seek to conduct diligence (collectively, the "**Potential Bidders**").

24.       On or before the Bid Deadline (defined below), each Potential Bidder must submit a Qualified Bid (as defined below) to the following:  (i) counsel to the Debtors, Brownstein Hyatt Farber Schreck, LLP, 410 17th Street, Suite 2200, Denver, Colorado 80202, Attn:  Michael J. Pankow and Joshua M. Hantman, (ii) counsel to Wells, Markus Williams Young & Zimmerman LLC, 1700 Lincoln, Suite 4550, Denver Colorado 80203, Attn:  James T. Markus, and (iii) counsel to the Official Committee of Unsecured Creditors, if one is appointed (the "**Committee**") (collectively, the "**Bid Recipients**").

25.       All Bids are irrevocable until seven days after the Sale Hearing.

26.       All Liquidation Transaction bids shall be based upon the terms and conditions of the Agency Agreement submitted by Stalking Horse Liquidator and shall provide for a bid

amount that equals or exceeds the sum of (i) the Guaranteed Amount, plus (ii) $140,000 (comprised of the $90,000 Bid Protections plus $50,000), with no other modifications to the Agency Agreement submitted by Stalking Horse Liquidator.[3]

27.     Going Concern Transaction bids are not subject to an initial overbid requirement and will be based on a proposed asset purchase agreement (the "**Form APA**") to be provided by the Debtors to prospective Going Concern Transaction bidders.  Any bidder making a Going Concern Transaction Bid shall provide a deposit in an amount not less than ten percent (10%) of the purchase price of such bidder's bid in good funds.

### (iii)     Bid Deadline

28.     The deadline to submit competing bids will be on or before 4:00 p.m. Prevailing Mountain Time on **[TBD], 2015** (the "**Bid Deadline**").

### (iv)     Qualified Bid Requirements

29.     Bids for a Liquidation Transaction or a Going Concern Transaction that meet the following conditions shall be deemed "**Qualified Bids**," and bidders submitting Qualified Bids shall be deemed "**Qualified Bidders**":

- To be considered by the Debtors as a Qualified Bid, such bid must (unless otherwise determined by the Debtors, in consultation with Wells and the Committee):

    a)     give sufficient indicia that the bidder or its representative is legally empowered, by power of attorney or otherwise, to both bid on behalf of the bidder and also to complete and sign, on behalf of the bidder, a binding and enforceable agency agreement or an asset purchase agreement, as applicable;

    b)     in the case of a Liquidation Transaction, deliver to the Bid Recipients on or before the Bid Deadline, (I) written evidence of the bidder's ability to consummate the transaction as required by the Debtors, (II) a redline version of the submitted Agency Agreement compared to the Agency Agreement submitted by Stalking Horse Liquidator (III) a clean version of the submitted

---

[3] If potential liquidation bidders propose other modifications to the Stalking Horse Liquidator Agency Agreement, any such modifications will be considered by the Debtors in determining whether to accept or reject such Bid.

Agency Agreement executed by such liquidation bidder which does not contain any contingencies including, but not limited to, due diligence and financing contingencies; and

c)  in the case of a Going Concern Transaction, deliver to the Bid Recipients on or before the Bid Deadline (I) written evidence of the bidder's ability to consummate the transaction as required by the Debtors, (II) a redline version of an Asset Purchase Agreement compared to the Form APA, (III) a clean version of the submitted Asset Purchase Agreement executed by such Going Concern Transaction bidder, which does not contain any contingencies including, but not limited to, due diligence and financing contingencies. Any bidder making a Going Concern Transaction Bid shall provide a deposit in an amount not less than ten percent (10%) of the purchase price of such bidder's bid in good funds. If one or more Going Concern Transaction proposals are received, the Debtors in consultation with Wells and the Committee will evaluate which, if any, of such bids should be deemed Qualified Bids for purposes of participating in the Auction as described below.

• Potential Bidders shall be required to complete and execute a confidentiality agreement. Upon execution of a confidentiality agreement, the Debtors will provide reasonable access to due diligence material before the Auction.

• The Debtors, in consultation with Wells and the Committee, will determine, in their sole discretion, (i) whether a bid(s) is a Qualified Bid(s), and (ii) at the conclusion of the Auction, which bid constitutes the highest and/or best bid.

• The Debtors, in consultation with Wells and the Committee may request additional information from a bidder to evaluate the bidder's ability to consummate a transaction and to fulfill its obligations in connection therewith, and such bidder shall be obligated to provide such information.

