## AGENCY AGREEMENT

This Agency Agreement (the "Agreement") is made as of this 4th day of April 2015, by and between Yellen Partners, LLC, an Illinois limited liability company with a principal place of business located at 570 Lake Cook Rd. Suite 125, Deerfield, IL 60015 (the "Agent") and Fresh Produce Holdings, LLC., a Delaware limited liability company, Fresh Produce Retail, LLC, a Colorado limited liability company, Fresh Produce Sportswear, LLC, a Colorado limited liability company, Fresh Produce of St. Armands, LLC, a Florida limited liability company, FP Brogan-Sanibel Island LLC, a Colorado limited liability company, and Fresh Produce Coconut Point, LLC, a Florida limited liability company, each having its principal place of business at 2865 Wilderness Place, Boulder, Colorado 80301 (collectively, the "Merchant").

## RECITALS:

**WHEREAS,** on or about [April 4], 2015, Merchant filed a voluntary petition (the "Bankruptcy Case") for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Colorado (the "Bankruptcy Court");

**WHEREAS,** in connection with the Bankruptcy Case, Merchant desires that Agent act as Merchant's exclusive agent for the limited purpose of (a) selling all of the Merchandise (as hereinafter defined) located or to be located in Merchant's retail store locations identified on Exhibit 1A annexed hereto (collectively, the "Stores") and Merchant's distribution center(s) identified on Exhibit 1B annexed hereto (the "Distribution Centers," and together with the Stores, the "Closing Locations"), by conducting a "going-out-of-business," "store closing," or similar theme sales (the "Sale") at the Stores, and (b) subject to Merchant's exercise of its option pursuant to Section 15 hereof, disposing of Merchant's owned furniture, fixtures and equipment (the "Owned FF&E") located at the Closing Locations, subject to the terms and conditions set forth herein; and

**WHEREAS,** Agent is willing to serve as Merchant's exclusive agent to conduct the Sale and to dispose of the Owned FF&E (subject to Merchant's exercise of its option pursuant to Section 15 hereof), in accordance with the terms and conditions of this Agreement.

**NOW THEREFORE,** in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Merchant and Agent hereby agree as follows:

Section 1.

1.1     Defined Terms. The terms set forth below are defined in the Sections referenced of this Agreement:

| Defined Term | Section Reference |
|---|---|

| | |
|---|---|
| Adjustment Amount | Section 3.3(b) |
| Agency Accounts | Section 3.3(d) |
| Agency Documents | Section 11.1(b) |
| Agent | Preamble |
| Agent Claim | Section 12.5 |
| Agent's Fee | Section 3.1(b) |
| Agent's Security Interest | Section 16.12 |
| Agreement | Preamble |
| Approval Order | Section 10(d) |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Base Retail Price | Section 5.3(a) |
| Benefits Cap | Section 4.1(c) |
| Bid Deposit | Section 3.3(a) |
| Bidding Procedures Order | Section 10(d) |
| Bid Protections | Section 16.13(b) |
| Break-Up Fee | Section 16.13(b) |
| Central Services Expenses | Section 4.1 |
| Closing Locations | Recitals |
| Competing Bid | Section 16.13 |
| Cost Factor | Section 3.1(d) |
| Cost Factor Threshold | Section 3.1(d) |
| Cost File | Section 3.1(a) |
| Cost Value | Section 3.1(a) |
| Defective Merchandise | Section 5.2(b) |
| Designated Merchant Accounts | Section 3.3(d) |
| Distribution Center Merchandise | Section 5.2(b) |
| Distribution Centers | Recitals |
| Event of Default | Section 14 |
| Estimated Guaranteed Amount | Section 3.3(b) |
| Excluded Benefits | Section 4.1 |
| Excluded Pricing Adjustment | Section 5.3(b) |
| Expense L/C | Section 4.2 |
| Expense Reimbursement | Section 16.13(b) |
| Expenses | Section 4.1 |
| Final Inventory Report | Section 3.3(b) |
| Final Reconciliation | Section 3.4 |
| FF&E | Section 15 |
| FF&E Election | Section 15 |
| Guaranty Percentage | Section 3.1(a) |
| Global Inventory Adjustment | Section 5.3(b) |
| Guaranteed Amount | Section 3.1(a) |

| | |
|---|---|
| Guaranty L/C | Section 3.3(c) |
| Greige Goods | Section 5.2(b) |
| Gross Rings | Section 6.3 |
| Incentive Bonus | Section 9.4 |
| Initial Guaranty Payment | Section 3.3(b) |
| Inventory Completion Date | Section 5.1 |
| Inventory Date | Section 5.1 |
| Inventory Taking | Section 5.1 |
| Inventory Taking Instructions | Section 5.1 |
| Inventory Taking Service | Section 5.1 |
| Lowest Location Price | Section 5.3(c) |
| Merchandise | Section 5.2(a) |
| Merchandise Ceiling | Section 3.1(c) |
| Merchandise Threshold | Section 3.1(c) |
| Merchant | Preamble |
| Merchant Consignment Goods | Section 5.6 |
| Non-Saleable RTV Merchandise | Section 5.2(b) |
| Occupancy Expenses | Section 4.1 |
| On-Order Merchandise | Section 5.2(b) |
| Owned FF&E | Recitals |
| Proceeds | Section 7.1 |
| PLU | Section 5.3(a) |
| Raw Materials | Section 5.2(b) |
| Recovery Amount | Section 3.1(b) |
| Remaining Merchandise | Section 3.2 |
| Retail Price | Section 5.3 |
| Retained Employee | Section 9.1 |
| Retention Bonus | Section 9.4 |
| Sale | Recitals |
| Sale Commencement Date | Section 6.1 |
| Sale Guidelines | Section 8.1 |
| Sale Term | Section 6.1 |
| Sale Termination Date | Section 6.1 |
| Saleable RTV Merchandise | Section 5.2(b) |
| Sales Taxes | Section 8.3 |
| Seconds | Section 5.2(b) |
| Sharing Threshold | Section 3.1(b) |
| Special Order Merchandise | Section 5.2(b) |
| Store Receipt Deadline | Section 5.3(a) |
| Stores | Recitals |
| Third Party | Section 4.1 |
| Thirds | Section 5.2(b) |
| Vacate Date | Section 6.2 |
| WARN Act | Section 9.1 |

Wells Fargo      Section 3.3(a)
WIP        Section 5.2(b)

1.2  <u>Exhibits</u>. The Exhibits and Schedules annexed to this Agreement, as listed below, are an integral part of this Agreement:

| Exhibit | Section | Description |
| --- | --- | --- |
| Exhibit 1A | Recitals | Store List |
| Exhibit 1B | Recitals | Distribution Center |
| Exhibit 3.1(c) | Section 3.1(c) | Guaranty Percentage Adjustment Schedule |
| Exhibit 3.1(d) | Section 3.1(d) | Cost Factor Adjustment |
| Exhibit 3.3(a) | Section 3.3(a) | Initial Guaranty Payment Account |
| Exhibit 3.3(c) | Section 3.3(c) | Form of Guaranty L/C |
| Exhibit 4.1(a) | Section 4.1(a) | Occupancy Expense Schedule |
| Exhibit 4.2(a) | Section 4.2(a) | Form of Expense L/C |
| Exhibit 5.1 | Section 5.1 | Inventory Taking Instructions |
| Exhibit 8.1 | Section 8.1 | Sale Guidelines |
| Exhibit 11.1 (l) | Section 11.1(l) | Promotional Calendar |

1.3  <u>Currency</u>. Unless otherwise specified, all references to monetary amounts refer to United States dollars.

<u>Section 2</u>.  <u>Appointment of Agent</u>. Merchant hereby appoints Agent, and Agent hereby agrees to serve, as Merchant's exclusive agent for the limited purpose of conducting the Sale and disposing of the Owned FF&E in accordance with the terms and conditions of this Agreement. Merchant's obligations hereunder are expressly subject to the issuance of the Approval Order.

<u>Section 3</u>.  <u>Guaranteed Amount and Other Payments</u>

3.1  <u>Payments to Merchant and Agent</u>.

(a)  As a guaranty of Agent's performance hereunder, Agent guarantees that Merchant shall receive the sum of (i) eighty-six percent (86%) (the "<u>Guaranty Percentage</u>") of the aggregate Cost Value of the Merchandise included in the Sale (the "<u>Guaranteed Amount</u>"). As used in this Agreement "<u>Cost Value</u>" shall mean, with respect to each item of Merchandise, the lower of (x) Merchant's actual cost and (y) Merchant's cost of such item as reflected in the UPC file for such item as set forth in the Column labeled "Avg Cost" on Merchant's inventory item master cost file entitled "IO1a Retail_Online Inventory Value Report_03.21.2015.xls" (together with all updated files received by Agent on or prior to the Sale Commencement Date, the "<u>Cost File</u>").

4

(b)     To the extent that Proceeds exceed the sum of: (x) the Guaranteed Amount, (y) Expenses of the Sale, and (z) six percent (6%) of the aggregate Cost Value of the Merchandise (the "Agent's Fee") (the sum of (x), (y) and (z), the "Sharing Threshold"), then all remaining Proceeds of the Sale above the Sharing Threshold shall be shared sixty percent (60%) to Merchant and forty percent (40%) to Agent. All amounts, if any, to be received by Merchant from Agent in excess of the Sharing Threshold shall be referred to as the "Recovery Amount". Agent shall pay to Merchant the Guaranteed Amount and the Recovery Amount, if any, in the manner and at the times specified in Section 3.3 below.  The Guaranteed Amount and the Recovery Amount will be calculated based upon the aggregate Cost Value of the Merchandise as determined by (A) the final certified report of the Inventory Taking Service after verification and reconciliation thereof by Agent and Merchant, and (B) the aggregate amount of Gross Rings (as adjusted for shrinkage per this Agreement), if applicable, and (C) the aggregate amount of any On-Order Merchandise received in the Stores after the completion of the Inventory Taking at such Stores.

(c)     The Guaranty Percentage set forth in Section 3.1 is based upon Merchant's representation that the  aggregate Cost Value of the Merchandise is not less than $6 million (the "Merchandise Threshold") and not greater than $7.5 million (the "Merchandise Ceiling"), in the event the aggregate Cost Value of the Merchandise is less than the Merchandise Threshold or greater than the Merchandise Ceiling, the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1 (c).

(d)     The Guaranty Percentage is also based upon the parties' assumption that the aggregate Cost Value of the Merchandise included in the Sale is not greater than thirty-two percent (32.0%) (the "Cost Factor Threshold") of the Retail Price of the Merchandise included in the Sale (the "Cost Factor").  In the event that the Cost Factor is greater than the Cost Factor Threshold, then such deviation shall not constitute a breach of any representation or warranty, or an Event of Default hereunder; provided, however, that the Guaranty Percentage shall be adjusted (in addition to any applicable adjustment hereunder) in accordance with Exhibit 3.1(d). Any adjustment to the Guaranty Percentage provided for under this Section 3.1(d) shall be cumulative with, and in addition to, any other adjustment provided for under this Agreement, including, without limitation, any adjustment provided for under Sections 3.1(c) hereof.

3.2     Payments to Agent.  Agent shall receive as its compensation for services rendered to Merchant, all remaining Proceeds of the Sale after payment of the Guaranteed Amount, the Recovery Amount, if any, and all Expenses.  All unsold Merchandise remaining, if any, in the Closing Locations at the Sale Termination Date ("Remaining Merchandise") shall become the property of Agent, free and clear of all liens, claims and encumbrances, provided, however, that Agent shall use its reasonable best efforts to sell all of the Merchandise during the Sale; provided, further, that Agent shall dispose of the Remaining Merchandise in a commercially reasonable manner and any proceeds received by Agent from the disposition of such Remaining Merchandise shall constitute Proceeds hereunder.

3.3     Time of Payments and Control of Proceeds

(a)     Upon execution of this agreement, Agent shall pay Merchant ten percent (10%) of the estimated Guaranteed Amount ("Bid Deposit") calculated based upon the estimated Cost Value of the Merchandise to be included in the Sale by wire transfer to the trust account for Merchant's counsel in accordance with instructions to be provided by Merchant. The Bid Deposit shall be held in the trust account until occurrence of the Sale Commencement Date, in which case it will be transferred to the Merchant's account designated in Exhibit 3.3(a) hereto which Merchant will provide within ten (10) days after execution of this agreement, which account shall be with Wells Fargo Bank. N.A. ("Wells Fargo") to be designated by Merchant and Wells Fargo. If the Agreement is terminated prior to the Sale Commencement Date, the funds shall be returned in accordance with the terms of this agreement.

(b)     After entry of the Approval Order and on the first business day prior to the Sale Commencement Date, Agent shall pay Merchant eighty percent (80%) of the estimated Guaranteed Amount (the "Initial Guaranty Payment"), calculated based upon the estimated aggregate Cost Value of the Merchandise to be included in the Sale as reflected on Merchant's books and records on the date immediately proceeding the Sale Commencement Date (the "Estimated Guaranteed Amount") by wire transfer to the account designated in Exhibit 3.3(a) hereto less any Bid Deposit previously paid to Merchant. The balance of the Guaranteed Amount, if any, or of the Estimated Guaranteed Amount, as and to the extent applicable, shall be paid by Agent to Merchant on the *earlier* of (i) the date that is thirty (30) days after the Sale Commencement Date (in which case payment shall be of the balance of the Estimated Guaranteed Amount) and (ii) the first business day following the issuance of the final audited report of the aggregate Retail Price of the Merchandise by the Inventory Taking Service, after verification thereof by Agent and Merchant (the "Final Inventory Report"). Agent's failure to pay the balance of the Guaranteed Amount, if any, or of the Estimated Guaranteed Amount, as and to the extent applicable, shall constitute a material breach of this Agreement and thereupon entitle Merchant to draw upon the Guaranty L/C to the extent of such remaining balance. The Inventory Taking shall be reconciled within fourteen (14) days after its completion (and Agent and Merchant shall use their reasonable best efforts to accomplish such reconciliation within such fourteen (14) day period). In the event there is any dispute with respect to the reconciliation of the aggregate Retail Price of the Merchandise following the Inventory Taking, then any such dispute shall be resolved in the manner and at the times set forth in Section 3.4(b) hereof. In the event that the Final Inventory Report is issued after payment of the Estimated Guaranteed Amount, Agent or Merchant, as the case may be, shall pay to Merchant or Agent, as the case may be, the amount (the "Adjustment Amount") by which the actual Guaranteed Amount exceeds or is less than the Estimated Guaranteed Amount actually paid as set forth above, within two (2) business days after the Final Inventory Report has been issued.

(c)     To secure payment of the balance of any unpaid portion of the Guaranteed Amount, the Recovery Amount, the Additional Recovery Amount, and any other amounts due from Agent to Merchant hereunder, Agent shall deliver to Merchant, naming Merchant and Wells Fargo as co-beneficiaries, a standby letter of credit in the original face amount equal to the unpaid twenty percent (20%) of the Estimated Guaranteed Amount, as and to the extent

applicable, as provided for in Section 3.3(b) above, substantially in the form of Exhibit 3.3(c) attached hereto (the "Guaranty L/C"). The Guaranty L/C shall be delivered to Merchant no later than one (1) business day prior to the Sale Commencement Date, shall be issued by a bank selected by Agent and reasonably acceptable to Wells Fargo, and shall contain terms, provisions and conditions mutually acceptable to Merchant, Wells Fargo, and Agent. The Guaranty L/C shall expire no earlier than sixty (60) days after the Sale Termination Date. Unless the parties shall have mutually agreed that they have completed the final reconciliation under this Agreement, then, at least thirty (30) days prior to the initial or any subsequent expiry date, Agent shall obtain and deliver to Merchant an amendment to the Guaranty L/C solely extending (or further extending, as the case may be) the expiry date by at least sixty (60) days. Agent's failure to deliver any required amendment to the Guaranty L/C shall constitute a material breach of this Agreement, and thereupon all amounts hereunder shall become immediately due and payable, and in addition to all other remedies available to Merchant or Wells Fargo hereunder, Merchant, shall be permitted to draw under the Guaranty L/C in payment of amounts owed. In the event that Agent, after receipt of five (5) days' notice (which notice shall not be required if Agent or any member of Agent shall be a debtor under Title 11, United States Code), fails to pay the Guaranteed Amount, or portion thereof, or other obligations hereunder when due, Merchant or Wells Fargo may draw on the Guaranty L/C in an amount equal to the unpaid past due, amount of the Guaranteed Amount or other obligations hereunder. Merchant and Agent agree that after payment of the unpaid portion of the Guaranteed Amount (whether the Estimated Guaranteed Amount or the Guaranteed Amount calculated pursuant to the Final Inventory Report) pursuant to Section 3.3(b), the face amount of the Guaranty L/C shall be reduced in an amount(s) to be agreed upon by Merchant, Wells Fargo and Agent.

(d)     Within ten (10) business days after the Sale Commencement Date, Agent may establish its own bank accounts, dedicated solely for the deposit of Proceeds and the disbursement of amounts payable by Agent hereunder, which accounts may be the Designated Merchant Accounts so long as Merchant, Agent and Wells Fargo agree (the "Agency Accounts"). Merchant shall, promptly upon Agent's request, execute and deliver all necessary documents to open and maintain the Agency Accounts. Agent shall exercise sole signatory authority and control with respect to the Agency Accounts; provided however, upon request, Agent shall deliver to Merchant copies of all bank statements and other information relating to such accounts. Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all bank fees and charges, including wire transfer charges, related to the Agency Accounts and or Designated Merchant Accounts, whether received during or after the Sale Term. Upon Agent's designation of the Agency Accounts, all Proceeds of the Sale (including credit card proceeds) shall be deposited into the Agency Accounts. During the period between the Sale Commencement Date and the date Agent establishes the Agency Accounts, all Proceeds of the Sale (including credit card proceeds), shall be collected by Agent and deposited on a daily basis into Merchant's existing accounts designated for the Stores (the "Designated Merchant Accounts"). Commencing on the first business day following the payment of the Initial Guaranty Payment and the posting of the Guaranty L/C and the Expense L/C, and on each business day thereafter (or as soon thereafter as is practicable), Merchant shall promptly pay to Agent by wire transfer all collected funds constituting Proceeds deposited in such accounts (but

7

not any other funds, including, without limitation, any proceeds of Merchant's inventory sold prior to the Sale Commencement Date, or collections of accounts receivable at the Store level, if any). During this interim period, Agent shall control the Proceeds of the Sale, and Merchant shall not take any action with respect to such Proceeds deposited into the Designated Merchant Accounts.