• Each bidder, as a consequence of submitting a bid, shall be deemed to acknowledge:  (a) that it is bound by these Bidding Procedures; (b) that it had an opportunity to inspect and examine the Assets and to review all pertinent documents and information with respect to the Assets before making its offer and that each such bidder relied solely on that review and upon its own investigation and inspection in making its bid; and (c) except as expressly provided for in the agency agreement accompanying its bid, such bidder is not relying upon any written or oral statements, representations or warranties of the Debtors, their agents or representatives.

• ANY BIDDER FAILING TO COMPLY WITH THESE REQUIREMENTS MAY NOT BE CONSIDERED A QUALIFIED BIDDER.

### (v)   Auction

30.     The Auction will be conducted on **[TBD], 2015 at 10:00 a.m.** (Prevailing Mountain Time) at the offices of Brownstein Hyatt Farber Schreck, LLP, 410 17th Street, Suite 2200, Denver, Colorado 80202 or such other location as may be selected by the Debtors.

31.     Only Qualified Bidders who have complied with the Bid Procedures may improve their Bids at the Auction.  At the commencement of the Auction, the Debtors will announce the best bid (or combination of bids) received to date and will open the Auction for other Qualified Bidders to improve upon their bid.  Bidding increments will be announced at the outset of the Auction.  Bidding at the Auction will continue until such time as the highest or otherwise best Bid is determined by Debtors in consultation with Wells and the Committee.  The Debtors, in consultation with Wells and the Committee, may adopt or modify rules for the bidding process. The Debtors, in consultation with Wells and the Committee, will select the highest or otherwise best bid(s) (the "**Successful Bidder**") at the conclusion of the Auction, subject to Court approval, and the Successful Bidder(s) will be required to enter into a definitive agency agreement and/or asset purchase agreement (as consensually modified by the parties, if appropriate), as applicable, before the Auction is deemed closed.

32.     The Debtors, with the consent of Wells, reserve the right to, to (i) adjourn the Auction or (ii) modify the Bidding Procedures at the Procedures Hearing or at the Auction.

33.     In the event that no higher and/or better Going Concern Transaction is received at the Auction, the Debtors request that the Court authorize the Debtors to conduct the Sale of all of the Assets pursuant to an Agency Agreement with the liquidator who submitted the highest and best bid at the conclusion of the Auction.  It is contemplated that the Sale will be conducted according to the following schedule (the "**Sale Term**"):  the Sale shall commence on the first calendar day after the entry of the Sale Order, but not later than **May 15, 2015**, and the

Successful Bidder with respect to a Liquidation Transaction (the "**Liquidation Agent**") shall complete the sales on or before **August 31, 2015**. The Liquidation Agent shall conduct the Sale in accordance with the Sale Guidelines (the "**Guidelines**") annexed to the Agency Agreement as Exhibit 8.1 and incorporated herein.

## V.   LEGAL ARGUMENT

### A.   The Agency Agreement and the Proposed Sale and Process Should Be Approved

34.     The relief requested by this Motion is appropriate under the Court's equitable powers under section 105(a) of the Bankruptcy Code and authority to approve non-ordinary course transactions under section 363(b) of the Bankruptcy Code.

35.     Bankruptcy Code section 363 authorizes a debtor to sell assets of the estate other than in the ordinary course of business free and clear of liens, claims and encumbrances. *See* 11)U.S.C. § 363(b)(1) and (f); Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction."). The decision to sell assets outside the ordinary course of business is based upon a debtor's sound business judgment. *In re Castre, Inc.*, 312 B.R. 426, 428 (Bankr. D. Colo. 2004); *In re Psychometric Sys., Inc.*, 367 B.R. 670, 675 (Bankr. D. Colo. 2007) (debtor's business judgment in a section 363 sale to be given "great deference"). And, when a debtor's sound business judgment dictates it, a bankruptcy court can authorize the sale of all of the debtor's assets pursuant to §363(b)(1) prior to plan confirmation. *Stephens Indus. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) ("[A] bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action.").

36.     Additionally, Bankruptcy Code section 105(a) provides a bankruptcy court with broad powers in the administration of a case so that "[t]he court may issue any order, process, or

judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."
Further, pursuant to section 105(a), a court may fashion an order or decree that helps preserve or
protect the value of a debtor's assets. *See, e.g.*, *Chinichian v. Campolongo (In re Chinichian)*,
784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to
fashion orders as necessary pursuant to the purposes of the Bankruptcy Code.").