(e)     To the extent that the Final Reconciliation provided for in Section 3.4 below shows that the amount of the Guaranty Payment exceeds the amount due Merchant in respect of the Guaranteed Amount, Merchant (and Wells Fargo, but only to the extent it has received proceeds of the Guaranty Payment) shall cause any overpayment to be promptly refunded to Agent.

3.4     Final Reconciliation.  (a) Within thirty (30) days after the Sale Termination Date, Agent and Merchant, in consultation with Wells Fargo, shall jointly prepare a final reconciliation of the Sale including, without limitation, a summary of Proceeds, Sales Taxes, Expenses, and any other accountings required hereunder (the "Final Reconciliation"). Within five (5) days of completion of the Final Reconciliation, any undisputed and unpaid Expenses shall be paid from Proceeds or, if there are insufficient Proceeds deposited by Agent with Merchant, by Agent. In the absence of an order of the Bankruptcy Court, no disputed amount(s) shall be paid until the dispute has been resolved by agreement of the parties or as determined in the manner prescribed in Section 3.4(b) hereof. During the Sale Term, and until all of Agent's obligations under this Agreement have been satisfied, Merchant and Agent shall have reasonable access to Merchant's and Agent's records with respect to Proceeds, Sales Taxes and Expenses to review and audit such records. Merchant and Agent hereby agree to submit to the jurisdiction of the Bankruptcy Court for such determination.

(b)     In the event that there is any dispute with respect to the Final Reconciliation, such dispute shall be promptly (and in no event later than the third business day following the request by either Merchant or Agent) submitted to the Bankruptcy Court for a determination.

Section 4.     Expenses of the Sale.

4.1     Expenses. Except as otherwise provided herein, Agent shall be unconditionally responsible for all Expenses incurred in conducting the Sale during the Sale Term. "Expenses" shall mean all Stores operating expenses of the Sale which arise during the Sale Term at the Stores and the Distribution Center (where applicable), limited to the following (unless otherwise specified herein):

(a)     Occupancy Expenses, on a per Store, per diem basis in an amount *equal to* the per diem amounts set forth on Exhibit 4.1(a) annexed hereto;

8

(b)    Payroll for Retained Employees in the Stores used in conducting the Sale, for the actual days worked (or in the case of hourly employees, the hours worked) in connection with the Sale, including 50% of the costs of the hours worked during the Inventory Taking;

(c)    Any amounts payable or accrued, whether directly or indirectly, by Merchant for benefits for Retained Employees (including, but not limited to, FICA, unemployment taxes, workers' compensation and health care insurance benefits, pension 401-K benefits, holiday and vacation pay, and payment for sick days, but excluding Excluded Benefits), for Retained Employees used in the Sale, subject to actual expenses per retained Employee capped at up to fifteen percent (15%) of the base payroll for each Retained Employee ("Benefits Cap");

(d)    Actual and reasonable costs of Agent's on-site supervision, supervisor travel and supervisor bonuses;

(e)    Interior and exterior signs and banners which are produced for the Sale;

(f)    Promotional costs, including, without limitation, advertising, and direct mail, and any advertising medium produced for the Sale;

(g)    The costs and expenses of obtaining additional supplies as may be required by Agent to conduct the Sale;

(h)    Telephone charges, leased line charges, postage/overnight or delivery/courier charges;

(i)    Credit card and bank card fees (including processing fees), chargebacks and discounts;

(j)    Freight costs of moving, transferring or consolidating Merchandise between the Stores and from the Distribution Center to the Stores;

(k)    A pro rata share of Merchant's casualty, property, general liability and workers' compensation insurance premiums attributable to the Closing Locations;

(l)    Trash removal and ordinary course third party cleanings;

(m)    Closing Location security and building alarm services;

(n)    Fifty percent (50%) of the cost of the Inventory Taking by the Inventory Taking Service and fifty percent (50%) of the payroll costs incurred during the Inventory Taking;

(o)    Agent's actual cost of capital and letter of credit fees and reasonable legal fees and expenses and insurance;

9

(p)     Armored car fees;

(q)     Bank fees;

(r)     Central Services Expenses in amount equal to $5,000 per week during the Sale Term;

(s)     Retention Bonuses for Retained Employees as provided for in Section 9.4 hereof; and

(t)     Third-Party payroll processing fees.

"Expenses" shall not include: (i) Central Service Expenses in excess of $5,000 per week; (ii) Excluded Benefits; (iii) any rent or other occupancy expenses other than Occupancy Expenses in accordance with Section 4.1(a) hereof; and (iv) any costs, expenses or liabilities arising during the Sale Term, other than the Expenses listed above, all of which shall be paid by Merchant promptly when due during the Sale Term. There will be no double payment of Expenses to the extent Expenses appear or are contained in more than one Expense category.

As used herein, the following terms have the following respective meanings:

"Central Services Expenses" means costs and expenses for Merchant's central administrative services necessary for the Sale, including, but not limited to, MIS services, inventory processing and handling and data processing and reporting, payroll processing (other than third party payroll processing already included as an Expense under Section 4.1(t) hereof), sales audit functions, and all services required for the Sale at the Closing Locations to the extent such services are normally provided by Merchant in house.

"Excluded Benefits" means employee benefit in excess of the Benefits Cap.

"Occupancy Expenses" means rent (including, base rent and any portion of percentage rent specifically allocable to the period of the Sale Term on an annualized basis), cost or expense under any real property lease, mortgage, or real estate agreement (including any expired or month to month lease under which Merchant continues to operate), HVAC, CAM, real estate and use taxes, Merchant's association dues and expenses, cash register maintenance, building maintenance, pet control, landscaping, utilities, and rental for furniture, fixtures and equipment.

"Third party" means, with reference to any Expenses to be paid to a "third party", a party which is not affiliated with or related to Merchant.

4.2     Payment of Expenses; Security.

(a)    All Expenses incurred during each week of the Sale (*ie.*, Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant, or offset from Proceeds held by Merchant, immediately following the weekly Sale reconciliation by Merchant and Agent pursuant to Section 8.7, based upon invoices and other documentation reasonably satisfactory to Agent; except with respect to Occupancy Expenses, which shall be funded weekly, in advance by Agent during the Sale Term. To secure Agent's obligations to pay Expenses, Agent shall deliver to Merchant an irrevocable and unconditional standby letter of credit (substantially in the form of Exhibit 4.2(a)) ("Expense L/C") in an original face amount equal to three (3) weeks' estimated Expenses, naming Merchant as beneficiary. The Expense L/C shall be delivered to Merchant no later than one (1) business day after the Sale Commencement Date, and shall be issued by a U.S. national bank selected by Agent and reasonably acceptable to Merchant and Wells Fargo.

(b)    In the event that Agent fails to pay any Expense(s) when due, or within three (3) business days after Merchant notifies Agent that any Expense(s) is/are unpaid and past due, or in the event the Expense L/C shall be set to expire within three (3) business days and certain Expenses remain unpaid, Merchant shall be entitled to draw on the Expense L/C to fund such unpaid amount(s). The Expense L/C shall expire not earlier than the date that is sixty (60) days after the Sale Termination Date.

Section 5.    Inventory Valuation; Merchandise.

5.1    Inventory Taking. Commencing on the Sale Commencement Date, Merchant and Agent shall cause to be taken an UPC and a Retail Price physical inventory of the Merchandise located in the Stores (the "Inventory Taking"), and shall use reasonable efforts to have such Inventory Taking completed in all of the Closing Locations no later seven (7) days after the Sale Commencement Date (the "Inventory Completion Date", and the date of the Inventory Taking at each Closing Location being the "Inventory Date" for each such Closing Location). Merchant and Agent shall jointly employ RGIS or another mutually acceptable independent inventory taking service (the "Inventory Taking Service") to conduct the Inventory Taking. The Inventory Taking shall be conducted in accordance with the procedures and instructions attached hereto as Exhibit 5.1, which shall be initialed on each page by a representative of Merchant and Agent prior to dissemination to the Closing Locations (the "Inventory Taking Instructions"). As an Expense, Agent shall be responsible for 50% of the fees and expenses of the Inventory Taking Service. The balance of such fees and expenses shall be paid by Merchant. Except as provided in the immediately preceding sentence and in Section 4.1(b) hereof, Merchant and Agent shall each bear their respective costs and expenses relative to the Inventory Taking. Merchant and Agent may each have representatives present during the Inventory Taking, and shall each have the right to review and verify the listing and tabulation of the Inventory Taking Service. Merchant agrees that during the conduct of the Inventory Taking in each of the Closing Locations, the applicable Closing Location shall be closed to the public and no sales or other transactions shall be conducted.

5.2    Merchandise Subject to this Agreement. (a) For purposes of this Agreement, including, without limitation, the calculation of the Guaranteed Amount and the Recovery

Amount, if any, "Merchandise" shall mean: (i) all finished goods inventory that is owned by Merchant located in the Stores on the Sale Commencement Date (including, but not limited to, (A) Defective Merchandise, (B) Seasonal Merchandise including Out of Season Merchandise and (C) Merchandise subject to Gross Rings), (ii) Distribution Center Merchandise, (iii) On-Order Merchandise, (iv) Special Order Merchandise which is not picked up by customers prior to the Special Order Pick-Up Date; and (v) Saleable RTV Merchandise.  Notwithstanding the foregoing, "Merchandise" shall not include: (1) goods which belong to sublessees, licensees or concessionaires of Merchant; (2) goods held by Merchant on memo, on consignment, or as bailee; (3) Non-Saleable RTV Merchandise; (4) furnishings, trade fixtures furniture and equipment and improvements to real property which are located in the Closing Locations; (5) Raw Materials, Greige Goods, WIP, Seconds and Thirds.

      (b)      As used herein, the following terms shall have the respective meanings set forth below:

"Defective Merchandise" means any item of finished goods Merchandise identified and agreed upon by Merchant and Agent during the Inventory Taking as defective in that it is worn, scratched, broken, faded, torn, mismatched, tailored or affected by other similar defenses rendering it not first quality.  Sample Merchandise and Merchandise on display shall not per se be deemed to be Defective Merchandise.  Agent and Merchant shall mutually agree upon the value of these items and segregate them during the Inventory Taking.

"Distribution Center Merchandise" means all items of finished goods merchandise owned by Merchant and located at the Distribution Centers, or in transit from the Distribution Centers to the Stores on the Sale Commencement Date.

"Special Order Merchandise" means all items of Merchandise held at the Stores for customer-specific special orders for goods, in each case pursuant to binding agreements, invoices or other legal documentation, where (a) the documentation is clear as to the name, address, telephone number, date of last payment and balance due from the customer, and (b) the goods subject to special order are properly identified, segregated, and in a condition as described in the documentation on order Merchandise means any item of Merchandise for which Merchant had issued a purchase order prior to the Closing Date, which order has not been previously cancelled by Merchant with respect to vendors but has not been received by the Stores on or before the Closing Date.

"Non-Saleable RTV Merchandise" shall mean any item of merchandise located in the Closing Locations that has been designated by Merchant as "return to vendor" goods, which items of merchandise are either (i) so damaged or defective so as to render such item inoperable and no longer fit for the purpose for which it was intended by the manufacturer; or (ii) so damaged or defected that the sale of such item would be in violation of applicable state or federal law.

"On-Order Merchandise" means all items of merchandise, which have previously been ordered by Merchant in the ordinary course of business, which items have not been received in the Distribution Centers or the Stores on or before the Sale Commencement Date.

"Saleable RTV Merchandise" means items of merchandise that are located in the Closing Locations that has been designated by Merchant as "return to vendor" merchandise, which items of merchandise do not constitute Non-Saleable RTV Merchandise.   Agent   and Merchant shall mutually agree upon the value of these items and segregate them during the Inventory Taking.

"Raw Materials" means goods purchased from suppliers without additional alteration by Merchant and its production vendors.  Examples include material, buttons, zippers, labels, hang tags, etc.

"Greige Goods" means items manufactured for Merchant for current or previous seasons that are fully assembled but have not been dyed.

"WIP" means items that have been partially manufactured for Merchant but have not completed the production process.  This includes both Cut and Sew and Dye WIP.

"Seconds" mean items received from production vendors that do not meet Merchant's quality standards but could be saleable as complete garments through Merchant's distribution channels.

"Thirds" mean items received from production vendors that do not meet Merchant's quality standards and are not saleable as complete garments through Merchant's distribution channels.

5.3    Valuation.  (a) For purposes of this Agreement, "Retail Price" shall mean with respect to each item of Merchandise, other than On-Order Merchandise received in the Closing Locations after seven (7) days after the Sale Commencement Date (the "Store Receipt Deadline"), the lower of the lowest ticketed price, UPC price, or Merchant's Price Look-up ("PLU") file applicable to such location for such period (the "Base Retail Price"); provided however, Excluded Pricing Adjustments shall not be taken into account in determining the Base Retail Price.  With respect to On-Order Merchandise that is received in the Closing Locations after the Store Receipt Deadline but before the Merchandise Removal Deadline, "Retail Price" shall mean the Base Retail Price for such item applicable to the Store in which such item was received, multiplied by the inverse of the prevailing discount in effect in such receiving Store in the same category as such late arriving On-Order Merchandise.

(b)    The Retail Price of any item of Merchandise shall be determined as provided for by this Agreement and in accordance with the Inventory Taking Instructions set forth in Exhibit 5.1.  For the purposes of this Agreement, "Excluded Pricing Adjustments" shall

mean the following discounts or price adjustments offered by Merchant during the applicable period: (i) point-of-sale discounts or similar adjustments, *regardless of duration*; (ii) employee discounts; (iii) member or customer appreciation points or coupons; (iv) multi-unit purchase discounts; (v) adjustments for damaged or defective or "as-is" items; (vi) coupons, catalog, colored sticker discounts, website, or circular prices, buy, one get one type discounts; and (vi) customer savings pass discounts or bounce back coupons, or discounts for future purchases based on dollar value of past purchases, or similar customer specific, temporary, or employee non-product specific discounts or pricing accommodations.

(c)     In the event of a conflict between this Agreement and the Inventory Taking Instructions, the terms of this Agreement shall control.  The Retail Price of any item of Merchandise shall exclude all Sales Taxes, and Merchant represents that the ticketed prices of items of Merchandise at the Stores do not and shall not include any Sales Taxes.  Provided no Excluding Pricing Adjustments are made, if an item of Merchandise has more than one ticketed price, or if multiple items of the same UPC are ticketed, at different prices, or have a different UPC or PLU price, the lowest ticketed, marked, UPC or PLU price on any such item shall prevail for such item or for all such items within the same UPC (as the case may be, the "Lowest Location Price"), as the case may be, that are located within the same location, unless it is reasonably determined by Merchant and Agent that the applicable Lowest Location Price was mismarked or such item was priced because it was damaged or marked as "as is", in which case the higher price shall control; provided however, in determining the Lowest Location Price with respect to any item of Merchandise at a Store, the Lowest Location Price shall be determined based upon the lowest ticketed, marked, UPC, or PLU price for such item on a per Store basis. No adjustment to Retail Price shall be made with respect to different ticketed price, marked price, UPC or PLU prices for items located in different Stores.

5.4     Distribution Center(s) Operating and Transfer Costs.    Merchant shall use commercially reasonable efforts to deliver, at Merchant's expense such On-Order Merchandise and Distribution Center Merchandise to the Stores as Agent shall designate, it being expressly understood that all Merchandise shall be removed from the Distribution Center on or before the date that is the twenty-one (21) days after the Sale Commencement Date.  Agent shall be responsible solely for the cost of the freight for the first fourteen days after Commencement Date, and shall not be responsible for any other costs or expenses, including without limitation, payroll and occupancy expenses, for the Distribution Center, in connection with the removal of all remaining merchandise during the first fourteen days after Commencement Date.  However beginning on the fifteenth day and continuing until the last of the Merchandise is removed, Agent, in addition to being responsible for all freight costs, shall reimburse Merchant for actual payroll used and occupancy costs as outlined in Exhibit 4.1 for the Gardena, CA warehouse; provided however that all Distribution Center Merchandise and On-Order Merchandise shall be removed from the Distribution Center on or before the Merchandise Removal Deadline.  For the avoidance of doubt, Agent shall not be required to have all Merchant Consigned Goods removed by the Merchandise Removal Deadline.  Merchant and Agent shall work together from the execution of this agreement until the Sale Commencement Date on the replenishment of the Stores.

14

5.5     Excluded Goods.  Merchant shall retain all rights and responsibility for any goods not included as "Merchandise" hereunder.

5.6     Merchant Consigned Goods.  Agent will assist Merchant in selling the Raw Materials, Greige Goods, WIP, Seconds and Thirds on a consignment basis ("Merchant Consignment Goods").  Merchant shall retain eighty-five percent (85%) of the gross proceeds of the sales of these goods, and Agent shall retain fifteen percent (15%) of the gross proceeds of the sales of these goods.

Section 6.     Sale Term.