37.    It is the Debtors' business judgment that the comprehensive sale process
described herein is in the best interest of their creditors and estates, as it provides the Debtors
with the best strategy for maximizing the value of their assets. Furthermore, the administrative
and economic costs of maintaining such assets for an uncertain period of time would not be in
the best interest of the estate. The Asset Transaction (in whatever form that ultimately results)
represents the highest and best use for the Debtors' assets. Under these circumstances, sound
business reasons exist that justify the sale of the Assets outside of the ordinary course of
business.

38.    The Debtors believe that, absent an higher and/or better Going Concern
Transaction, the disposition of the Assets through the Sale as set forth in the Agency Agreement
will maximize the value of the Debtors' estates. The Debtors' decision to liquidate the Assets in
the absence of a higher and/or better Going Concern Transaction is an exercise of sound business
judgment. The Debtors believe that any attempt to restore the profitability of the enterprise in
the absence of a substantial capital infusion and/or an alternative, more favorable financing
arrangement, would be unrealistic.

39.    Further, the proposed Bidding Procedures and the Agency Agreement assure that
the highest and best price will be realized for the Debtors' assets. The Notice will be provided to

all persons the Debtors believe may have an interest in their assets, which will maximize potential for overbids.

40.     Liquidation sales are a routine occurrence in chapter 11 cases involving retail debtors.  *See In re Ames Dept. Stores, Inc.*, 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (holding that "going-out-of-business" sales are an important part of "overriding federal policy requiring Debtors to maximize estate assets").  Bankruptcy Courts in this and other districts have approved similar stores closing sales.  *See, e.g.*, *In re Coupounas,* Case No. 14-23906-EEB (Bankr. D. Colo. Oct. 31, 2014); *In re Tweeter Home Entm't Group, Inc.*, Case No. 07-10787-PJW (Bankr. D. Del. July 13, 2007); *In re Three A's Holding, LLC*, Case No. 06-10086-BLS (Bankr. D. Del. Sept. 25, 2006).

41.     The Debtors believe that the terms of the Agency Agreement are typical, customary and reasonable under the circumstances in the exercise of their business judgment. Accordingly, the Debtors respectfully request that this Court authorize the Debtors to enter into the Agency Agreement, subject to higher and better bids, to conduct the proposed dual track sale process described herein, and to enter into a Going Concern Transaction or a Liquidation Transaction with the Successful Bidder, as the case may be.

### B.      The Bid Protections Should Be Approved

42.     As a condition to the Agency Agreement, the Debtors are required to obtain approval of the Bid Protections in the Bid Procedures Order.  The Bid Protections represent a fair compensation and reimbursement of the expenses incurred in conducting due diligence and negotiating the Agency Agreement.  Absent such provisions, Stalking Horse Liquidator would likely not have agreed to act as a "stalking horse" in connection with a transaction for which it may not ultimately be the Successful Bidder.  As has been repeatedly demonstrated in recent years, obtaining a "stalking horse" is critical to successful and efficient conduct of a sale process.

The presence of such a "stalking horse" sets a floor for the auction and encourages bidding, thereby maximizing a seller's return.  In order to provide this benefit, though, the "stalking horse" must be compensated for, inter alia, (a) the risk it takes by entering into an agreement subject to higher and better offers without any assurances that its transaction will ultimately be consummated, (b) exposing its bid to the market, and (c) standing by its bid commitment while the seller's marketing process plays out.  The Debtors thus believe that in this instance it was necessary and appropriate for the Debtors to agree to the Break Up Fee, which amounts to approximately 1.25% of the estimated Guaranteed Amount being paid by Stalking Horse Liquidator under the Agency Agreement.

43.     Break-up and other termination fees are a normal, and in some cases necessary, component of sales outside the ordinary course of business under § 363 of the Bankruptcy Code. *See, e.g., In re Twenver, Inc.*, 149 B.R. 954, 956 (Bankr. D. Colo. 1992)*; In re Integrated Resources, Inc.*, 147 B.R. 650, 660 (S.D.N.Y. 1992) (noting that breakup fees may be legitimately necessary to convince a single "white knight" to enter the bidding by providing some form of compensation for the risk it is undertaking); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 879 (Bankr. S.D.N.Y. 1990) (break-up fees in merger agreement approved); *In re 995 Fifth Ave. Assoc., L.P.*, 96 B.R. 24, 28-9 (Bankr. S.D.N.Y. 1989) (payment of $500,000 break-up fee to outbid contract vendee following sale of debtor's property was not unreasonable absent evidence that fee chilled bidding).