6.1     Term.  The Sale shall commence at the Stores on May 15, 2015 (the "Sale Commencement Date").  Subject to any restrictions that may exist by virtue of applicable law or regulation, Agent shall complete the Sale at each Store, and shall vacate each Store's premises in favor of Merchant or its representative or assignee on or before August 31, 2015 (the "Sale Termination Date").  The period from the Sale Commencement Date to the Sale Termination Date shall be referred to herein as the "Sale Term".   Subject to applicable law or regulation (except as may otherwise be provided in the Approval Order), the Sale Termination Date may be (a) extended by mutual written agreement of Agent and Merchant; or (b) accelerated by Agent, in which case Agent shall provide Merchant with not less than seven (7) days advance written notice of any such planned accelerated Sale Termination Date.

6.2     Vacating the Stores.  Subject to the terms of Section 6.1 hereof, Agent shall provide Merchant with not less than ten (10) days advance written notice of its intention to vacate any Store (as to each Store, the "Vacate Date").  On the Vacate Date, Agent shall vacate in favor of Merchant or its representatives or assignee, remove all Remaining Merchandise and leave the Stores in "broom clean" condition (ordinary wear and tear excepted).   Agent's obligation to pay the Expenses set forth in Section 4.1 for each Store shall continue until the later of (a) the applicable Vacate Date for such Store or (b) the fifteenth (15) day of the calendar month in which the Vacate Date occurs to the extent that the Court does not approve under the Approval Order Merchant's request to limit Merchant's obligations to pay rent under such Store leases on a per diem basis through the effective rejection date only;  provided however, to the extent applicable,  during the period between the Vacate Date and the fifteenth (15th) day of the calendar month during which the Vacate Date occurs, Agent's obligation to pay Expenses shall be limited to payment of Occupancy Expenses.  All assets of Merchant used by Agent in the conduct of the Sale (e.g. FF&E, supplies, etc.) shall be returned by Agent to Merchant or left at the Stores' premises at the end of the Sale Term to the extent the same have not been used in the conduct of the Sale or have not been otherwise disposed of through no fault of Agent.  Where reference is made in this Section 6 to vacating the Stores, such shall mean vacating the Stores in favor of Merchant, its representatives or assignee and shall not mean vacating possession or disclaimer of lease in favor of the landlord or owner of the Store premises.

6.3     Gross Rings.  In the event that the Sale commences prior to the completion of the Inventory Taking at any Closing Location, then for the period from the Sale Commencement Date until the Inventory Date for such Closing Location, Agent and Merchant shall jointly keep (i) a strict count of gross register receipts less applicable Sales Taxes ("Gross Rings"), and (ii) cash reports of sales within such Stores.  Register receipts shall show, for each item sold, the Retail Price for such item and the markdown or discount, if any, specifically granted by Agent in connection with such Sale.  All such records and reports shall be made available to Agent and Merchant during regular business hours upon reasonable notice.  Agent shall pay that portion of the Guaranteed Amount calculated on the Gross Rings basis, to account for shrinkage, on the basis of 101% of sales (without taking into account any point of sale discounts or point of sale markdowns) during the Gross Rings period.

Section 7.     Sale Proceeds.

7.1     Proceeds.  For purposes of this Agreement, "Proceeds" shall mean the aggregate of (a) the total amount (in dollars) of all sales of Merchandise made under this Agreement, exclusive of Sales Taxes, and specifically excluding (i) proceeds from Merchant's sale of merchandise prior to the Sale Commencement Dates, such as special order goods; and (ii) collections of accounts receivable at the Store level, if any; and (b) all proceeds of Merchant's insurance for loss or damage to Merchandise or loss of cash arising from events occurring during the Sale Term.  Proceeds shall also include any and all proceeds received by Agent from the disposition, in a commercially reasonable manner, of Remaining Merchandise at the end of the Sale whether through salvage, bulk sale or otherwise.

7.2     Credit Card Proceeds.  Agent shall use its reasonable best efforts to establish its own merchant identification numbers under Agent's name to enable Agent to process all credit card sales for Agent's account within ten (10) days after the Sale Commencement Date.  Until such time as Agent establishes its own identification numbers, if applicable, during the Sale Term, Agent may use Merchant's credit card facilities (including Merchant's credit card terminals and processor(s) and credit card processor coding) for credit card sales; provided however Agent shall not accept Merchant's proprietary credit card; provided further however, until such time as Agent establishes its own identification numbers, if applicable, Agent shall also have the right to use Merchant's identification number(s) and existing bank accounts, to process credit card sales.  Merchant shall process credit card transactions, applying customary practices and procedures.  Merchant shall cooperate with Agent to down-load data from all credit card terminals each day during the Sale Term and to effect settlement with Merchant's credit card transactions under Merchant's merchant identification number(s).  Until such time as Agent establishes its own merchant identification numbers, if applicable, Merchant shall deposit the net settlement received from any credit card sales receipts into the Designated Merchant Accounts.  Merchant shall prepare a weekly reconciliation of the amounts deposited into the Designated Merchant Accounts in respect of the sales of Merchandise by credit card, and of the Sales Taxes attributable to such sales, less credit card and bank card fees, chargebacks and service charge adjustments, returns allowances and customer credits.  Merchant shall not be responsible for

16

paying and Agent shall pay as an Expense hereunder, all credit card fees and chargebacks related to the Sale, whether received during or after the Sale Term.

7.3    Petty Cash.    In addition to the Guaranteed Amount, Agent shall reimburse Merchant on and as of the start of business on the Sale Commencement Date for all cash in the Stores.

Section 8.    Conduct of the Sale.

8.1    Rights of Agent.    Subject to applicable federal, state, local and provincial law and the terms of the applicable Stores' leases, mortgages, or other occupancy agreements, and subject to Agent's satisfaction of any applicable licensing or registration requirements, except as may otherwise be provided in the Approval Order, Agent shall be permitted to conduct the Sale as a "going-out-of-business," "store closing," or similar theme sale in the Stores throughout the Sale Term in a manner consistent with the sale guidelines annexed hereto as Exhibit 8.1 (the "Sale Guidelines"). In addition to any other rights granted to Agent hereunder, in conducting the Sale, Agent, in the exercise of its discretion, shall have the right:

(a)    for each Store, to establish Store hours which are consistent with the terms of applicable leases, mortgages or other occupancy agreements, and local laws or regulations, including, without limitation, Sunday closing laws and to establish Sale prices;

(b)    to use without charge (except to the extent provided otherwise herein) during the Sale Term all FF&E, bank accounts, Store-level customer lists and mailing lists, computer hardware and software, existing supplies located at the Stores, intangible assets (including Merchant's name, logo and tax identification numbers), Stores keys, case keys, security codes, and safe and safe combinations required to gain access to and operate the Stores, and any other assets of Merchant located at the Stores (whether owned, leased, or licensed) consistent with applicable terms of leases or licenses. Agent shall exercise due care and return to Merchant immediately at the end of the Sale all materials and supplies except materials or supplies expended;

(c)    to use Merchant's central office facilities, central administrative services and personnel to process payroll, perform MIS and provide other central office services necessary for the Sale to the extent that such services are normally provided by Merchant in house, at no cost to Agent, subject to Agent's payment of Central Service Expenses in accordance with Section 4.1; provided, however, that in the event Agent expressly requests Merchant to provide services other than those normally provided to the Stores and relating to the sale of Merchandise by Merchant in the ordinary course of business and as expressly contemplated by this Agreement, and Merchant shall agree, in its sole and absolute discretion to provide such services (it being understood that Merchant shall be under on obligation to do so), Agent shall be responsible to reimburse Merchant for the actual incremental cost of such services incurred by Merchant as an Expense of the Sale hereunder;

(d)     to establish and implement advertising, signage (including banners), and promotion programs consistent with a "going-out-of-business," "store closing," or similar theme sale, and as otherwise provided in the Approval Order and the Sale Guidelines (including, without limitation, by means of media advertising, banners, A-frame, and similar signage);  and

(e)     to transfer Merchandise between the Distribution Center and the Stores; provided however the Inventory Taking Instructions shall incorporate a procedure to ensure that all Merchandise that is in transit between and among the Stores and Distribution Center, as the case may be, shall be properly accounted for and included in the Inventory Taking.

8.2     Terms of Sales to Customers, Law Compliance.

(a)     Subject to Agent's compliance with applicable law, all sales of Merchandise will be "final sales" and "as is" and all advertisements and sales receipts will reflect the same.  Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  All sales will be made only for cash, nationally recognized bank credit cards and, in Agent's discretion, personal checks, provided, however, if Agent determines to accept personal checks, Agent shall bear the risk of loss therefore (and the amount of such checks shall be deemed Proceeds hereunder, regardless of whether such checks actually clear).  Agent shall not accept any coupons or other promotional savings passes issued by Merchant prior to the Sale Commencement Date.

(b)     For the first thirty (30) days of the Sale Term, Agent shall accept Merchant's gift certificates, gift cards, Merchandise credits, and Merchandise certificates issued by Merchant prior to the Sale Commencement Date if Merchant requests that Agent to do so in writing prior to the Sale Commencement Date.  Merchant shall reimburse Agent in cash for such amounts during the weekly sale reconciliation provided for in Section 8.7.

(c)     Except as may otherwise be provided in the Approval Order, Agent shall comply with all applicable laws and regulations in its conduct of the Sale, including laws and regulations governing the advertising of the Sale, and Merchandise pricing.  If Agent fails to perform its responsibilities in accordance with this Section 8.2, Agent shall indemnify and hold harmless Merchant from and against any and all costs including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Merchant sustains or incurs as a result or consequence of the failure by Agent to comply with applicable laws and regulations.

8.3     Sales Taxes.  During the Sale Term, all sales, excise, gross receipts and other taxes attributable to sales of Merchandise as indicated on Merchant's point of sale equipment (other than taxes on income) payable to any taxing authority having jurisdiction (collectively, "Sales Taxes") shall be added to the sales price of Merchandise and collected by Agent, on Merchant's behalf, and deposited into Merchant's existing accounts, trust accounts or other accounts, as designated by Merchant.  Provided that Agent has collected all Sales Taxes during the Sale and remitted the proceeds thereof to Merchant, Merchant shall promptly pay all Sales Taxes and file all applicable reports and documents required by the applicable taxing authorities.

Merchant will be given access to the computation of gross receipts for verification of all such Sales Tax collections. Provided Agent performs its responsibilities in accordance with this Section 8.3, Merchant shall indemnify and hold harmless Agent from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Agent sustains or incurs as a result or consequence of the failure by Merchant to promptly pay such taxes to the proper taxing authorities and/or the failure by Merchant to promptly file with such taxing authorities all reports and other documents required, by applicable law, to be filed with or delivered to such taxing authorities. If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided Merchant complies with its obligations in accordance with this Section 8.3, Agent shall indemnify and hold harmless Merchant from and against any and all costs including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and/or, to the extent Agent is required hereunder to prepare reports and other documents, the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities.

     8.4    Supplies. Agent shall have the right to use all existing supplies necessary to conduct the Sale (*e.g.,* bags, twine,) but not gift certificates, rain checks, merchandise credits or the like, located at the Stores at no charge to Agent. In the event that additional supplies are required in any of the Stores during the Sale, the acquisition of such additional supplies shall be the responsibility of Agent as an Expense; provided, however, that Merchant shall assist Agent in obtaining supplies from Merchant's vendors at Merchant's cost.

     8.5    8.5    Returns of Merchandise.(a) Agent shall not accept returns of Merchandise sold by Merchant prior to the Sale Commencement Date.

     8.6    Sale Reconciliation. On each Wednesday during the Sale Term, commencing on the second Wednesday after the Sale Commencement Date, Agent and Merchant shall cooperate to reconcile Expenses, Gross Rings, and such other Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (*ie.,* Sunday through Saturday), all pursuant to procedures agreed upon by Merchant and Agent. Within thirty (30) days after the end of the Sale Term, Agent and Merchant shall complete a final reconciliation of the Sale, the written results of which shall be certified by representations of each of Merchant and Agent as a final settlement of accounts between Merchant and Agent.

     8.7.    Force Majeure. If any casualty, act of terrorism, or act of God prevents or substantially inhibits the conduct of business in the ordinary course at any Store, such Store and the Merchandise located at such Store shall, in Agent's discretion, be eliminated from the Sale and considered to be deleted from this Agreement as of the date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; provided, however, that (i) subject to the terms of Section 7.1, the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder, and (ii) the Guaranteed Amount shall be reduced to account for any Merchandise eliminated from the Sale which is not the subject of insurance proceeds.

**Section 9.**     Employee Matters.

9.1     Merchant's Employees.     Subject to Merchant's past practices, policies and procedures relating to the employment of its employees, Agent may use Merchant's Store-level employees in the conduct of the Sale to the extent Agent, in consultation with Merchant, deems expedient, and Agent, in consultation with Merchant, may select and schedule the number and type of Merchant's employees required for the Sale. Agent shall identify any such employees to be used in connection with the Sale (each such employee, a "Retained Employee") prior to the Sale Commencement Date. In consultation with Merchant, Agent shall identify any employees who will not be used in connection with the Sale prior to the Sale Commencement Date. Agent acknowledges that the selection and scheduling of Retained Employees and the decision to cease using Retained Employees in connection with the Sale shall be made with due regard to, but Agent shall not be obligated to comply with, Merchant's desire to minimize severance and termination costs to Merchant, and to the extent reasonably possible shall be made so as not to interrupt any statutory working notice, provided that Agent's ability to terminate the Sale at any Store under the terms of this Agreement shall not be impaired thereby. In that latter connection, Agent acknowledges that it has been advised by Merchant that Merchant has not provided certain of its employees with WARN Act notices prior to the execution and delivery of this Agreement. Retained Employees shall at all times remain employees of Merchant, and shall not be considered or deemed to be employees of Agent. Merchant and Agent agree that, except to the extent that wages and benefits of Retained Employees constitute Expenses hereunder, nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Excluded Benefits, termination type claims and obligations, or any other amounts required to be paid by statute or law; nor shall Agent become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees. Merchant shall not, without Agent's prior written consent, raise the salary or wages or increase the benefits for, or pay any bonuses or make any other extraordinary payments to, any of its employees in anticipation of the Sale or prior to the Sale Termination Date. Merchant has not terminated and shall not during the Sale Term terminate any employee benefits or benefit programs. It is understood and agreed that Agent's on-site supervisors shall not be employees of Merchant under any circumstances.

9.2     Termination of Employees.     Agent may in its discretion stop using any Retained Employee at any time during the Sale. In the event of termination of any Retained Employee, Agent will provide written notice to Merchant at least seven (7) days prior thereto, except for termination "for cause" (such as dishonesty, fraud or breach of employee duties), in which event no prior notice to Merchant shall be required, provided Agent shall notify Merchant as soon as practicable after such termination. From and after the date of this Agreement and until the Sale Termination Date, Merchant shall not transfer or dismiss employees of the Stores except "for cause" without Agent's prior consent (which consent shall not be unreasonably withheld). Notwithstanding any other provision hereof, Agent will indemnify Merchant with respect to any

claims by Retained Employees arising from Agent's gross negligence in its treatment of such Retained Employees.

9.3   Payroll Matters.   During the Sale Term, Merchant shall process and pay the base payroll and all related payroll taxes, worker's compensation, employment and unemployment insurance, and benefits for all Retained Employees in accordance with its usual and customary procedures.   Any additional personnel hired by Agent for the Sale shall not be deemed to be employees of Merchant, nor shall Merchant be obligated to process the payroll therefor or offer benefits to said additional personnel.

9.4   Employee Incentive Bonuses.   Agent shall pay as an Expense, incentive bonuses ("Incentive Bonuses") (which bonuses shall be inclusive of payroll taxes but as to which no benefits shall be payable), up to a maximum of ten percent (10%) of base payroll, to certain Retained Employees who do not voluntarily leave employment and are not terminated "for cause".   The amount of such Incentive Bonuses, which will be payable within thirty (30) days after the Sale Termination Date, shall be in an amount to be determined by Agent, in its sole discretion, and shall be processed through Merchant's payroll system.   Agent shall provide Merchant with a copy of Agent's Incentive Bonus plan within five (5) business days after the Sale Commencement Date.   Agent shall not utilize the Incentive Bonus as a mechanism to incentivize Retained Employees to act contrary to Merchant's best interests.

Section 10.   Conditions Precedent.   The willingness of Agent and Merchant to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by the applicable party:

(a)   All representations and warranties of Merchant and Agent hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and as of the Sale Commencement Date.

(b)   Agent hereby acknowledges that prior to the execution of this Agreement, Merchant has provided Agent reasonable access to all pricing and cost files, computer hardware, software and data files, inter-Stores transfer logs, markdown schedules, invoices, style runs and all other documents relative to the price, mix and quantities of inventory located at the Stores.

(c)   Agent hereby acknowledges that prior to the execution of the Agreement, and on the date immediately preceding the Inventory Date, Agent has had and shall have had the opportunity to inspect the Stores and the Merchandise.

(d)   On or before [May 1], 2015, the Bankruptcy Court shall have entered an order, inter alia, approving the Bid Protections and Expense Reimbursements set forth in Section 16.13 (a "Bidding Procedures Order"), and which Bidding Procedures Order shall be in form and substance reasonably satisfactory to Agent and Merchant;

21

(e)     The Bankruptcy Court shall have entered an order, in form and substance reasonably satisfactory to Agent and Merchant, approving Merchant's retention of Agent pursuant to this Agreement (the "Approval Order") on or before [May 13], 2015;

(f)     The Bankruptcy Court shall have entered one or more interim and/or final orders, inter alia, approving a debtor-in-possession financing or cash collateral facility sufficient, in the good faith opinion of Agent, to enable Merchant to perform its obligations under this Agreement during the Sale Term; and

(g)     Merchant and Wells Fargo shall have executed this Agreement in the space provided therefor.

Section 11.     Representations, Warranties and Covenants.