44.     In considering whether to approve a break-up fee, courts generally consider the following three factors:  (i) the relationship between the initial bidder and the seller; (ii) whether the fee is designed to encourage bidding; and (iii) the size of the fee in relation to the purchase price.  *See In re Integrated Resources*, 147 B.R. at 657-63.

45.     Obtaining approval and authority to pay the Bid Protections will facilitate the Debtors' efforts to assure a sale to a contractually committed bidder at a price(s) the Debtors believe is fair, while at the same time providing the Debtors with the potential of even greater benefit to the estate.

46.     A break-up fee that constitutes a fair and reasonable percentage of the proposed purchase price and that is reasonably related to the risk, effort, and expenses of the prospective purchaser is generally permissible.  *See, e.g., In re 995 Fifth Ave. Assoc.*, 96 B.R. 25, 28 (Bankr. S.D.NY. 1989); *In re Integrated Resources, Inc.*, 147 B.R. at 662 (break-up fee reasonable percentage of proposed purchase price and in accord with industry averages).

47.     As set forth above, the Break-Up Fee represents approximately 1.25% of the estimated Guaranteed Amount to be paid under the Agency Agreement.  This percentage is well within the order of magnitude of break-up fees approved in other cases.  *See, e.g., In re Coupounas,* Case No. 14-23906-EEB (Bankr. D. Colo. Oct. 31, 2014) (approving break-up fee equal to roughly 3% of transaction price); *Twenver*, 149 B.R. at 957; *Consumer News & Business Channel Partnership v. Financial News Network, Inc. (In re Financial News Network, Inc.)*, 980 F.2d 165, 167 (2d Cir.1992) (noting without discussion $8.2 million breakup fee on $149.3 million transaction (5.5% of consideration offered)); *Cottle v. Stores Communications*, 849 F.2d 570, 578-79 (11th Cir 1988) (approving a combined $29 million fee on $2.5 billion transaction, (1.16% of consideration); *see also LTV Aerospace & Defense Co. v. Thomson-CSF, S.A. (In re Chateugay Corp.)*, 1998 B.R. 848, 861 (S.D.N.Y. 1996) (enforcing $20 million "reverse breakup fee" payable to debtor on $450 million offer (4.4% of consideration)).

48.     The Bid Protections are beneficial to the Debtors' estate and its creditors, as the Agency Agreement establishes a floor for further bidding on the Assets, and served as a basis for

procuring Wells' support as the Debtors continue their efforts to procure a Going Concern Transaction.

49.     Stalking Horse Liquidator is unwilling to commit to holding open its offer to liquidate the inventory (which is the vast majority of the value of the Assets) unless the Bid Procedures Order authorizes payment of the Bid Protections.  Thus, absent entry of the Bid Procedures Order and approval of the Bid Protections, the Debtors may lose the opportunity to obtain the highest and best offer it has received to date.  Accordingly, the Bid Protections should be approved.

**C.     Scheduling of a Hearing on the Merits and Approving Notice in Connection Therewith on an Expedited Basis are Necessary to Conduct a Sale Taking Advantage of the Peak Selling Season**

**i.     The Debtor Requests that the Court Set the Sale Hearing on or Before May 12, 2015**

50.     The Debtor seeks two hearings in connection with the Sale Motion:  a hearing to consider the signing of the Bid Procedures Order and a Sale Hearing.  The Bid Procedures Order, if entered, will approve and establish the procedures to be employed for the proposed sale of the Assets, including, among other things, (a) the Bid Protections, and (b) the form and manner of notice of the proposed Auction.  The Bid Procedures Order will also schedule the Sale Hearing to consider entry of the Sale Order.

51.     Pursuant to Bankruptcy Rules 2002(m) and 9007, this Court is empowered to enter any order designating the matters in respect to which, the entity to whom, and the form and manner in which notices shall be sent, except as otherwise provided by these rules.

52.     Furthermore, to allow the Debtors sufficient opportunity to analyze and respond to objections, if any, to the entry of the Sale Order, the Debtors request that the deadline for filing such objections be set to a date that is a business day at least three days prior to the Sale

Hearing, which would be on or before May 8, 2015 (the "**Objection Deadline**"), notwithstanding any rule or previous order of the Court governing general response deadlines in this case; provided, however, objections to the selection of the Successful Bidder after the Auction may be raised at the Sale Hearing. The proposed Objection Deadline is adequate because notice of the Motion and Sale Hearing will be provided to the notice parties more than fourteen (14) days before the Sale Hearing.