11.1     Merchant's Representations, Warranties and Covenants.  Merchant hereby represents, warrants and covenants in favor of Agent as follows:

(a)     Merchant (i) is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation; (ii) has all requisite corporate power and authority to own, lease and operate its assets and properties and to carry on its business as presently conducted; and (iii) is and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)     Subject to the issuance and entry of the Approval Order, (i) Merchant has the right, power and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this Agreement, the "Agency Documents") and to perform fully its obligations thereunder; (ii) no further consent or approval is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale; (iii) each of the Agency Documents has been duly executed and delivered by Merchant and constitutes the legal, valid and binding obligation of Merchant enforceable in accordance with its terms; (iv) no court order or decree of any federal, state, local, or provincial governmental authority or regulatory body is in effect that would prevent or materially impair, or is required for Merchant's consummation of, the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor, other than as shall be obtained prior to the Sale Commencement Date, except for any such consent the failure of which to be obtained could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder; and (v) other than for any consent as shall be obtained prior to the Sale Commencement Date, and those contracts or

agreements identified by Merchant to Agent on or prior to the Sale Commencement Date, if any, no contract or other agreement to which Merchant is a party or by which Merchant is otherwise bound will prevent or materially impair the consummation of the Sale and the other transactions contemplated by this Agreement.

(c)     Merchant owns and will own at all times during the Sale Term, good and marketable title to all of the Merchandise.  Merchant shall not create, incur, assume, or suffer to exist any security interest, lien or other charge or encumbrance upon or with respect to any of the Merchandise or the Proceeds, except for such pre-existing pre-petition liens and the security interests and liens of Wells Fargo.

(d)     Merchant has maintained its pricing files in the ordinary course of business consistent with historic practices, and prices charged to the public for goods (whether in-Store, by advertisement or otherwise) are the same in all material respects as set forth in such pricing files for the periods indicated therein, except to the extent that such pricing files do not reflect point of sale discounts taken by Merchant.

(e)     Merchant has not since April 3, 2015, and shall not up to the Sale Commencement Date, marked up or raised the price of any items of Merchandise, or removed or altered any tickets or any indicia of clearance merchandise, except in the ordinary course of business consistent with historic practices and except for the effects of the termination of promotional events.

(f)     Merchant shall ticket or mark all items of inventory received at the Stores prior to the Sale Commencement Date in a manner consistent with similar Merchandise located at the Stores and in accordance with Merchant's past practices and policies relative to pricing and marking inventory.

(g)     Merchant has not and shall not purchase, or transfer to or from the Stores, any Merchandise, or goods outside the ordinary course in anticipation of the Sale or of the Inventory Taking, except that commencing on or about March 31, 2015, Merchant closed the Gilbert, Arizona store.

(h)     Merchant makes no representation as to what portion, if any, of the On-Order Merchandise scheduled to be delivered will in fact be delivered and Merchant reserves the right to cancel any orders for On-Order Merchandise.

(i)     Since on or about April 3, 2015, due to its financial condition, Merchant ceased operating in the ordinary course of business in that it, *inter alia,* has not been ordering and/or replenishing the Merchandise in the Stores and/or the Distribution Center consistent with historic practices and/or consistent with its present business.   Merchant has continued its policies with respect to RTV Merchandise.

(j)      Merchant had paid and, subject to Agent's compliance with its obligations under Section 4.1(b) hereof, will continue to pay throughout the Sale Term, to the extent authorized by the Bankruptcy Court, all self-insured or Merchant funded employee benefit programs for Store employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

(k)      Merchant is not a party to any collective bargaining agreements covering any Retained Employees.

(l)      Since April 3, 2015 and continuing until the Sale Commencement, Merchant has sold inventory during such period at customary prices consistent with the ordinary course of business, and has not promoted or advertised any sales or in-Store promotions (including, without limitation, POS promotions) to the public other than as described on Exhibit 11.1(l) in all cases consistent with Merchant's ordinary course of business related to historic periods,

(m)      To the best of Merchant's knowledge and belief, formed after a reasonable review and inquiry, all information provided by Merchant to Agent in the course of Agent's due diligence and preparation and negotiation of this Agreement is as of the date hereof and shall remain true and accurate in all material respects.

11.2     Agent's Representations, Warranties and Covenants.  Agent hereby represents, warrants and covenants in favor of Merchant as follows:

(a)      Agent: (i) is a corporation or limited liability company, as the case may be, duly and validly existing and in good standing under the laws of the State of its organization; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; and (iii) is and during the Sale Term will continue to be duly authorized and qualified as a foreign company to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification.

(b)      Agent has the right, power and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder.  Agent has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale.  Each of the Agency Documents has been duly executed and delivered by Agent and, constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms.  No court order or decree of any federal, provincial, state or local governmental authority or regulatory body is in effect that would prevent or impair or is required for Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor other than as provided herein.

No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)     No action, arbitration, suit, notice, or legal administrative or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved, or to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement, or which if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

(d)     Except as may be otherwise provided in the Approval Order, the Sale shall be conducted in compliance with all applicable federal, state, and local laws, rules and regulations.

Section 12.     Insurance.

12.1    Merchant's Liability Insurance.     Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, all of its liability insurance policies including, but not limited to, products liability, comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with Merchant's operation of the Stores, and shall cause Agent to be named an additional named insured with respect to all such policies. Prior to the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent. All such policies shall require at least thirty (30) days prior notice to Agent of cancellation, non-renewal, or material change. In the event of a claim under any such policies Merchant shall be responsible for the payment of all deductibles, retentions or self-insured amounts to the extent said claim arises from or relates to the alleged acts or omissions of Merchant or its employees, agents (other than Agent's employees), or independent contractors (other than Agent and independent contractors hired by Agent in conjunction with the Sale).

12.2    Merchant's Casualty Insurance.     Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, fire, flood, theft and extended coverage casualty insurance covering the Merchandise in a total amount equal to no less than the Cost Value thereof. In the event of a loss to the Merchandise on or after the date of this Agreement, the proceeds of such insurance attributable to the Merchandise (net of any deductible) shall constitute Proceeds. Prior to the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof, in form and substance reasonably satisfactory to Agent. All such policies shall require at least thirty (30) days prior notice to Agent of cancellation, non-renewal, or material change. Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date or the Extended Sale Termination Date, as the case may be, without Agent's prior written consent.

12.3   Worker's Compensation Insurance.   Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, worker's compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements.  Prior to the Sale Commencement Date, Merchant shall deliver to Agent a certificate of its insurance broker or carrier evidencing such insurance.

12.4   Agent's Insurance.   Agent shall maintain as an Expense throughout the Sale Term, comprehensive public liability and automobile liability insurance policies covering injuries to persons and property in or in connection with Agent's agency at the Stores, and shall cause Merchant to be named an additional insured with respect to such policies.  Prior to the Sale Commencement Date, Agent shall deliver to Merchant certificates evidencing such insurance policies, setting forth the duration thereof and naming Merchant as an additional insured, in form and substance reasonably satisfactory to Merchant.  In the event of a claim under such policies Agent shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, to the extent said claim arises from or relates to the alleged acts or omissions of Agent or Agent's employees, agents or independent contractors.

12.5   Risk of Loss.   Without limiting any other provision of this Agreement, Merchant acknowledges that Agent is conducting the Sale on behalf of Merchant solely in the capacity of an agent, and that in such capacity (i) Agent shall not be deemed to be in possession or control of the Stores or the assets located therein or associated therewith, or of Merchant's employees located at the Stores, and (ii) except as expressly provided in this Agreement, Agent does not assume any of Merchant's obligations or liabilities with respect to any of the foregoing. Agent shall not be deemed to be a successor employer. Merchant and Agent agree that, subject to the terms of this Agreement, Merchant shall bear all responsibility for liability claims of customers, employees and other persons arising from events occurring at the Stores during and after the Sale Term, except to the extent any such claim arises directly from the acts or omissions of Agent, or its supervisors, agents, independent contractors, or employees located at the Stores (an "Agent Claim").   In the event of any liability claim other than an Agent Claim, Merchant shall administer such claim and shall present such claim to Merchant's liability insurance carrier in accordance with Merchant's policies and procedures existing immediately prior to the Sale Commencement Date, and shall provide a copy of the initial documentation relating to such claim to Agent at the address listed in this Agreement. To the extent that Merchant and Agent agree that a claim constitutes an Agent Claim, Agent shall administer such claim and shall present such claim to its liability insurance carrier, and shall provide copies of the initial documentation relating to such claim to Merchant. In the event that Merchant and Agent cannot agree whether a claim constitutes an Agent Claim, each party shall present the claim to its own liability insurance carrier, and a copy of the initial claim documentation shall be delivered to the other party to the foregoing address.

Section 13.     Indemnification.

13.1   Merchant Indemnification.  Merchant shall indemnify and hold Agent and its officers, directors, employees, agents and independent contractors harmless from and against

26

all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses (collectively, "Claims"), asserted directly or indirectly against Agent resulting from, or related to (including acts or omissions of persons or entities affiliated with or acting on behalf of Merchant, but excluding Claims arising from Agent's gross negligence), including without limitation, the following:

(a)     Merchant's material breach of or failure to comply with any local, state, or federal laws or regulations, or any of its agreements, covenants, representations or warranties contained in any Agency Document;

(b)     subject to Agent's performance and compliance with its obligations pursuant to Sections 4.1(b) and 4.1(c) and Section 9 hereof, any failure of Merchant to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term or other claims asserted against Agent by Merchant's employees resulting from Merchant's (and not Agent's) treatment of its employees;

(c)     subject to Agent's compliance with its obligations under Section 8.3 hereof, any failure by Merchant to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof; and

(d)     the negligence or willful misconduct of Merchant or any of its officers, directors, employees, agents (other than Agent) or representatives.

13.2     <u>Agent Indemnification</u>.  Agent shall indemnify and hold Merchant and its officers, directors, employees, agents and representatives harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against, Merchant resulting from, or related to (including acts or omissions of persons or entities affiliated with or acting on behalf of Agent):

(a)     Agent's material breach of or failure to comply with any local, state, or federal laws or regulations, or any of its agreements, covenants, representations or warranties contained in any Agency Document;

(b)     any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortious or otherwise actionable treatment of any employees or agents of Merchant by Agent or any of its employees, agents, independent contractors or other officers, directors or representatives of Agent;

(c)     any claims by any party engaged by Agent as an employee or independent contractor arising out of such engagement;

(d)     any Agent Claims; and

(e)     the gross negligence or willful misconduct of Agent or any of its officer, directors, employees, agents, or representatives.

Section 14.     Defaults.  The following shall constitute "Events of Default" hereunder:

(a)     Merchant's or Agent's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured seven (7) days after receipt of written notice thereof to the defaulting party; or

(b)     Any representation or warranty made by Merchant or Agent proves untrue in any material respect as of the date made or at any time and throughout the Sale Term; or

(c)     The Sale is terminated or materially interrupted or impaired at any Store for any reason other than (i) an Event of Default by Agent, or (ii) any other material breach or action by Agent not authorized hereunder.

In the event of an Event of Default, the non-defaulting party may, in its discretion, elect to terminate this Agreement upon seven (7) business days' written notice to the other party and pursue any and all rights and remedies and damages resulting from such default hereunder.

Section 15.     Fixtures.  With respect to furniture, fixtures and equipment (other than artwork and visuals) owned by Merchant and located at the Closing Locations (collectively, the "FF&E"), at  Agent's sole option, ("FF&E Election") exercisable by Agent in writing on an individual Closing Location basis within seven (7) days after the Sale Commencement Date, Agent shall make commercially reasonable efforts to sell the FF&E in any such Closing Location; provided however, Merchant, with the consent of Wells Fargo, shall have the right to designate certain FF&E located at any of the Closing Location that Merchant does not elect to have Agent sell.  In the event Agent exercises the FF&E Election with respect to the FF&E in any Closing Location(s), Agent shall be entitled to receive a commission equal to fifteen percent (15%) of the proceeds from the sale of such FF&E, net of sales taxes and expenses incurred in connection with the disposition of the FF&E in accordance with a budget to be mutually agreed upon between Merchant and Agent.  Merchant may, with the consent of Wells Fargo, elect to receive, in lieu of proceeds net of expenses and Agent's commission, a lump sum payment, on a per Closing Location basis, in an amount to be agreed upon between Merchant, in consultation with Wells Fargo and Agent, in which case all costs and expenses associated with the disposition thereof shall be borne by Agent.  In either event, as of the Sale Termination Date, Agent may abandon, to Merchant, in place in a neat and orderly manner any unsold FF&E at the Closing Locations. In the event someone other than Agent disposes of the FF&E, Agent agrees that it shall cooperate with such party, provided however, it is understood that (i) such third party's efforts shall not unreasonably interfere with Agent's conduct of the Sale, (ii) such third party shall indemnify Agent to the extent of any claims or damages that may occur as a result of the actions of such third party's agents or representatives in the Closing Locations, (iii) such third party shall reimburse Agent and/or Merchant, as the case may be, for any additional cost or

expense incurred in connection with the Sale as a result of the third party's activities, and (iv) removal of any FF&E shall be done in coordination with, and the consent of, Agent, which consent shall not be unreasonably withheld.

    Section 16.    Miscellaneous.

    16.1   Notices.  All notices and communications provided for pursuant to this Agreement shall be in writing, and sent by hand, by facsimile, or a recognized overnight delivery service, as follows:

If to Agent:

Mr. Brian Yellen
Yellen Partners, LLC
570 Lake Cook Rd, Suite 125
Deerfield, IL  60015
Office:  224-804-6033
Fax:  847-607-8829
byellen@yellenpartners.com

With Copies to:

Michael M. Eidelman, Esq.
Vedder Price P.C.
222 N. LaSalle St., Suite 2600
Chicago, IL  60601
Office:  312-609-7636
Fax:  312-609-5005
meidelman@vedderprice.com

If to Merchant:

Ms. Jo Stone
Interim President/CFO
2865 Wilderness Place
Boulder, CO 80301
Office: 303-444-7573
Fax: 720-294-0804
jstone@fpcolor.com

With Copies to:

Mr. Alex Smith
Alliance Management
Market Square Center
1400 16th Street, Suite 400
Denver, CO 80202
 (Office) 720-932-8060
(Direct) 720-932-8171
(Cell) 303-249-7917
asmith@alliancemgmt.com

Mr. David Burke
Alliance Management, Inc.
601 Carlson Parkway, Suite 110
Minneapolis, MN, 55305
(Office) 952-475-2225
(Direct) 952-475-2242
(Cell) 651-357-2078
dburke@alliancemgmt.com

16.2    Governing Law; Consent to Jurisdiction.  This Agreement shall be governed and construed in accordance with the laws of the State of Colorado, without regard to conflicts of laws principles thereof.    The parties hereto agree that the Bankruptcy Court shall retain jurisdiction to hear and finally determine any disputes arising from or under this Agreement, and by execution of this Agreement each party hereby irrevocably accepts and submits to the jurisdiction of such court with respect to any such action or proceeding and to service of process by certified mail, return receipt requested to the address listed above for each party.

16.3    Entire Agreement.  This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.

16.4    Amendments.    This Agreement may not be modified except in a written instrument executed by each of the parties hereto.

16.5    No Waiver.  No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

16.6    Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon Agent and Merchant, including, but not limited to, any chapter 11 trustee. Merchant and Agent may not assign their respective obligations under this Agreement; provided however, it is understood that Merchant and/or Agent may assign their respective rights under this Agreement to their respect lenders.

16.7    Execution in Counterparts.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original and all of which together shall constitute

but one agreement. This Agreement may be executed by facsimile, and such facsimile signature shall be treated as an original signature hereunder.

16.8    Section Headings. The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

16.9    Survival. All representations, warranties, covenants and agreements made herein, by the parties hereto, shall be continuing, shall be considered to have been relied upon by the parties and shall survive the execution, delivery and performance of this Agreement.

16.10    Reporting.    If requested by Merchant, Agent shall prepare weekly reports including, without limitation, reports that comply with Merchant's current weekly cash reporting to its central office, reflecting the progress of the Sale which shall specify the Proceeds received to date. Agent will maintain and provide to Merchant sales records to permit calculation of and compliance with any percentage rent obligations under Stores leases. During the course of the Sale, Merchant shall have the right to have representatives continually act as observers of the Sale in the Stores so long as they do not interfere with the conduct of the Sale.

16.11    Termination.    This Agreement shall remain in full force and effect until the first to occur of: (i) receipt by Merchant or Agent, as the case may be, of written notice from Merchant or Agent, as the case may be, that any of the conditions specified in Section 10 hereof have not been satisfied; or (ii) the expiration of the Sale Term and completion and certification by Merchant and Agent of the final Sale reconciliation pursuant to Section 8.7 above. Notwithstanding the foregoing, the representations and warranties of Merchant and Agent contained herein and the provisions of Section 11 above and the indemnification obligations contained in Sections 13.1 and 13.2 shall survive the termination of this Agreement pursuant to this Section 16.11.

16.12    Security Interest. Upon payment of the Initial Guaranty Payment to Merchant and the issuance of the Guaranty L/C in favor of the Merchant and Wells Fargo and the Expense L/C in favor of Merchant and in consideration of Agent's payment of the Guaranteed Amount, the Recovery Amount, if any, and Expenses, and the provision of services hereunder to Merchant, Merchant hereby grants to Agent a first priority security interest in and lien upon the Merchandise and the Proceeds to secure all obligations of Merchant to Agent hereunder, subject to no prior liens, claims or encumbrances thereon except for the security interest in favor of Wells Fargo, which shall have priority to the extent set forth in the following sentence. Until the payment of amounts due to Merchant hereunder, including, but not limited to, the Guaranteed Amount, the Recovery Amount, if any, the Additional Recovery Amount, if any, and reimbursement of Expenses, the security interest granted to Agent hereunder shall remain junior to the security interest of Wells Fargo, only to the extent of such unpaid amount. Upon payment of the Initial Guaranteed Payment, and the issuance of the Guaranty L/C and the Expense L/C, the security interest granted to Agent hereunder shall be deemed properly perfected without the need for further filings or documentation. Agent further agrees that in the event Agent fails to

pay Merchant any portion of the Guaranteed Amount, Expenses, the Recovery Amount, or any other undisputed amounts due Merchant under this Agreement, and such failure shall continue for five (5) days after written notice by Merchant to Agent, then the security interest granted to Agent hereunder shall be deemed released in an amount equal to such unpaid amounts, provided however, the balance of Agent's security interest shall remain in full force and effect.