53.     For the reasons set forth more fully herein, the Debtors believes that the current peak shopping season provides a window of opportunity for the Debtors to maximize value from the liquidation of their assets. Accordingly, the Debtors respectfully request that the Sale Hearing on this matter be scheduled for hearing on the merits on or before May 12, 2015.

### ii.     Reasonable Notice of the Asset Transaction is Being Provided

54.     In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside of the ordinary course of business may be by private or by public auction. *See* Fed. R. Bankr. P. 6004(f)(l). Further, pursuant to Bankruptcy Rule 2002(a)(2), this Court may, for cause shown, shorten or direct another method of giving notice regarding the general 21 day by mail period for the proposed use, sale, or lease of property of the estate other than in the ordinary course of business. *See* Fed. R. Bankr. P. 2002(a)(2). Subject to Bankruptcy Rule 6004, the notice of a proposed use, sale, or lease of property required under Bankruptcy Rule 2002(a)(2) must include the time and place of any public sale, the terms and conditions of any private sale, and the time fixed for filing objections. *See* Fed. R. Bankr. P. 2002(c)(1). Moreover, the notice of a proposed use, sale, or lease of property is sufficient if it generally describes the property. *Id.*

55.     Within one (1) business day after entry of the Bid Procedures Order, the Debtor intends to serve the Notice upon all interested parties, including those potential bidders who may bid at the Auction.

56.     Such notices and procedures set forth herein and in the Notice satisfy the notice requirements of Bankruptcy Rules 2002 and 6004 and section 363(b) of the Bankruptcy Code, and constitute good and sufficient notice and that no other or further notice is required. Accordingly, the Debtors respectfully submits that this Court should authorize such notices.

### D.     Compliance With Any State and Local Laws, Statutes, Rules and Ordinances on Liquidation Sale Should Be Waived

57.     Certain municipalities or counties in which the Debtors' retail locations are located may have licensing and similar requirements with respect to the conduct of liquidation and store closing sales.  In certain circumstances, however, these requirements do not apply where such sales are conducted pursuant to an order, and under the supervision, of a court. Accordingly, the Debtors requests that this Court authorize the Debtors and the Liquidation Agent conduct the Sale without the necessity of, and the delay associated with, obtaining various state licenses and/or satisfying any additional requirements in connection therewith.

58.     As a general matter, under 28 U.S.C. § 959(b), a debtor-in-possession must "manage and operate the property. . . according to the requirements of the valid laws of the state in which such property is situated . . . ."  Courts, however, have held that a debtor-in-possession that is liquidating estate assets does not "manage and operate" the property for the purposes of section 959(b).  *See Alabama Surface Mining Comm'n v. N.P. Mining Co., Inc. (In re N.P. Mining Co., Inc.)*, 963 F.2d 1449, 1460-61 (11th Cir. 1992) (holding that section 959(b) does not apply when debtor-in-possession is liquidating property and not operating business); *Missouri v. United States Bankruptcy Court*, 647 F.2d 768, 778 n. 18 (8th Cir. 1981) (no need for a state license solely for a liquidation), cert. denied, 454 U.S. 1162 (1982).  Because the Debtors may seek to liquidate the Assets completely, section 959(b) does not require compliance with these

state and local licensing procedures and other regulations, especially when the Debtors would conduct the Sale with the knowledge and oversight of its creditors and this Court.

59.     Moreover, federal bankruptcy law preempts state and local laws that conflict with the underlying policies of the Bankruptcy Code. *See Belculfine v. Aloe (In re Shenango Group, Inc.)*, 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("[T]rustees and debtor-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code. . . . [A] state statute[] cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code."), aff'd, 112 F.3d 633 (3d Cir. 1997).  While preemption of state law is not always appropriate, *see Baker & Drake, Inc. v. Public Serv. Comm'n of Ne. (In re Baker & Drake, Inc.)*, 35 F.3d 1348, 1353-54 (9th Cir. 1994) (holding that Bankruptcy Code did not preempt state law prohibiting taxicab leasing that was promulgated in part as public safety measure), preemption is appropriate when, as here, the only state laws involved concern economic regulation rather than the protection of public health and safety.  *See id.* at 1353 (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety"); *see also In re Scott Housing Sys. Inc.*, 91 B.R. at 196-97 (holding that automatic stay under section 362 is broad and preempts state law except for those laws designed to protect public health and safety).