16.13   Break-Up Fee; Expense Reimbursement.   (a) The parties agree that this Agreement is subject to entry of a Bidding Procedures Order which, approves certain bidding procedures, including the consideration by Merchant of competing bids that Merchant, in its sole discretion, deems to be higher or better than the terms contemplated by this Agreement (each, a "Competing Bid").   The Bidding Procedures Order shall require that all bids must be in an amount equal to or greater than the sum of (x) the Guaranteed Amount; plus (y) the amount of the Bid Protections; and (z) $50,000, in order to be deemed a Competing Bid. Further bidding increments shall be announced by Merchant (in consultation with Wells Fargo) at the outset of any auction conducted by Merchant by no later than [May 12], 2015 pursuant to the Bidding Procedures Order.

(b)   Upon consummation of an agency agreement respecting all or a portion of the Merchandise with a third party (other than Agent) who submits a Competing Bid which Merchant selects as the winning bid, or if Merchant commits a material breach of this Agreement or unilaterally abandons the transactions contemplated by this Agreement, Merchant shall pay to Agent (i) a breakup fee equal to seventy thousand dollars ($70,000) (the "Break-Up Fee"); plus (ii) the reasonable fees and expenses of legal, accounting and financial advisors and out of pocket costs and expenses incurred by Agent in connection with conducting due diligence and the negotiation, documentation and implementation of this Agreement and the transactions contemplated hereby in an amount not to exceed twenty thousand dollars ($20,000) (the "Expense Reimbursement" and together with the Break-Up Fee, the "Bid Protections") and (iii) the return of any deposits (including without limitation the 10% deposited with Merchant's counsel at execution under 3.3(a).   Subject to approval of the Bankruptcy Court, the Bid Protections shall have superpriority administrative expense claim status in the Bankruptcy Case pursuant to Section 507 of the Bankruptcy Code, senior to all other administrative expense superpriority or priority claims, and shall be paid in cash within five (5) business days after entry of an order approving a Competing Bid.   The obligation to pay the Bid Protections under this Agreement shall be absolute and unconditional and shall not be subject to any defense, claim, counterclaim, offset, recoupment or reduction of any kind whatsoever.

IN WITNESS WHEREOF, Agent and Merchant hereby execute this Agreement by their duly authorized representatives as of the day and year first written above.

YELLEN PARTNERS, LLC

By: _Brian Yellen_____
Name: _Brian Yellen_
Title: _President_

**FRESH PRODUCE HOLDINGS, LLC,**
**a Delaware limited liability company**

By:_____
Name:
Title:

**FRESH PRODUCE RETAIL, LLC,**
**a Colorado limited liability company**

By:_____
Name:
Title:

**FRESH PRODUCE SPORTSWEAR, LLC**
**a Colorado limited liability company**

By:_____
Name:
Title:

**FRESH PRODUCE OF ST. ARMANDS, LLC,**
**a Florida limited liability company**

By:_____
Name:
Title:

**FP BROGAN-SANIBEL ISLAND LLC**
**a Colorado limited liability company**

By:_____
Name:
Title:

IN WITNESS WHEREOF, Agent and Merchant hereby execute this Agreement by their duly authorized representatives as of the day and year first written above.

YELLEN PARTNERS, LLC

By: _____
Name:
Title:

**FRESH PRODUCE HOLDINGS, LLC,**
**a Delaware limited liability company**

By: _____
Name: Thomas Vernon
Title:

**FRESH PRODUCE RETAIL, LLC,**
**a Colorado limited liability company**

By: _____
Name: Thomas Vernon
Title:

**FRESH PRODUCE SPORTSWEAR, LLC**
**a Colorado limited liability company**

By: _____
Name: Thomas Vernon
Title:

**FRESH PRODUCE OF ST. ARMANDS, LLC,**
**a Florida limited liability company**

By: _____
Name: Thomas Vernon
Title:

**FP BROGAN-SANIBEL ISLAND LLC**
**a Colorado limited liability company**

By: _____
Name: Thomas Vernon
Title:

33

**FRESH PRODUCE COCONUT POINT, LLC,**
**a Florida limited liability company**

By: _____

Name: _Thomas Vernon_

Title:


CONSENTED AND AGREED TO AS TO
SECTIONS 3.3(c) AND 16.12
BY WELLS FARGO BANK

As Merchant's Secured Lender


By: _____
　　　Name:
　　　Title:


By: _____
　　　Name:
　　　Title:

34

CONSENTED AND AGREED TO AS TO
SECTIONS 3.3(c) AND 16.12
BY WELLS FARGO BANK

As Merchant's Secured Lender

By: _____
      Name: Amber Vestal
      Title: Relationship Manager, AVP

Exhibit 1B


Gardena Warehouses

15507 Broadway Center Street
15517 Broadway Center Street
15522 Broadway Center Street
15612 Broadway Center Street
15622 Broadway Center Street
Gardena, CA  90248

018059\0001\12100539.1

**Exhibit 1A**

**Store List**

**Fresh Produce Clothes**
**Store List**
**Exhibit A**

| Str | Name/Mall | Loc Type | Address | | City | ST | Zip |
|---|---|---|---|---|---|---|---|
| 801 | Boulder | Office | 1218 Pearl Street | | Boulder | CO | 80302 |
| 804 | Sanibel | Lifestyle | 2075 Periwinkle Way | Units 30, 31, 32 and 33 | Sanibel | FL | 33957 |
| 807 | La Jolla | Street | 1147 Prospect St. | | La Jolla | CA | 92307 |
| 808 | Palm Desert | Street | 73-199 El Paseo | Suite K | Palm Desert | CA | 92260 |
| 809 | Orlando | Entertainment | 6000 Universal Blvd. | 745C | Orlando | FL | 32819 |
| 810 | Scottsdale | Mall | 15147 N Scottsdale Road | Space H1-125 | Scottsdale | AZ | 85260 |
| 811 | Sarasota | Street | 1 North Blvd of the Presidents | Stores 7 and 8 in The Circ | Sarasota | FL | 34236 |
| 814 | Key West | Street | 400A Duval Street | | Key West | FL | 33040 |
| 816 | Fort Lauderdale | Street | 912 E Las Olas Blvd. | B | Fort Lauderdal | FL | 33301 |
| 817 | Naples | Street | 691 Fifth Ave South | | Naples | FL | 34102 |
| 819 | Boca Grande | Street | 411 Park Ave. | | Boca Grande | FL | 33921 |
| 821 | Myrtle Beach | Mall | Broadway at the Beach, 1301 Celebrity Circle | Unit 128 | Myrtle Beach | SC | 29577 |
| 823 | Marietta | Mall | The Avenue East Cobb, 4475 Roswell Rd. | Space Number 1100 | Marietta | GA | 30062 |
| 825 | Charleston | Mall | The Shops at Charleston Pl, 128 Market St. | Store No. 102 of Building | Charleston | SC | 29401 |
| 827 | West Palm Beach | Lifestyle | City Place, 700 S Rosemary Ave. | Space No. B-13 | West Palm Bea | FL | 33401 |
| 828 | Destin | Mall | 4145 Legendary Dr. | Room No. F-121 | Destin | FL | 32541 |
| 829 | Anaheim | Mall | 321 West Katella Ave. | Sp 137 | Anaheim | CA | 92802 |
| 831 | Estero / Coconut Point | Outlet | 23161 Fashion Dr | 109, Room M21 | Estero | FL | 33928 |
| 832 | Tucson | Mall | 7113 & 7115 North Oracle Road | | Tucson | AZ | 85704 |
| 835 | St. Simons | Mall | 315 Mallery St. | | St. Simons Isl | GA | 31522 |
| 836 | St. Augustine | Street | 139 Saint George St. | | St. Augustine | FL | 32084 |
| 837 | Buford | Mall | Mall of Georgia, 3333 Buford Dr. | SP VC-01B, Room #1034 | Buford | GA | 30519 |
| 838 | Pasadena | Street | 32 E Colorado Blvd | | Pasadena | CA | 91105 |
| 839 | Delray | Office | 401-403 East Atlantic Avenue, The Hannah Buil | Retail Bay 101 | Delray Beach | FL | 33483 |
| 840 | The Villages | Office | 1112 Main Street | | Lady Lake | FL | 32159 |
| 915 | Foley Outlet | Outlet | Tanger Outlet Center, , 2601 S McKenzie St. | Unit #250 | Foley | AL | 36535 |
| 934 | Myrtle Beach Outlet | Outlet | Tanger Outlet Center, 10839 Kings Rd. | Suite 720 | Myrtle Beach | SC | 29572 |

27

**Exhibit 1B**

**Distribution Center**

Exhibit 1B

Gardena Warehouses

15507 Broadway Center Street
15517 Broadway Center Street
15522 Broadway Center Street
15612 Broadway Center Street
15622 Broadway Center Street
Gardena, CA  90248

018059\0001\12100539.1

**Exhibit 3.1(c)**

**Guaranty Percentage Adjustment Schedule**

Fresh Produce Clothes

### EXHIBIT 3.1(c)

### MERCHANDISE CEILING ($000's)

| Incremental Dollars in Inventory | Cost Value of Merchandise | Gtee % | Gtee $ | Gtee Increase / (Decrease) | Decremental % in Guarantee |
|---|---|---|---|---|---|
| 80 | 9,100 | 81.21% | 7,390 | 23 | -0.470% |
| 80 | 9,020 | 81.68% | 7,368 | 26 | -0.445% |
| 80 | 8,940 | 82.13% | 7,342 | 28 | -0.420% |
| 80 | 8,860 | 82.55% | 7,314 | 31 | -0.395% |
| 80 | 8,780 | 82.94% | 7,282 | 34 | -0.370% |
| 80 | 8,700 | 83.31% | 7,248 | 37 | -0.345% |
| 80 | 8,620 | 83.66% | 7,211 | 40 | -0.320% |
| 80 | 8,540 | 83.98% | 7,172 | 42 | -0.295% |
| 80 | 8,460 | 84.27% | 7,129 | 45 | -0.270% |
| 80 | 8,380 | 84.54% | 7,085 | 47 | -0.245% |
| 80 | 8,300 | 84.79% | 7,037 | 50 | -0.223% |
| 80 | 8,220 | 85.01% | 6,988 | 52 | -0.200% |
| 80 | 8,140 | 85.21% | 6,936 | 54 | -0.178% |
| 80 | 8,060 | 85.39% | 6,882 | 56 | -0.155% |
| 80 | 7,980 | 85.54% | 6,826 | 58 | -0.133% |
| 80 | 7,900 | 85.68% | 6,768 | 60 | -0.110% |
| 80 | 7,820 | 85.79% | 6,708 | 62 | -0.088% |
| 80 | 7,740 | 85.87% | 6,647 | 64 | -0.065% |
| 80 | 7,660 | 85.94% | 6,583 | 66 | -0.043% |
| 80 | 7,580 | 85.98% | 6,517 | 67 | -0.020% |
| CEILING | 7,500 | 86.00% | 6,450 | | |

### MERCHANDISE THRESHOLD ($000's)

| Decremental Dollars in Inventory | Cost Value of Merchandise | Gtee % | Gtee $ | Gtee Increase / (Decrease) | Decremental % in Guarantee |
|---|---|---|---|---|---|
| THRESHOLD | 6,000 | 86.00% | 5,160 | | |
| 80 | 5,920 | 85.98% | 5,090 | (70) | -0.020% |
| 80 | 5,840 | 85.94% | 5,019 | (71) | -0.043% |
| 80 | 5,760 | 85.87% | 4,946 | (72) | -0.065% |
| 80 | 5,680 | 85.79% | 4,873 | (74) | -0.088% |
| 80 | 5,600 | 85.68% | 4,798 | (75) | -0.110% |
| 80 | 5,520 | 85.54% | 4,722 | (76) | -0.133% |
| 80 | 5,440 | 85.39% | 4,645 | (77) | -0.155% |
| 80 | 5,360 | 85.21% | 4,567 | (78) | -0.178% |
| 80 | 5,280 | 85.01% | 4,489 | (79) | -0.200% |
| 80 | 5,200 | 84.79% | 4,409 | (80) | -0.223% |
| 80 | 5,120 | 84.54% | 4,329 | (80) | -0.245% |
| 80 | 5,040 | 84.27% | 4,247 | (81) | -0.270% |
| 80 | 4,960 | 83.98% | 4,165 | (82) | -0.295% |
| 80 | 4,880 | 83.66% | 4,082 | (83) | -0.320% |
| 80 | 4,800 | 83.31% | 3,999 | (83) | -0.345% |
| 80 | 4,720 | 82.94% | 3,915 | (84) | -0.370% |
| 80 | 4,640 | 82.55% | 3,830 | (85) | -0.395% |
| 80 | 4,560 | 82.13% | 3,745 | (85) | -0.420% |
| 80 | 4,480 | 81.68% | 3,659 | (86) | -0.445% |
| 80 | 4,400 | 81.21% | 3,573 | (86) | -0.470% |

*** For every $80k below $4.8 million and above $8.96 million, guarantee shall be reduced by 0.625%

**Exhibit 3.1(d)**

**Cost Factor Adjustment**

**Fresh Produce Clothes**

<u>**EXHIBIT 3.1(d )**</u>

<u>**Cost Factor Threshold (as % of Retail Price)**</u>

| Increase in Cost Factor Percentage | Cost Factor | Gtee % | Decremental Percent in Guarantee |
|---|---|---|---|
| 0.10% | 34.60% | 76.450% | -0.800% |
| 0.10% | 34.50% | 77.250% | -0.750% |
| 0.10% | 34.40% | 78.000% | -0.700% |
| 0.10% | 34.30% | 78.700% | -0.650% |
| 0.10% | 34.20% | 79.350% | -0.600% |
| 0.10% | 34.10% | 79.950% | -0.550% |
| 0.10% | 34.00% | 80.500% | -0.500% |
| 0.10% | 33.90% | 81.000% | -0.450% |
| 0.10% | 33.80% | 81.450% | -0.400% |
| 0.10% | 33.70% | 81.850% | -0.350% |
| 0.10% | 33.60% | 82.200% | -0.300% |
| 0.10% | 33.50% | 82.500% | -0.250% |
| 0.10% | 33.40% | 82.750% | -0.200% |
| 0.10% | 33.30% | 82.950% | -0.150% |
| 0.10% | 33.20% | 83.100% | -0.100% |
| 0.10% | 33.10% | 83.200% | -0.050% |
| 0.10% | 33.00% | 83.250% | -0.500% |
| 0.10% | 32.90% | 83.750% | -0.450% |
| 0.10% | 32.80% | 84.200% | -0.400% |
| 0.10% | 32.70% | 84.600% | -0.350% |
| 0.10% | 32.60% | 84.950% | -0.300% |
| 0.10% | 32.50% | 85.250% | -0.250% |
| 0.10% | 32.40% | 85.500% | -0.200% |
| 0.10% | 32.30% | 85.700% | -0.150% |
| 0.10% | 32.20% | 85.850% | -0.100% |
| 0.10% | 32.10% | 85.950% | -0.050% |
|  | 32.00% | 86.000% |  |

***for every 0.1% beyond 34.6%, guarantee % shall be reduced by 1.0%

**Exhibit 3.3(a)**

**Initial Guaranty Payment Account**

**[To be supplied]**

**Exhibit 3.3(c)**

**Form of Guaranty L/C**

This sample wording is presented without any responsibility on our part. This draft is provided to you as a suggestion only at your request.
*Please note that the draft remains unissued and is not an enforceable instrument.*

Bank Information

## Irrevocable Standby Letter of Credit

**Number:** _____
**Issue Date:** _____

Beneficiaries:

Ladies and Gentlemen:

At the request and for the account of [Yellen Partners, LLC] (the "Applicant"), we hereby establish our Irrevocable Standby Letter of Credit (the "Letter of Credit") in favor of the Co-Beneficiaries set forth above in the amount of *Amount in Words* United States Dollars USD$ *Amount in Numbers* available with us at our above office by payment of draft(s) drawn at sight on ourselves.

Drafts must be purportedly signed by an officer of each of the Co-Beneficiaries and be accompanied by the original of this Letter of Credit and a signed statement worded in the form of Exhibit A attached hereto with the instructions in brackets therein complied with.

Partial and multiple drawings are permitted under this Letter of Credit.

Each draft must be marked "Drawn under Letter of Credit No. _____ dated September __, 2014, of _____."

This Letter of Credit expires at our above office on _____ __, 2015 (the "Expiry Date").

As used herein the term "Business Day" shall mean a day of the year on which our Standby Letters of Credit office is open for business.

We hereby agree with you that each drawing presented hereunder in full compliance with the terms hereof will be duly honored by our payment to you of the amount of such drawing, in immediately available funds of

_____ not later than the third Business Day following the Business Day on which such drawing is presented to us.

Except so far as otherwise expressly stated herein, this Letter of Credit is subject to the "International Standby Practices 1998".

It is a condition of this Letter of Credit that it shall be decreased without amendment upon our receipt at our above office of a statement in the form of Exhibit B signed by the Co-Beneficiaries with the instructions in brackets therein complied with.

CANCELLATION PRIOR TO EXPIRATION: You may return this Letter of Credit to us at our above office for cancellation prior to its expiration provided that this Letter of Credit is accompanied by a written agreement signed by you to its cancellation. Such written agreement to cancellation should specifically reference this Letter of Credit by number, clearly indicate that it is being returned for cancellation and be signed by a person identifying themselves as authorized to sign for you.