60.     Here, any local licensing requirements, time limits or bulk sale restrictions on liquidation sales would undermine the fundamental purpose of section 363(b) by placing constraints on the Debtors' ability to marshal and maximize estate assets for the benefit of creditors.

61.     Accordingly, the Debtors respectfully request that the Court authorize them to conduct the Sale and related transactions without the necessity of, and the delay associated with,

obtaining various local licenses, observing local waiting periods or time limits, and/or satisfying any additional requirements with respect to advertising, transferring of merchandise, and the like. Finally, the Debtors request that the Court enjoin any action by any lessor or any federal, state or local agency, department or governmental authority or any other entity to prevent, interfere with, or otherwise hinder consummation of the store closing sales or advertisement of such sales.  *See Missouri v. United States Bankruptcy Court*, 647 F.2d at 776 (holding that attempt to enforce state regulations governing liquidation of grain warehouses directly conflicted with bankruptcy court's control over property of Debtors' estate and therefore violated automatic stay).  The requested waiver is narrowly tailored to facilitate the successful consummation of the Sale.  The Debtors do not seek a general waiver of all state and local requirements, and the Debtors and the Liquidation Agent fully intend to be bound by and comply with state and local health and safety laws.

62.     Similar relief has been granted in other bankruptcy cases.  *See, e.g., In re FFW OPCO, Ltd.*, No. 10-33761 (HDH) (Bankr. N.D. Tex. June 9, 2010) ("The Sale shall be conducted by FFW and PFP without the necessity of compliance with any federal, state or local statute or ordinance (other than Safety Laws), lease provision, or licensing requirement affecting store closing, going out of business, bankruptcy liquidation or auction sales, or affecting advertising, including signs, banners, and posting of signage"); *In re Nameco, LLC*, Case No. 13-10610-PJW (Bankr. D. Del. April 12, 2013) (authorizing store closing sales with waiver of federal and state going out of business laws and other applicable law restrictions); *In re Orchard Supply Hardware Stores Corp.*, 13-11565-CSS (Bankr. D. Del. June 28, 2013) (same); *In re Borders Grp., Inc.*, Case No. 11-10614-MG (Bankr. S.D.N.Y. July 21, 2011) (same).

###### E.     Any Terms in the Leases Restricting Liquidation Sales Should be Held to be Unenforceable

63.     Certain of the leases and other agreements governing the premises or conduct of business at the Closing Locations (the "**Leases**") may contain provisions purporting to restrict or prohibit the Debtors from conducting store closing, liquidation, or similar sales.  Such provisions have been held to be unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to properly administer its case and maximize the value of its assets under section 363 of the Bankruptcy Code.  *See, e.g., In re Ames Dep't Stores, Inc.*, 136 B.R. at 359 (holding that enforcement of such lease restrictions would "contravene overriding federal policy requiring debtor to maximize estate assets. . . ."); *In re R.H. Macy and Co., Inc.*, 170 B.R. 69, 73–74 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a covenant to stay open because the debtor had a duty to maximize the value to the estate and the debtor fulfilled this obligation by holding a store closing sale and closing the store); *In re Tobago Bay Trading Co.*, 112 B.R. 463, 467–68 (Bankr. N.D. Ga., 1990) (finding that a debtor's efforts to reorganize would be significantly impaired to the detriment of creditors if lease provisions prohibiting a debtor from liquidating its inventory were enforced); *In re Lisbon Shops, Inc.*, 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in chapter 11 case where debtor sought to conduct going-out-of-business sale).

64.     As such, to the extent that such provisions or other contractual restrictions exist in any of the Leases pertaining locations where Debtors would conduct the Sale, the Debtors respectfully request that the Court invalidate such provisions and authorize the Debtors and the Liquidation Agent to conduct the Sale without interference by any landlords or other persons affected, directly or indirectly, by the Sale.

F.     **Abandonment of Certain Property in Connection with the Sale**

65.     During the course of the Sale, the Debtors may determine that the costs associated with holding and/or selling certain property (including, but not limited to, Owned FF&E) exceeds the likely proceeds that may be realized upon its sale.   As such, the property is of inconsequential value and benefit to the Debtors' estates and may, in certain cases, be burdensome to the Debtors' estates.  To maximize the value of the Debtors' estates to be realized in connection with the Sale, the Debtors request authority under § 554(a) of the Bankruptcy Code to abandon property the Debtors determine to be burdensome, or of inconsequential value and benefit, to the Debtors' estates.