Very Truly Yours,

**Bank Name**

By: _____
                        *Authorized Signature*

***The original of the Letter of Credit contains an embossed seal over the Authorized Signature.***

Please direct any written correspondence or inquiries regarding this Letter of Credit, always quoting our reference number, to **BANK NAME**

***at either***                                                            ***or***

Phone inquiries regarding this credit should be directed to our Standby Customer Connection Professionals

Exhibit A
BANK NAME
Letter of Credit No. _____

Re: Drawing for Amounts Due to:

Ladies and Gentlemen:

We refer to your Letter of Credit No. _____ (the "Letter of Credit"). The undersigned, duly authorized officers of the Co-Beneficiaries set forth above, and the Co-Beneficiaries of the Letter of Credit hereby certify to you that:

(i) [_____] (the "Applicant") has not made a payment when due of or for the Guaranteed Amount (as defined in the Agency Agreement), or other amounts due by Applicant to Merchant (as defined in the Agency Agreement), pursuant to, and as such term is defined in that certain Agency Agreement, dated as of April [___], 2015 (the "Agency Agreement"), by the Merchant, on the one hand and Yellen Partners, LLC, on the other.

(ii) The unpaid amount is $[insert amount] (the "Amount Owing").

(iii) The amount of the sight draft accompanying this statement is an amount equal to the lesser of (a) the Amount Owing and (b) the amount available on the date hereof to be drawn under the Letter of Credit.

(iv) The Letter of Credit has not expired prior to the delivery of this letter and the accompanying sight draft.

(v) The payment hereby demanded is requested to be made no later than three (3) business days after the date of delivery of this certificate, by wire transfer to the following account:

[insert bank]
ABA No: [insert number]
Further Credit to: [insert name]
Account No. [insert number]

(vi) Merchant is not in material default of any of its obligations under the Agency Agreement such that the Agency Agreement prohibits Merchant and/or Lender from drawing on the Letter of Credit.

IN WITNESS WHEREOF, I have executed and delivered this certificate as of this  [insert date] day of [insert month], [insert year].

Very truly yours,


,
a Co-Beneficiary

By:       [insert signature]
Name:   [insert name]
Title:     [insert title]


a Co-Beneficiary

By:       [insert signature]
Name:   [insert name]
Title:     [insert title]

Exhibit B
BANK NAME
Letter of Credit No. _____

Re: Reduction of Letter of Credit Amount:

Ladies and Gentlemen:

We refer to your Letter of Credit No. _____ (the "Letter of Credit"). The undersigned, duly authorized officers of the Co-Beneficiaries set forth above, and the Co-Beneficiaries of the Letter of Credit hereby certify to you that the amount of the Letter of Credit may be decreased by $[insert amount].

IN WITNESS WHEREOF, we have executed and delivered this certificate as of this  [insert date] day of [insert month], [insert year].

Very truly yours,

a Co-Beneficiary

By:        [insert signature]
Name:   [insert name]
Title:      [insert title]


a Co-Beneficiary

By:        [insert signature]
Name:   [insert name]
Title:      [insert title]

*end format*

Exhibit 4.1(a)

Occupancy Expense Schedule

**FRESH PRODUCE**
**PER DIEM SUMMARY - $'s**
Exhibit 4.1 (a)   Occupancy Expense Schedule

| Store # | Location Name | Rent | CAM | HVAC | Billing | Parking | Taxes | RE Taxes | Ins | Bank Fees | Telephone | Technology | Utilities | Other Occ | Store Repairs | Selling Supplies | Total Per Mtg [a] | Per Diem [a] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 601 | Boulder | 9,225 | | | | | 20 | 1,427 | 308 | 116 | 769 | 664 | 689 | 150 | 471 | 518 | 11,916 | $897.00 (c) |
| 604 | Sanibel | 32,619 | | | | | | | 443 | 27 | 870 | 828 | 2,509 | 459 | 353 | 956 | 39,201 | $1,307.00 (c) |
| 607 | La Jolla | 15,704 | | | | 400 | | | 516 | 127 | 759 | 690 | 690 | 730 | 244 | 615 | 19,937 | $645.00 |
| 608 | Palm Desert | 11,834 | 3,709 | | | 63 | | | 483 | 239 | 344 | 811 | 909 | 194 | 342 | 647 | 18,527 | $618.00 (c) |
| 809 | Orlando | | 3,686 | | | 370 | | | 535 | 153 | 967 | 864 | 746 | 853 | 234 | 650 | 9,660 | $322.00 (b) |
| 810 | Scottsdale | 6,925 | 1,921 | 576 | 83 | | 4 | 580 | 704 | 118 | 428 | 927 | 744 | 178 | 211 | 840 | 18,378 | $633.00 (a) |
| 811 | Sarasota | 13,725 | 2,214 | | | | | | 480 | 107 | 968 | 664 | 448 | 442 | 194 | 1,146 | 13,178 | $635.00 |
| 814 | Key West | 20,163 | 1,132 | 262 | | | | | 366 | 87 | 561 | 664 | 1,185 | 158 | 227 | 719 | 19,048 | $920.00 (c) |
| 816 | Fort Lauderdale | 11,909 | | 501 | | 170 | | 675 | 524 | 107 | 560 | 968 | 1,249 | 463 | 438 | 656 | 16,823 | $561.00 |
| 817 | Naples | 17,140 | 1,072 | | | | | 1,093 | 298 | 115 | 333 | 738 | 696 | 161 | 323 | 775 | 21,646 | $722.00 |
| 819 | Boca Grande | 4,973 | 2,045 | 624 | | 22 | | | 228 | 112 | 261 | 651 | 636 | 328 | 291 | 393 | 8,879 | $396.00 (b) |
| 821 | Myrtle Beach | 9,557 | 1,720 | 337 | | | | 828 | 886 | 254 | 407 | 402 | 167 | 540 | 330 | 392 | 15,375 | $396.00 (b) |
| 823 | Marietta | 16,657 | 2,515 | 791 | | 154 | | | 359 | 166 | 596 | 681 | 803 | 116 | 977 | 330 | 15,375 | $512.00 (c) |
| 825 | Charleston | 18,935 | 4,208 | 1,088 | 460 | | | 2,327 | 302 | 120 | 600 | 709 | 1,896 | 679 | 305 | 447 | 19,746 | $886.00 (c) |
| 827 | West Palm Beach | 15,587 | 4,311 | 179 | 220 | | | | 181 | 120 | 626 | 677 | 1,462 | 427 | 291 | 328 | 19,746 | $638.00 (c) |
| 828 | Destin | | | 62 | 576 | 375 | | 1,189 | 364 | 105 | 887 | 677 | 873 | 233 | 285 | 311 | 23,172 | $772.00 (c) |
| 829 | Anaheim | 15,507 | 3,450 | 1,152 | | 8 | | 397 | 151 | 122 | 674 | 666 | 656 | 453 | 284 | 251 | 9,372 | $312.00 (c) |
| 831 | Estero / Coconut Point | 8,560 | 1,943 | 2,814 | | 18 | | | 884 | 188 | 554 | 907 | 2,020 | 297 | 671 | 25,731 | 25,731 | $858.00 (c) |
| 832 | Tucson | 3,647 | | | | | | | 194 | 274 | 274 | 671 | 463 | 159 | 250 | 346 | 15,207 | $507.00 (c) |
| 835 | St. Simons | 8,722 | | | | | | | 559 | 103 | 362 | 668 | 668 | 131 | 219 | 244 | 5,740 | $191.00 |
| 836 | St. Augustine | 7,260 | 3,843 | | 375 | 466 | | | 618 | 103 | 459 | 594 | 595 | 500 | 41 | 355 | 11,443 | $381.00 (c) |
| 837 | Buford | 10,066 | 1,086 | | | 108 | | 973 | 333 | 117 | 594 | 648 | 1,073 | 101 | 352 | 285 | 14,550 | $485.00 |
| 838 | Pasadena | 15,155 | 1,096 | | | | | | 394 | 108 | 985 | 844 | 781 | 673 | 307 | 838 | 14,947 | $485.00 (c) |
| 839 | Delray | 3,241 | 1,184 | 25 | | | | 262 | 343 | 54 | 856 | 772 | 592 | 200 | 581 | 214 | 20,207 | $674.00 (c) |
| 840 | The Villages | 3,075 | 2,759 | | | | | | 226 | 197 | 985 | 349 | 836 | 804 | 167 | 374 | 7,029 | $234.00 (c) |
| 915 | Foley Outlet | 7,238 | 4,609 | 914 | | 26 | | 155 | 153 | 169 | 340 | 485 | 656 | 134 | 235 | 703 | 8,470 | $282.00 (c) |
| 916 | Myrtle Beach Outlet | | | | | | | | | | | | | | | | 12,175 | $408.00 (c) |
| | **SUBTOTAL** | 284,988 | 54,498 | 52,449 | 9,088 | 2,200 | 3,382 | 12,608 | 10,330 | 3,129 | 15,219 | 19,597 | 23,478 | 8,333 | 50,655 | 513,976 | 437,372 | $14,579.00 |
| 920 | Gardena Warehouse | 20,560 | 6,483 | | | | | | 2,906 | | 594 | | 3,157 | | | 2,310 | | 46,495 | $1,550.00 (c) |
| | Boulder HO | 7,596 | 2,841 | | | | | To Be Determined | 1,329 | | 594 | | | | 1,615 | | | 12,041 | $401.00 (a) |
| | **TOTAL** | $313,141 | $54,811 | $2,449 | $9,088 | $2,200 | $1,392 | $20,458 | $13,826 | $4,423 | $17,006 | $19,597 | $26,644 | $12,073 | $10,994 | $495,808 | | $16,530.00 |

**Notes:**

a) Monthly Total excludes Store Supplies and Selling Supplies (Days)

b) Percentage Rents Currently Being Paid; Additive to Per Diem Calculation:

| | | | | |
|---|---|---|---|---|
| Colorado | $0 | Monthly base rent = | 10.0% | on Net Sales |
| Boca Grande | $7,044 | Monthly base rent = | 11.0% | on Net Sales less Base + $55K mrktg / $150K mrktg |
| Anaheim | $0 | Monthly base rent = | 4.0% | on Gross Sales |

c) Potential Percentage Rents / Threshold not expected to be exceeded; Not Included in Per Diem Calculation:

| | | | |
|---|---|---|---|
| Sanibel | Monthly base rent = | 5.0% | on Gross Sales |
| Palm Desert | Monthly base rent = | 5.0% | on Net Sales above |
| Scottsdale | Monthly base rent = | 5.0% | on Net Sales above |
| Key West | Greater of annual base rent or | 13.0% | of annual Gross Sales |
| Myrtle Beach | Monthly base rent = | 6.0% | on Gross Sales above |
| Marietta | Monthly base rent = | 6.0% | on Gross Sales above |
| Charleston | Monthly base rent = | 6.0% | on Gross Sales above |
| West Palm Beach | Monthly base rent = | 6.0% | on Net Sales above |
| Destin | Monthly base rent = | 6.0% | on Gross Sales above |
| Anaheim | Monthly base rent = | 4.0% | on Gross Sales above |
| Estero / Coconut Point | Monthly base rent = | 5.0% | on Net Sales above |
| Tucson | Monthly base rent = | 5.0% | on Net Sales above |
| St. Augustine | Monthly base rent = | 5.00% | on Gross Sales above |
| Buford | Monthly base rent = | 6.0% | on Gross Sales above |
| Pasadena | Monthly base rent = | 6.0% | on Gross Sales above |
| Delray | Monthly base rent = | 6.0% | on Gross Sales above |
| The Villages | Monthly base rent = | 10.0% | on Net Sales above |
| Myrtle Beach Outlet | Monthly base rent = | 6.0% | on Net Sales above |

**As of 2/28/15**

| | Cumul Sales | % Applied? |
|---|---|---|
| Colorado | $492,948 | Yes |
| Boca Grande | $211,578 | Yes |
| Anaheim | $556,632 | Yes |
| | $404,000 | Yes |

**As of 2/28/15**

| | Sales Threshold | Timeframe for Current Threshold Calculation | Cumul Sales | % Applied? | $ Above / (Below) Threshold |
|---|---|---|---|---|---|
| Sanibel | $7,477,738 | from 3/1/15 to 2/29/16 | $492,948 | No | ($6,984,790) |
| Palm Desert | $2,926,333 | from 2/1/15 to 1/31/16 | $211,578 | No | ($2,702,962) |
| Scottsdale | $2,472,200 | from 10/1/14 to 9/30/15 | $270,167 | No | ($3,180,832) |
| Key West | $2,238,284 | from 1/1/15 to 12/31/15 | $444,260 | No | ($2,030,032) |
| Myrtle Beach | $897,000 | from 4/1/15 to 3/31/16 | $81,788 | No | ($883,766) |
| Marietta | $2,239,600 | from 1/1/15 to 12/31/15 | $115,729 | No | ($2,177,871) |
| Charleston | $2,864,657 | from 1/1/15 to 12/31/15 | $97,246 | No | ($2,277,906) |
| West Palm Beach | $2,864,417 | from 1/1/15 to 12/31/15 | $150,560 | No | ($2,694,537) |
| Destin | $2,146,883 | from 2/1/15 to 1/31/16 | $328,765 | No | ($2,754,149) |
| Anaheim | $5,720,200 | from 2/1/15 to 1/31/16 | $556,632 | No | ($5,393,914) |
| Estero / Coconut Point | $2,044,224 | from 4/1/14 to 3/29/15 | $664,400 | No | ($1,289,816) |
| Tucson | $1,533,523 | from 12/1/14 to 11/30/15 | $105,851 | No | ($1,308,371) |
| St. Augustine | $860,000 | from 1/1/15 to 12/31/15 | $330,144 | No | ($663,630) |
| Buford | $350,000 | from 3/1/15 to 2/29/16 | $93,939 | No | ($340,061) |
| Foley Outlet | $644,750 | from 12/1/14 to 11/30/15 | $45,627 | No | ($538,628) |

Exhibit 4.2(a)

Form of Expense L/C

[To be supplied]

## Exhibit 5.1

## Inventory Taking Instructions

*These are typical inventory instructions defined by the contract when SKU levels and discount buckets are used.*

## INVENTORY INSTRUCTIONS AND PROCEDURES

### TYPE OF COUNT

The counts will capture SKU or UPC, department, ticketed retail, system retail and quantity. In this type of count, the Inventory Service personnel should key in the quantity and the retail for each item and scan or key in the SKU or UPC. The retail price will be the lower of a) the lowest ticketed price and b) the system price or scan price for each item of merchandise in the store. Some specific kinds of merchandise need to be specifically identified (see Exception Categories below), because this merchandise is subject to special valuation in the Agency Agreement.

Stores open prior to the inventory taken at their store will have the actual starting inventory determined by the "gross rings" (gross register receipts less applicable sales tax) method per the Agency Agreement.

The count is set-up by the inventory service to accept scanned bar code (UPC), keyed bar code (UPC) or SKU. If the SKU or UPC is determined to be invalid, an SKU from a similar item (i.e., same item but different color) will be used to record the item. The substitute item must be of similar retail and cost as the item with the invalid SKU.

### STORE MAPPING

The Inventory Service will map out the store into small areas (no more than a four foot run, starting at the upper left and moving to the lower right). For each area they will create a total number of pieces counted and a total of dollars counted and write these totals of the area tag. These totals will be reviewed on an area-by-area basis for "reasonableness" (see Controls).

### LOWEST MARKED PRICE

Goods are to be counted at the lowest ticketed or scanned price. If there are multiple prices on an item, each item will be counted at the lowest ticketed or marked price. Obviously mismarked items are excluded from this (i.e. if every item is marked at $19.99, but one piece is marked at $1.99, the $1.99 price would be ignored). Items, which are offered for sale at a reduced price as a result of hard markdowns, in-store clearance, advertisement or POS markdown (to be taken at the register), are to be counted at the lowest price ticketed or marked.

Merchandise which is sold at "two for . . . " or "three for . . . " values has a piece retail equal to the "two for . . . " price divided by two or the "three for . . . " price divided by three. For example, two bottles of nail polish labeled at "2 for $1.39" should be counted as a quantity of two and a retail of $0.70 each ($1.39 divided by two pieces = $0.695 each - rounded up to $0.70). Six bottles of shampoo at "3 for $1.00" should be counted as a quantity of six and a retail of $0.33 each ($1.00 divided by 3 pieces = $0.33 each).

1

**STAFFING**

The Agent will have at least one representative present at every count and the Merchant will also have at least a store manager present.

**CONTROLS**

A primary focus of these counts is insuring the accuracy both of the piece count and of the retail price keying. The Service should audit each of their inventory counters during the first hour of the count. This is done by having a service supervisor testing each crew person by having him or her bring up on their machines the last ten pieces counted. Both the piece count and the retail entered should exactly match the items on the shelf. Counters who have any errors should be tested further, (i.e. more SKU's – another 20 or 30 pieces). If you feel the counter's error rate is unreasonably high, direct the Service to send that person home so they cannot count any more.

Taking counters off the count is the responsibility of both the Agent and the Merchant to insure an accurate count. Counters who are inaccurate can cost the company a lot of money, and it can cost additional money to recount every section that they counted. INSIST ON ACCURACY. NO EXCEPTIONS!

Take care not to count empty boxes. Open all packed away goods, overstock and new receipts to count the goods inside. NEVER allow the inventory service to key from a pack away list. If merchandise received from the warehouse has not been ticketed and received by the time of the inventory taking, the store must receive the shipment from the pick report included with the shipment, adjusting any quantities that are incorrect. After this has been done, the inventory service can use the pick report to properly record the inventory using the "received" column to record the proper quantities actually received.

Designated personnel of the Merchant and the Agent must jointly agree upon any adjustment made to any area or any count.

The service is to furnish representatives of the Merchant and the Agency with a hard copy of the inventory (both units and dollars) at the completion of the count. In addition, the inventory service will print out SKU level detail for each section which shows the SKU or UPC, quantity, system price and keyed in ticketed price.