G.     **Stalking Horse Liquidator or the Successful Bidder Should be Afforded the Protections of 11 U.S.C. § 363(m) for a Good Faith Purchaser**

66.     Section 363(m) of the Bankruptcy Code provides:  The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.   11 U.S.C. § 363(m).  While the Bankruptcy Code does not define "good faith", the Third Circuit in *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986) has held that:  "The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  788 F.2d at 147 (citations omitted).

67.     The Debtors submit, and will adduce evidence (either through direct testimony or by proffer) at the Sale Hearing, that sale of the transactions contemplated hereby will be conducted in an arm's-length transaction, in which the Debtors and the Successful Bidder will have at all times acted in good faith under applicable legal standards.   The Debtors shall therefore request that the Court make a finding that the Successful Bidder at the Auction has/have entered into an asset purchase agreement and/or an alternative agency agreement, as the case may be, in good faith within the meaning of section 363(m) of the Bankruptcy Code.

**H.     The Proposed Sale of Assets Should Be Granted Free and Clear of Liens, Claims, Interests and Encumbrances**

68.     Under section 363(f) of the Bankruptcy Code, a debtor may sell property "under subsection (b) and (c) free and clear of any interest in such property of an entity other than the estate."   In particular, section 363(f) authorizes a debtor to sell property free and clear if (i) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (ii) such entity consents; (iii) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (iv) such interest is in bona fide dispute; or (v) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.   11 U.S.C. § 363(f); *see also In re Collins*, 180 B.R. 447, 449-50 (Bankr. E.D. Va. 1995) ("Section 363(f) is phrased in the disjunctive, such that only one of the enumerated conditions must be met in order for the Court to approve the proposed sale."); *In re P.K.R. Convalescent Ctrs., Inc.*, 189 B.R. 90, 93-94 (Bankr. E.D. Va. 1995) ("[Section] 363 covers more situations than just sales involving liens . . . Section 363(f) addresses sales free and clear of any interest . . .").

69.     Other than a lien in favor of Wells, the Debtors are unaware of any (i) liens, encumbrances or interests (collectively "**Interests**") or (ii) "claims" as defined in section 101(5)

of the Bankruptcy Code ("**Claims**") that have been asserted against the Assets and any other assets of the Debtors.  The Debtors believe that Wells will consent to the Sale Order, so long as Debtor obtains authority to pay the Wells debt from the proceeds of the Sale without further Court order.  Debtors believe that Wells could otherwise be compelled, in a legal or equitable proceeding, to accept a money satisfaction of any such interest.   Furthermore, the proposed Sale Order will provide that Wells shall be paid in full on or before the date of the closing of the Asset Transaction and that all Interests and Claims attach to the net cash proceeds derived from the Asset Transaction in the same validity, force and effect that such Interests or Claims now have against the Assets and any other assets of the Debtors.

**I.     Proposed Assumption and Assignment of the Assumed Contracts is Within the Debtors' Sound Business Judgment and Should Therefore Be Approved**

70.     Section 365 of the Bankruptcy Code provides that a chapter 11 debtor, subject to Bankruptcy Court approval, may assume or reject executory contracts at any time prior to plan confirmation.  11 U.S.C. § 365(a) and (d)(2).

71.     The assignment of executory contracts and unexpired leases is governed by section 365(f) of the Bankruptcy Code, which provides, in pertinent part:  "(2) The trustee may assign and executory contract or unexpired lease of the debtor only if – (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and (B) adequate assurance or future performance by the assignee of such contract or lease is provided whether or not there has been a default in such contract or lease."  11 U.S.C. § 365(f)(2).

72.     The standard governing bankruptcy court approval of a debtor's decision to assume or reject executory contracts or unexpired leases of nonresidential real property is whether the debtor's reasonable business judgment supports assumption or rejection.  *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303 (5th Cir. 1985); *In re Taylor*, 913

F.2d 102, 107 (3d Cir. 1990); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993).