**DISPUTED` MERCHANDISE**                    **Area 8888**

If the representative from the Agent and the Merchant disagree about whether goods can be sold, or whether goods require an adjustment into one of the exception classifications, classify this merchandise as in dispute. At the end of the inventory, count all the goods in this disputed area using area number 8888 by SKU, retail and quantity.

2

## DEFECTIVE MERCHANDISE                    Area 9910-9990

Defective goods are defined as those goods which are dented, worn, faded, torn, broken, shopworn, scratched, dried out, unsealed, missing parts or packing materials and mismatched. Testers and "gift with purchase" items are also considered defective - they cannot be sold as "first quality goods" at full retail price. Also included are magazines and periodicals for which the issue is dated prior to the sale commencement date or expire before the sale termination date. All out-of-season merchandise, which is defined as Holidays falling outside the sale term (such as Christmas, Thanksgiving, Easter, Valentine's Day, Fourth of July) and merchandise outside the established aging guidelines (as described in the agreement) are also considered defective unless otherwise directed in the Agency Agreement.

The Merchant's and Agent's representatives must agree on what discount should apply to any defective merchandise. The merchandise will then be inventoried in the area number that corresponds to the discount that was agreed upon. The following areas will be used for the following discounts:

| AREA # | DISCOUNT |
|--------|----------|
| 9910 | 10% |
| 9920 | 20% |
| 9930 | 30% |
| 9940 | 40% |
| 9950 | 50% |
| 9960 | 60% |
| 9970 | 70% |
| 9980 | 80% |
| 9990 | 90% |

The merchandise counted in these areas will be inventoried the same way as all other merchandise, i.e. the SKU or UPC will be keyed or scanned in, the quantity will be keyed in and the ticketed price will be keyed in. All discounts will be calculated at the home office during the final inventory reconciliation between Merchant and Agent.

All defective merchandise is to be counted at the lowest ticketed retail but placed in the appropriate section number corresponding to the merchandise discount that is agreed upon, (described below).

You will need totals for all the areas identified as Exception Categories (below), since these will need to be reconciled at the end of the count by the Agent and Merchant after the inventory is complete.

## CASH COUNTING

The coin and currency of the store should be counted jointly by Merchant's and Agent's representatives using a cash audit form. If Agent's representatives are not available on this day, the store will count the cash using the form and fax it to the Agent representative for verification on the next visit. Two people must be present when counting the cash and both people must sign the form.

3

## EXCEPTIONS CATEGORIES

Specific kinds of merchandise are identified in the Agency Agreement as less than full value, whereby the Agent is entitled to an adjustment for these kinds of inventory. It is very important to identify this merchandise and to use the designated areas when counting these goods. Note that this merchandise is still counted at the lowest ticketed price but these items must be counted in the appropriate area number that corresponds to the agreed upon discount. These area numbers are described below.

At the beginning of the count, the Agent and Merchant's representatives should walk the store to identify these pieces and remove them from the displays. After this is done, the Service will assign one counter to go around the store and key the exceptions into the correct areas as shown below. Make sure they mark these pieces by removing them from the displays and placing them on the floor or in a shopping cart, so that the Series knows NOT to count the merchandise again with the regular area.

## EXCLUDED MERCHANDISE                    Area 9999

Some merchandise has no sales value and should not be counted (broken bottles of nail polish, past date or expired goods, concessions by third parties, etc.). Merchandise which requires additional labor in order to be sold (for example, gift sets that must be assembled before sale, fragrances that must be mixed, etc.) is also excluded from the count. This merchandise should only be counted in area 9999. As you walk the store, identify merchandise that is not to be counted. Physically remove these goods from the present location and put them in a designated area.

Goods that are on display and are incomplete, altered, fastened down, etc., in such a way as to render them less than full retail value, or goods that are lacking boxes, warranties, instructions (where needed), are covered under Defective Merchandise language.

All goods are to be counted at the lowest ticketed price.

When counting these areas, the last two digits of the area (99XX) represent the percent off the full value which will be deducted during the inventory settlement. For example, a product with a retail of $90 and a cost of $60 would be valued as follows:

If counted in area 9950, the retail would become $45 and the cost would become $30.

4

**Exhibit 8.1**

**Sale Guidelines**

**EXHIBIT 8.1**

**SALE GUIDELINES**

1.      The Sale shall be conducted so that the Stores in which sales are to occur will remain open no longer than during the normal hours of operation provided for in the respective leases for the Stores.

2.      The Sale shall be conducted in accordance with applicable state and local "Blue Laws", where applicable, so that no Sale shall be conducted on Sunday unless the Merchant had been operating such Store on a Sunday.

3.      On "shopping center" property, the Agent shall not distribute handbills, leaflets or other written materials to customers outside of any Store's premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Store is located; provided that Agent may solicit customers in the Stores themselves. On "shopping center" property, the Agent shall not use any flashing lights or amplified sound to advertise the Sale or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

4.   At the conclusion of the Sale, the Agent shall vacate the Stores and the Distribution Center in broom clean condition, and shall leave the locations in the same condition as on Sale Commencement Date, ordinary wear and tear excepted, in accordance with Section 6 of the Agency Agreement, provided, however, the Merchant and the Agent hereby do not undertake any greater obligation than as set forth in an applicable lease with respect to a Store or the Distribution Center.

5.      The Merchant and the Agent may advertise the Sale as a "going out of business", "store closing", "sale on everything", or similar themed sale.

6.      Agent shall be permitted to utilize display, hanging signs, and interior banners in connection with the Sale; provided, however, that such display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Merchant and the Agent shall not use neon or day-glo on its display, hanging signs, or interior banners. Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines. Nothing contained herein shall be construed to create or impose upon the Agent any additional restrictions not contained in the applicable lease agreement. In addition, the Merchant and the Agent shall be permitted to utilize exterior banners at (i) non-enclosed mall Stores and (ii) enclosed mall Stores to the extent the entrance to the applicable Store does not require entry into the enclosed mall common area; provided, however, that such banners shall be located or hung so as to make clear that the Sale is being conducted only at the affected Store, shall not be wider than the storefront of the Store, and shall not be larger than 4 feet x 40 feet. In addition, the Merchant and the Agent shall be permitted to utilize sign walkers and street

signage in a safe and professional manner and in accordance with the terms of the Approval Order. Nothing contained herein shall be construed to create or impose upon the Agent any additional restrictions not contained in the applicable lease agreement.

7.  Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final."

8.  Except with respect to the hanging of exterior banners, the Agent shall not make any alterations to the storefront or exterior walls of any Stores.

9.  The Agent shall not make any alterations to interior or exterior Store lighting. No property of the landlord of a Store shall be removed or sold during the Sale. The hanging of exterior banners or in-store signage and banners shall not constitute an alteration to a Store.

10.  The Agent shall keep Stores' premises and surrounding areas clear and orderly consistent with present practices.

11.  Subject to the provisions of the Agency Agreement and the Approval Order, the Agent shall have the right to sell all Merchant-owned furniture, fixtures, and equipment located at the Stores and Distribution Center (the "Merchant FF&E"). The Agent may advertise the sale of the Merchant FF&E in a manner consistent with these Sale Guidelines. The purchasers of any Merchant FF&E sold during the Sale shall be permitted to remove the Merchant FF&E either through the back shipping areas at any time, or through other areas after store business hours. For the avoidance of doubt, as of the Sale Termination Date the Agent may abandon, in place and without further responsibility or obligation, any unsold Merchant FF&E located at a Store, the Distribution Center and/or corporate offices. Any abandoned Merchant FF&E left in a Store, the Distribution Center and/or the corporate offices after the underlying lease is rejected shall be deemed abandoned to the landlord, with the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Merchant.

12.  The Agent shall be entitled to include Additional Agent Merchandise in the Sale in accordance with the terms of the Approval Order and the Agency Agreement.

13.  At the conclusion of the Sale at each Store, pending assumption or rejection of applicable leases, the landlords of the Stores shall have reasonable access to the Stores' premises as set forth in the applicable leases. The Merchant, the Agent and their agents and representatives shall continue to have exclusive and unfettered access to the Stores.

14.  Post-petition rents shall be paid by the Merchant as required by the Bankruptcy Code until the rejection or assumption and assignment of each lease. Agent shall have no responsibility therefor.

15.  The rights of landlords against Merchant for any damages to a Store or the

2

Distribution Center shall be reserved in accordance with the provisions of the applicable lease.

16.     If and to the extent that the landlord of any Store affected hereby contends that the Agent or Merchant is in breach of or default under these Sale Guidelines, such landlord shall email or deliver written notice by overnight delivery on the Merchant's counsel and the Agent's counsel as follows:

If to the Merchant:

        _____

        _____

        _____

        Attn:  _____
        Tel:   _____
        Email:  _____

If to the Agent:

17.     To the extent there are any inconsistencies between these Sale Guidelines and the Agency Agreement, the terms of the Agency Agreement shall control. To the extent there are any inconsistencies between these Sale Guidelines and the Approval Order, the terms of the Approval Order shall control.

**Exhibit 11.1**

**Promotional Calendar**

## Promo Calendar

D – direct mail
KI – retail signage (in addition to existing)
W – window support (in addition to existing)
E – eblast
S – social
F – paid ad

| Fiscal Week | Dates | RETAIL Rev. Rank | ONLINE Rev. Rank | RETAIL (2015) | ONLINE (2015) | RETAIL – COMP PROMOTIONS (2016) | ONLINE – COMP PROMOTIONS (2016) |
|---|---|---|---|---|---|---|---|
| **October** *Moon Rise (Fresh for Fall)* | | | | | | | |
| 1 | 9/28-10/4 | 50 | 49 | | | | 9/4-10/31 Receipt Offer: 25% off your next purchase of $100+ |
| 2 | 10/5-10/11 | 43 | 46 | 10/6-11/2 Fall Direct Mail: $25 or 25% off $125 purchase (D) | 10/6-11/2 Fall Direct Mail: $25 or 25% off $125 purchase (D) | | 9/4-10/31 Receipt Offer: 25% off your next purchase of $100+ |
| 3 | 10/12-10/18 | 33 | 43 | 10/6-11/2 Fall Direct Mail: $25 or 25% off $125 purchase (D) / 10/17-10/19 Sale on Sale: 35% off sale on sale (E, S, KI) | 10/6-11/2 Fall Direct Mail: $25 or 25% off $125 purchase (D) / 10/24-10/19 Sale on Sale: 35% off sale on sale (N) | | 9/4-10/31 Receipt Offer: 25% off your next purchase of $100+ |
| 4 | 10/19-10/25 | 35 | 39 | 10/6-11/2 Fall Direct Mail: $25 or 25% off $125 purchase (D) / 10/17-10/19 Sale on Sale: 35% off sale on sale (E, S, KI) | 10/6-11/2 Fall Direct Mail: $25 or 25% off $125 purchase (D) / 10/24 Color Day: Free color personality bookmark / 10/24-10/19 Sale on sale 35% off sale on sale (E, S, KI) | | 9/4-10/31 Receipt Offer: 25% off your next purchase of $100+ / 10/21 Color Day: Free color personality bookmark |
| **November** *Reflections* | | | | | | | |
| 5 | 10/26-11/1 | 39 | 50 | 10/6-11/2 Fall Direct Mail: $25 or 25% off $125 purchase (D) | 10/6-11/2 Fall Direct Mail: $25 or 25% off $125 purchase (D) | | |
| 6 | 11/2-11/8 | 34 | 45 | 10/6-11/2 Fall Direct Mail: $25 or 25% off $125 purchase (D) | 10/6-11/2 Fall Direct Mail: $25 or 25% off $125 purchase (D) | 11/14 It's a Colorful Life Event: ETW $250 PP GC, handout wishlists, launch spa ETW, launch holiday GC promo | |
| 7 | 11/9-11/15 | 36 | 29 | 11/14-11/16 Friends & Family: 25% off $125 purchase (E,W,KI) / 11/14-11/16 Friends & Family: Promo buy $100 GC and get a $20 GC free | 11/14-11/16 Sweater BOGO: buy one get one free on select sweaters (E,S) / 11/14 Veterans Day BOGO: buy 1 get 1 FREE, Vintage Logo Item Tee (E,S) / 11/14-11/16 Friends & Family: 25% off $125 purchase (E,W,KI) / 11/14-11/16 Friends & Family: Promo buy $100 GC and get a $20 GC free | 11/14 It's a Colorful Life Event: ETW $250 PP GC, handout wishlists, launch spa ETW, launch holiday GC promo / 11/14-16/15 Spa ETW/TTV? A spa gateway / 11/14-16/15 Holiday GC Promo buy a $100 GC and get a $20 GC free / 11/15-16/15 Holiday Wishlists 15% off wishlist items | 11/9-11/20 Additional 20% off Sale / 11/13 Holiday Shipping Launch $5.99 shipping all shipping |
| 8 | 11/16-11/22 | 47 | 42 | 11/14-11/16 Friends & Family: Promo buy $100 GC and get a $20 GC free | 11/14-11/16 Friends & Family: Promo buy $100 GC and get a $20 GC free | 11/14-16/15 Holiday GC Promo Buy a $100 GC and get a $20 GC free / 11/15-16/15 Holiday Wishlists 15% off wishlist items | 11/14-16/15 Holiday GC Promo buy a $100 GC and get a $20 GC free / 11/15-16/15 Holiday Wishlists 15% off wishlist items |
| **December** *Cozy Holiday (Winkz DO Goes Tree…)* | | | | | | | |
| 9 | 11/23-11/29 | 28 | 47 | 11/26-12/24 Holiday GC Promo buy a $100 GC and get a $20 GC free (E,W,KI,S) / 11/27-11/30 Black Friday: 25% off entire store (E,W,S) / 11/29-12/1 Black Friday Weekend: 25% off sale on sale (E,W,S) / 11/27-11/30 Black Friday OUTLETS: 30% off entire store (W) | 11/26-12/24 Holiday GC Promo buy a $100 GC and get a $20 GC free (E,W,KI,S) / 11/27-11/30 Black Friday: 25% off on sale (E,W,S) / 11/29-12/1 Black Friday Weekend: 25% off sale on sale (E,W,S) | 11/24-12/24 Holiday GC Promo Buy a $100 GC and get a $20 GC free / 11/28 Black Friday: 25% off entire store / 11/29 Black Friday Weekend: 25% off on sale / 11/29-12/1 Black Friday Pedia Points Promo $10 select curves / 11/28-12/1 Black Friday OUTLETS: 30% off AYP / 11/15-16/15 Holiday Wishlists 15% off wishlist items | 11/24-12/24 Holiday GC Promo Buy a $100 GC and get a $20 GC free / 11/28 Black Friday Weekend: Additional 20% off Sale / 11/29-12/24 National Free Shipping Day: Free Shipping All Orders + Last Day to ship for guaranteed x-mas delivery |
| 10 | 11/30-12/6 | 51 | 24 | 11/26-12/24 Holiday GC Promo buy a $100 GC and get a $20 GC free (E,W,KI,S) / 12/1-12/6 Gift of the Week: $20 off Sweaters, full price only (E,W,KI,S) | 11/26-12/24 Holiday GC Promo buy a $100 GC and get a $20 GC free (E,W,KI,S) / 12/1 Cyber Monday: 30% off Site Wide (E,S) / 12/3-12/9 Gift of the Week: $20 off Sweaters, full price only (E,W,KI,S) / 12/1-12/2 Cyber Monday: 25% off full price apparel, free shipping all orders (S) | 11/24-12/24 Holiday GC Promo Buy a $100 GC and get a $20 GC free / 12/1-12/6 Gift of the Week: $20 off Sweaters, full price (E,W,KI,S) | 11/24-12/24 Holiday GC Promo Buy a $100 GC and get a $20 GC free / 12/1 Cyber Monday: 30% off Site Wide / 11/29-12/24 Holiday GC Promo Buy a $100 GC and get a $20 GC free |
| 11 | 12/7-12/13 | 49 | 44 | 11/26-12/24 Holiday GC Promo buy a $100 GC and get a $20 GC free (E,W,KI,S) / 12/7-12/13 Gift of the Week: BOGO 50% off FP Dresses, full price (E,W,KI,S) | 11/26-12/24 Holiday GC Promo buy a $100 GC and get a $20 GC free (E,W,KI,S) / 12/10-12/16 Gift of the Week: BOGO 50% off FP Dresses, full price (E,W,KI,S) | 11/24-12/24 Holiday GC Promo Buy a $100 GC and get a $20 GC free / 12/6 Green Monday 50% off FP Dresses, full price | 11/24-12/24 Holiday GC Promo Buy a $100 GC and get a $20 GC free / 12/9 Green Monday: Free Shipping All Orders |
| 12 | 12/14-12/20 | 42 | 48 | 11/26-12/24 Holiday GC Promo buy a $100 GC and get a $20 GC free (E,W,KI,S) / 12/14-12/20 Gift of the Week: $10 off all Scarves (E,W,KI,S) / 12/18 National Free Shipping Day: free shipping no minimum (E,S) / 12/16-12/24 Gift of the Week: BOGO 50% off FP Dresses, full price (E,W,KI,S) | 12/14-12/20 Gift of the Week: $10 off all Scarves (E,W,KI,S) / 12/17-12/24 Last Minute Sale: 30% off full price apparel / 12/16-12/22 Holiday GC Promo buy a $100 GC and get a $20 GC free (E,W,KI,S) | 11/24-12/24 Holiday GC Promo Buy a $100 GC and get a $20 GC free / 11/25-16/15 Holiday Wishlists 15% off wishlist items | 11/24-12/24 Holiday GC Promo Buy a $100 GC and get a $20 GC free / 12/24 National Free Shipping Day: Free Shipping All Orders + Last Day to ship for guaranteed x-mas delivery |
| 13 | 12/21-12/27 | 22 | 52 | 12/17-12/24 Gift of the Week: $10 off all Scarves (E,W,KI,S) / 12/21-12/31 Fresh Start Sale: BOGO % off sale items (E,W,KI,S) | 12/17-12/24 Gift of the Week: $10 off all Scarves (E,W,KI,S) / 12/21-12/31 Fresh Start Sale: BOGO % off sale on sale (E,W,KI,S) | 11/28-12/24 Holiday GC Promo Buy a $100 GC and get a $20 GC free / 11/30-12/24 Fresh Start Sale: 25% off sale on sale | 11/28-12/24 Holiday GC Promo Buy a $100 GC and get a $20 GC free / 12/26-1/2 Fresh Start Sale: 25% off sale on sale |