73.     In the event that the Debtors consummates a Going Concern Transaction, the Debtors would proffer evidence at the Sale Hearing that the assumption and/or assignment of assumed contracts would represent an exercise of sound business judgment.  Moreover, the Debtors will proffer evidence at the Sale Hearing to satisfy the requirements of section 365(b) and (f) of the Bankruptcy Code with respect to the assumption and assignment of the assumed contracts.  Further, any provision restricting the assignment of any assumed contract would constitute an unenforceable anti-assignment under section 365(f) of the Bankruptcy Code.  *See, e.g., In re Office Products of America, Inc.*, 140 B.R. 407, 409 (Bankr. W.D. Tex. 1992) (stating that provisions in a lease which operate to restrict or discourage trustee from otherwise assigning such contract or lease are "struck down" under Bankruptcy Code).

74.     Section 365(b)(1) of the Bankruptcy Code, in turn, provides that if there has been a default on an executory contract or unexpired lease, the debtor may not assume such contract or lease unless, at the time of assumption, the debtor (a) cures, or provides adequate assurance that it will promptly cure, such default, (b) compensates, or provides adequate assurance that it will promptly compensate, the non-debtor party to the agreement for any pecuniary loss resulting from such default, and (c) provides adequate assurance of future performance under the agreement.  11 U.S.C. § 365(b)(1).

75.     To the extent any of the bids received by the Bid Deadline include any proposed assumption and assignment of contracts, Debtors shall notify the counter-parties to the contracts by telephone, e-mail and or fax, within 24 hours of the proposed assumption and assignment and

the proposed purchaser, the proposed cure and the proposed assurance of future performance. Debtors shall also inform the contract party that they may appear at the Sale hearing to object to any statement of cure amount or the adequacy of assurance of future performance.

76.     If a dispute arises regarding a cure amount or other requirements to assume and assign an executory contract, the Debtors will request the Court to provisionally determine each cure amount and the satisfaction of such requirements at the Sale Hearing.

**J.     The Court Should Waive the Fourteen-Day Stay Period Imposed by Bankruptcy Rules 6004(h) and 6006(d)**

77.     In addition, by this Motion, the Debtor seek a waiver of any stay of the effectiveness of the order approving the relief requested in this Motion.  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." As set forth above, the Debtors are facing significant liquidity constraints, which will be eased by an immediate commencement of the Sale and liquidation of the Liquidation Assets in accordance with the Agency Agreement.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), to the extent that they apply, or in the alternative, if an objection to the Asset Transaction is filed, reduce the minimum amount of time needed by the objecting party to file its appeal to allow the Asset Transaction to close.

## VI.   RESERVATION OF RIGHTS

78.     The Debtor expressly reserves the right to amend, modify, and/or supplement the relief requested in this Motion in all respects, including, but not limited to, the proposed Bidding Procedures attached hereto, prior to or at the applicable hearing (and the Bidding Procedures

prior to or during the Auction) and reserves the right to withdraw this Motion, in whole or in part, prior to or at the applicable hearing.

## VII.  NOTICE

79.     Notice of this Motion shall be provided to (a) the Office of the United States Trustee for the District of Colorado, (b) the Debtors' thirty largest unsecured creditors, (c) counsel to the Debtors' secured lender, Wells, (d) all parties known to be asserting a lien in the Assets, (e) each of the Debtors' landlords at the remaining open stores, (e) the Internal Revenue Service, (f) the Securities and Exchange Commission, (g) the Office of the Attorney General of the State of Colorado, (h) the Colorado Secretary of State, (i) the Office of the Attorney General for each of the states in which the Debtors operate, (j) cities and counties where the stores are located, (k) various federal and state tax and consumer protection authorities, (l) potential bidders, and (m) all entities entitled to notice pursuant to Bankruptcy Rule 2002.

80.     The Debtor submits that, in light of the nature of the relief requested, no other or further notice is necessary or required.

81.     No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtor respectfully requests the entry of the Bid Procedures Order, substantially in the form attached hereto as Exhibit A, and the Sale Order, respectively, granting the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated this 6th day of April, 2015.

Respectfully submitted,

BROWNSTEIN HYATT FARBER SCHRECK, LLP

___*s/Michael J. Pankow*_____
Michael J. Pankow, #21212
Joshua M. Hantman, #42010
Rafael R. Garcia-Salgado, #47382
410 17th Street, Suite 2200
Denver, Colorado  80202
Telephone:  (303) 223-1100
Facsimile:  (303) 223-1111
mpankow@bhfs.com
jhantman@bhfs.com
rgarcia@bhfs.com

*Proposed Attorneys for the Debtor*