# Promo Calendar

D - direct mail
RS - retail signage (in addition to existing)
W - window support (in addition to existing)
E - eblast
S - social
P - print ad

| Fiscal Week | Dates | RETAIL Rev. Rank | ONLINE Rev. Rank | 2015 RETAIL | 2015 ONLINE | 2014 RETAIL - COMP PROMOTIONS | 2014 ONLINE - COMP PROMOTIONS |
|---|---|---|---|---|---|---|---|
| **January** *Find Your Sunshine* | | | | | | | |
| 14 | 12/29-1/3 | 21 | 36 | 12/23-1/11 Fresh Start Sale:30% off all sale items (E,RS,S) | 12/23-1/11 Fresh Start Sale:30% off sale items (E,RS,S) | 12/26-1/21 Fresh Start Sale: 25% off sale on sale | 12/26-1/21 Fresh Start Sale:25% off all sale on sale |
| 15 | 1/4-1/10 | 38 | 27 | 12/23-1/11 Fresh Start Sale:30% off sale items (E,RS,S) | 12/23-1/11 Fresh Start Sale:30% off sale items (E,RS,S) | 1/7-1/21 Bring In Your Blues:15% off KUT Jeans when you recycle old denim | 12/26-1/21 Fresh Start Sale:25% off all sale on sale |
| 16 | 1/11-1/17 | 16 | 31 | 1/16-1/23 Sweater Promo: 40% off Sweaters | 1/16-1/23 Sweater Promo: 40% off sweaters | 1/7-1/21 Bring In Your Blues:15% off KUT Jeans when you recycle old denim | 1/7-1/21 Bring In Your Blues:15% off KUT Jeans when you recycle old denim |
| 17 | 1/18-1/24 | 19 | 23 | 1/24-1/26 BOGO Tops:buy one get one 50% off tops | 1/24-1/26 BOGO Tops:Buy one get one 50% off tops | | 1/23 Boa T BOGO:buy one get one FREE on Boca Tees |
| **February** *Love & Whimsy* | | | | | | | |
| 18 | 1/25-1/31 | 25 | 41 | 1/27-2/1 Pick of the Week:25% off all full price Cabin print (RS) | | | |
| 19 | 2/1-2/7 | 13 | 40 | 1/27-2/1 Pick of the Week:25% off all full price Cabin print (RS); 2/2-2/9 Pick of the Week 25% off Coral Coast & Green Cherries print (RS) | 2/2-2/8 Sweater Sale:50% off Sale on Sale (E,RS) | 2/28-2/9 Sweater Sale:50% off all sweaters | 2/8-2/9 Sweater Sale:30% off all sweaters |
| 20 | 2/8-2/14 | 7 | 35 | 2/2-2/9 Pick of the Week:25% off Circle Coast & Green Cherries print; 2/15-2/21 Presidents Day Sale:30% off sale (E,RS,S,W) | 2/2-2/8 Sale on sale:50% off Sale (E,RS) | 2/14-2/18 Presidents Day Sale:30% off all sale on sale;30% off sweaters and bottoms | 2/14-2/19 Sweater Sale:30% off all sweaters and bottoms |
| 21 | 2/15-2/21 | 3 | 11 | 2/15-2/21 Presidents Day Sale:30% off Sale (E,RS,S,W) | 2/15-2/21 Presidents Day Sale:30% off Sale (E,RS,S,W) | 2/14-2/18 Presidents Day Sale:30% off all sale on sale;30% off sweaters and bottoms | 2/14-2/18 Presidents Day Sale:30% off sale on sale;30% off sweaters and bottoms |
| **March** *Life is Better at the Beach* | | | | | | | |
| 22 | 2/22-2/28 | 4 | 32 | 2/23-3/28 Spring Sale:25% off $125+ full price (E,W,RS) | 2/23-3/28 Spring Sale:25% off $125+ full price (E,W,RS) | 2/28-3/9 Sweater Sale:50% off all sweaters | 2/28-3/9 Sweater Sale:50% off all sweaters |
| 23 | 3/1-3/7 | 6 | 16 | 2/23-3/28 Spring Sale:25% off $125+ full price (E,W,RS); 2/23-3/28 Sale on sale:50% off Sale (E,RS) | 2/23-3/28 Spring Sale:25% off $125+ full price (E,W,RS); 2/23-3/28 Sale on sale:50% off sale (E,RS); 3/4-3/14 Wholesale:40% off sitewide for all retail accounts | 2/28-3/9 Sweater Sale:50% off all sweaters; 3/1-3/16 Spring Lookbook:$20 off $100+ OR $10 off $50+, free shipping | 2/28-3/9 Sweater Sale:50% off all sweaters; 3/1-3/16 Spring Lookbook:$20 off $100+ OR $10 off $50+, free shipping |
| 24 | 3/8-3/14 | 1 | 21 | 2/23-3/28 Spring Sale:25% off $125+ full price (E,W,RS); 2/23-3/28 Sale on sale:50% off Sale (E,RS) | 2/23-3/28 Spring Sale:25% off $125+ full price (E,W,RS); 2/23-3/28 Sale on sale:50% off sale (E,RS); 3/4-3/14 Wholesale:40% off sitewide for all retail accounts | 2/28-3/9 Sweater Sale:50% off all sweaters; 3/1-3/16 Spring Lookbook:$20 off $100+ OR $10 off $50+, free shipping; 3/13-3/31 Life is Better at the Beach:ETW a custom FP beach cruiser | 2/28-3/9 Sweater Sale:50% off all sweaters; 3/1-3/16 Spring Lookbook:$20 off $100+ OR $10 off $50+, free shipping; 3/13-3/31 Life is Better at the Beach:ETW a custom FP beach cruiser |
| 25 | 3/15-3/21 | 2 | 22 | 2/23-3/28 Spring Sale:25% off $125+ full price (E,W,RS); 2/23-3/28 Sale on sale:30% off sale (E,RS); 3/14-3/30 Coastal Living A4 (April):$25 off $125+ full price FP (P) | 2/23-3/28 Spring Sale:25% off $125+ full price (E,W,RS); 2/23-3/28 Sale on sale:30% off sale (E,RS); 3/14-3/30 Coastal Living A4 (April):$25 off $125+ full price FP (P) | 3/1-3/16 Spring Lookbook:$20 off $100+ OR $10 off $50+, free shipping; 3/20-7/30 Sunshine Sale (PA):30% all full price & sale FP (select FL store); 3/24-4/2 Sunshine Sale:30% off sale on sale; 3/13-3/31 Life is Better at the Beach:ETW a custom FP beach cruiser | 3/1-3/16 Spring Lookbook:$20 off $100+ OR $10 off $50+, free shipping; 3/24-4/2 Sunshine Sale:30% off sale on sale; 3/13-3/31 Life is Better at the Beach:ETW a custom FP beach cruiser |
| 26 | 3/22-3/28 | 5 | 2 | 2/23-3/28 Spring Sale:25% off $125+ full price (E,W,RS); 2/23-3/28 Sale on sale:30% off sale (E,RS); 3/14-3/30 Coastal Living A4 (April):$25 off $125+ full price FP (P) | 2/23-3/28 Spring Sale:25% off $125+ full price (E,W,RS); 2/23-3/28 Sale on sale:30% off sale (E,RS); 3/14-3/30 Coastal Living A4 (April):$25 off $125+ full price FP (P) | 3/1-3/16 Spring Lookbook:$20 off $100+ OR $10 off $50+, free shipping; 3/20-7/30 Sunshine Sale (PA):30% all full price & sale FP (select FL store); 3/13-3/31 Life is Better at the Beach:ETW a custom FP beach cruiser | 3/14-3/15 Spring Lookbook:$20 off $120+ OR $10 off $50+, free shipping; 3/24-4/9 Sunshine Sale:30% off sale on sale; 3/13-3/31 Life is Better at the Beach:ETW a custom FP beach cruiser |
| **April** *Life is Better at the Beach* | | | | | | | |
| 27 | 3/29-4/4 | 9 | 6 | 3/14-3/30 Coastal Living A4 (April):$25 off $125+ full price FP (P) | 3/14-3/30 Coastal Living A4 (April):$25 off $125+ full price FP (P) | 3/14-4/15 Spring Lookbook:$20 off $120+ OR $10 off $50+, free shipping; 3/20-4/5 Sunshine Sale:30% off sale on sale; 4/3-4/13 Life is Better at the Beach:ETW a custom FP beach cruiser | 3/24-4/15 Spring Lookbook:$20 off $120+ OR $10 off $50+, free shipping; 3/20-4/5 Sunshine Sale:30% off sale on sale; 4/3-4/13 Life is Better at the Beach:ETW a custom FP beach cruiser |
| 28 | 4/5-4/11 | 8 | 17 | 3/14-3/30 Coastal Living A4 (April):$25 off $125+ full price FP (P); 4/3-4/13 Sale on Sale: 50% off sale on sale | 3/14-3/30 Coastal Living A4 (April):$25 off $125+ full price FP (P); 4/3-4/13 Sale on Sale:50% off sale on sale | 3/14-4/15 Spring Lookbook:$20 off $120+ OR $10 off $50+, free shipping; 4/3-4/13 Sale on Sale:50% off sale on sale; 4/3-4/13 Life is Better at the Beach:ETW a custom FP beach cruiser | 3/24-4/15 Spring Lookbook:$20 off $120+ OR $10 off $50+, free shipping; 4/3-4/13 Sale on Sale:50% off sale on sale; 4/3-4/13 Life is Better at the Beach:ETW a custom FP beach cruiser |
| 29 | 4/12-4/18 | 12 | 7 | 3/14-3/30 Coastal Living A4 (April):$25 off $125+ full price FP (P) | 3/14-3/30 Coastal Living A4 (April):$25 off $125+ full price FP (P) | 3/24-4/15 Spring Lookbook:$20 off $120+ OR $10 off $50+, free shipping; 4/24-4/30 Bottoms BOGO:buy one get one 50% off on Bottoms | 3/24-4/15 Spring Lookbook:$20 off $120+ OR $10 off $50+, free shipping; 4/24-4/30 Sale on Sale:50% off sale on sale |
| 30 | 4/19-4/25 | 17 | 18 | 3/14-3/30 Coastal Living A4 (April):$25 off $125+ full price FP (P) | 3/14-3/30 Coastal Living A4 (April):$25 off $125+ full price FP (P) | 4/24-4/30 Screen Prints Sale:30% off screens | 4/24-4/30 bottoms BOGO:buy one get one 50% off on bottoms |

# Promo Calendar

D - direct mail
IS - retail signage (in addition to existing)
W - window support (in addition to existing)
E - e-blast
S - social
P - print ad

| Fiscal Week | Dates | RETAIL Rev. Rank | ONLINE Rev. Rank | RETAIL | ONLINE | RETAIL + COMP PROMOTIONS | ONLINE + COMP PROMOTIONS |
|---|---|---|---|---|---|---|---|
| | | | | | 2015 | | 2014 |
| **May** *Paradise Found* | | | | | | | |
| 31 | 4/26-5/2 | 16 | 20 | | 3/14-4/26 Coastal Living Ad (April) $25 off $125+ full price FP (P) | 4/24-4/30 Screen Print Sale:30% off screen | 4/24-4/30 Bottoms BOGO:Buy one get one 25% off on bottoms |
| | | | | | | 5/3-5/7 BOGO Tops:BOGO 50% off tops | 5/3-5/7 BOGO Tops:BOGO 50% off tops |
| 32 | 5/3-5/9 | 14 | 14 | | | 5/3-5/7 BOGO Tops:BOGO 50% off tops | 5/3-5/7 BOGO Tops:BOGO 50% off tops |
| | | | | | | 5/8-5/14 BOGO:BOGO 20% off accessories | 5/8-5/14 BOGO:BOGO 20% off accessories |
| 33 | 5/10-5/16 | 13 | 13 | | | 5/8-5/14 BOGO:BOGO 20% off accessories | 5/8-5/14 BOGO:BOGO 20% off accessories |
| 34 | 5/17-5/23 | 10 | 13 | | | 5/14-5/21 Semiannual Sale:30% off sale on sale | 5/14-5/21 Semiannual Sale:30% off sale on sale |
| | | | | | | 5/14-5/21 Semiannual Sale:30% off sale on sale | 5/14-5/21 Semiannual Sale:30% off sale on sale |
| **June** *Paradise Found* | | | | | | | |
| 35 | 5/24-5/30 | 11 | 9 | | 3/14-4/26 Coastal Living Ad (April) $25 off $125+ full price FP (P) | 5/14-5/21 Semiannual Sale:30% off sale on sale | 5/14-5/21 Semiannual Sale:30% off sale on sale |
| | | | | | | 5/14-5/21 Semiannual Sale:30% off sale on sale | 5/14-5/21 Semiannual Sale:30% off sale on sale |
| 36 | 5/31-6/6 | 20 | 4 | | | 6/4-6/27 Summer Lookbook:25% off $100+ or $20 off $100+ | 6/4-6/27 Summer Lookbook:25% off $100+ or $20 off $100+ |
| | | | | | | 6/4-6/30 ETW:Girls Weekend Giveaway | 6/4-6/30 ETW:Girls Weekend Giveaway |
| | | | | | | 6/4-6/30 GWP B-day Tee:free tee with purchase of $150+ | 6/4-6/30 GWP B-day Tee:free tee with purchase of $150+ |
| | | | | | | 6/4-6/27 Summer Lookbook:25% off $100+ or $20 off $100+ | 6/4-6/27 Summer Lookbook:25% off $100+ or $20 off $100+ |
| | | | | | | 6/4-6/30 ETW:Girls Weekend Giveaway | |
| 37 | 6/7-6/13 | 23 | 3 | | | 6/4-6/27 Summer Lookbook:25% off $100+ or $20 off $100+ | 6/4-6/27 Summer Lookbook:25% off $100+ or $20 off $100+ |
| | | | | | | 6/4-6/27 Pick of Week:20% off cabin stripe skirt | 6/4-6/30 ETW:Girls Weekend Giveaway |
| | | | | | | 6/4-6/30 ETW:Girls Weekend Giveaway | 6/4-6/30 GWP B-day Tee:free tee with purchase of $150+ |
| | | | | | | 6/4-6/30 GWP B-day Tee:free tee with purchase of $150+ | |
| 38 | 6/14-6/20 | 24 | 19 | | | 6/4-6/27 Summer Lookbook:25% off $100+ or $20 off $100+ | 6/4-6/27 Summer Lookbook:25% off $100+ or $20 off $100+ |
| | | | | | | 6/4-6/30 ETW:Girls Weekend Giveaway | 6/4-6/30 ETW:Girls Weekend Giveaway |
| | | | | | | 6/4-6/30 GWP B-day Tee:free tee with purchase of $150+ | 6/4-6/30 GWP B-day Tee:free tee with purchase of $150+ |
| | | | | | | 6/4-6/24 Pick of Week:20% off harbor dress | |
| 39 | 6/21-6/27 | 15 | 8 | | | 6/4-6/27 Summer Lookbook:25% off $100+ or $20 off $100+ | 6/4-6/27 Summer Lookbook:25% off $100+ or $20 off $100+ |
| | | | | | | 6/4-6/30 ETW:Girls Weekend Giveaway | 6/4-6/30 ETW:Girls Weekend Giveaway |
| | | | | | | 6/28-6/24 Pick of Week:30% off harbor dress | 6/4-6/30 GWP B-day Tee:free tee with purchase of $150+ |
| | | | | | | 6/29-7/2 Pick of Week:30% off Vintage Pacific Top & EP Ella:half Sleeve | |
| **July** | | | | | | | |
| 40 | 6/28-7/4 | 27 | 1 | | | 6/28 30th B-days:30% off all shirts (excl VG & Brighton) | 6/28 30th B-days:30% off site wide |
| 41 | 7/5-7/11 | 30 | 26 | | | 6/29-7/2 Pick of Week:30% off Vintage Pacific Top & EP Ella:Half Sleeve | |
| 42 | 7/12-7/18 | 30 | 28 | | | | |
| 43 | 7/19-7/25 | 31 | 15 | | | | |
| **August** | | | | | | | |
| 44 | 7/26-8/1 | 32 | 25 | | | | |
| 45 | 8/2-8/8 | 37 | 34 | | | | |
| 46 | 8/9-8/15 | 40 | 38 | | | | |
| 47 | 8/16-8/22 | 41 | 5 | | | 8/23-8/7 Semiannual Sale:25% off sale on sale | 8/23-8/7 Semiannual Sale:25% off sale on sale |
| **September** | | | | | | | |
| 48 | 8/23-8/29 | 45 | 10 | | | 8/23-8/7 Semiannual Sale:25% off sale on sale | 8/23-8/7 Semiannual Sale:25% off sale on sale |
| 49 | 8/30-9/5 | 46 | 30 | | | 8/23-8/7 Semiannual Sale:25% off sale on sale | 8/23-8/7 Semiannual Sale:25% off sale on sale |
| 50 | 9/6-9/12 | 51 | 33 | | | 8/23-8/7 Semiannual Sale:25% off sale on sale | 8/23-8/7 Semiannual Sale:25% off sale on sale |
| 51 | 9/13-9/19 | 34 | 51 | | | | |
| 52 | 9/20-9/26 | 48 | 37 | | | | |