# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| In re | Case No. 15-13485 |
| FRESH PRODUCE HOLDINGS, LLC, | Chapter 11 |
| Debtor. | |

## OMNIBUS DECLARATION OF JO STONE
## IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, Jo Stone, submit this Omnibus Declaration of Jo Stone in Support of Chapter 11 Petition and First Day Motions (the "**Declaration**").  On April 4, 2015 (the "**Petition Date**"), Fresh Produce Holdings, LLC ("**FPH**") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  On April 2, 2015, Fresh Produce Retail, LLC, Fresh Produce Sportswear ("**FPS**"), LLC, Fresh Produce of St. Armands, LLC, FP Brogan – Sanibel Island, LLC, and Fresh Produce Coconut Point, LLC (collectively with FPH, the "**Debtors**")  filed voluntary chapter 11 petitions (collectively with FPH, the "**Cases**"). In support of the first day motions in these Cases (the "**First Day Motions**"), I declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that:

1.      I am the Interim President/Chief Financial Officer of FPS and FPH, the latter of which entity owns all of the equity of the other Debtors.   In my capacity as Interim President/CFO, I am knowledgeable regarding the Debtors' affairs, including business operations, strategic planning, financial reporting, human resources, legal affairs, and other management activities.

2.      I previously served as Chief Financial Officer and/or Chief Operating Officer of the Debtors from 2009 to January 2014.   I am authorized by the Debtors to submit this Declaration in support of the Debtors' Cases and the First Day Motions.

3.      The Debtors intend to continue in possession of their property and management of their respective businesses as debtors-in-possession. In order to enable the Debtors to operate effectively post-petition and to minimize adverse effects from their chapter 11 filings, the Debtors have requested relief in the form of the First Day Motions.  Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, information supplied or verified by the Debtors' personnel and advisors, my review of relevant documents, my discussions with other members of the Debtors' management team or advisors, or my opinion based upon experience, expertise, and knowledge of the Debtors' operations and financial condition.

4.      In making my statements based on my review of the Debtors' books and records, relevant documents, and other information prepared or collected by the Debtors' personnel and advisors, I have relied upon these personnel and advisors accurately recording, preparing, collecting, or verifying any such documentation and other information.  If I were called to testify as a witness in this matter, I could and would testify competently to the facts set forth herein.

5.      On April 2, each Debtor except FPH filed a voluntary petition for relief in the United States Bankruptcy Court for the District of Colorado (the "**Bankruptcy Court**").  Because FPH has the debt, assets, and most of the operations of the Debtors, references to the "Petition Date" are to April 4, 2015.

6.      Section I of this Declaration provides an overview of the Debtors' business and operations, as well as the events that led to the Debtors' filing for relief under chapter 11 of the Bankruptcy Code.  Section II affirms and incorporates facts that support the relief requested in the First Day Motions.

## I.   THE DEBTORS' BUSINESS AND OPERATIONS

### A.   Overview

#### a)   Introductory Statement

7.     The Debtors commenced these Cases in order to effectuate a liquidation or sale as a going concern of the Debtors.  With this transaction, the Debtors expect to be able to (1) ensure continued availability of an outstanding line of women's apparel and accessories to the Debtors' nationwide customer base, (2) preserve jobs for the Debtors' approximately 270 employees, or, in the alternative, (3) generate cash in liquidation.  The contemplated transaction is proposed in response to significant financial challenges facing this organization, and comes after a considerable effort.

8.     The proposed sale (the "**Sale**") contemplates divestiture of substantially all assets of the Debtors under the supervision of this Court, pursuant to section 363 of the Bankruptcy Code.  The purpose of the relief requested on an emergency basis at the commencement of this case is to ensure continuation of the Debtors' operations in the ordinary course and to permit the transactions associated with continued production and delivery of product.

9.     The Debtors were founded in 1984 at the Los Angeles Olympic games, selling white T-shirts with custom pastel designs that complemented the color theme used at the games. Overwhelming sales during the games and $15,000 from friends and family combined to launch the business of selling these designs to retail shop owners up and down the California coast, and expanded over the years to a wholesale, retail and e-commerce business.  The Debtors offer a broad line of Fresh Produce branded women's clothing and accessories consisting of approximately 184 styles for distribution through its three channels of business.

10.    The Debtors are a network of twenty-seven retail stores located nationwide— twenty-five full price, and two off-price—with approximately 400 wholesale customers and a

company branded e-commerce platform as well as a finishing, fulfillment and distribution center located in Gardena, CA (the "**Gardena Facility**").  The Gardena Facility is responsible for distributing approximately 80-85% of the Debtors' merchandise, with the balance being provided and distributed to the Debtors' stores by third-party vendors.

11.     The stores average approximately 2,100 square feet of selling space, with an additional 400 square feet utilized for merchandise processing, temporary storage, and administration.  The Debtors lease all retail locations.

12.      The Debtors' historical strategy was to focus on selling to coastal, beach resort retailers where the design and function of colorful, loose fitting cotton clothing resonated well with a tourist customer base.  As the brand grew in recognition, the Debtors expanded their distribution model to include opening their own retail stores, mainly in resort locations, and launching a company website to expand distribution beyond these coastal locations. The Debtors have expanded their strategy for future store locations to include non-resort, non-tourist areas with urban markets that may have national or regional broad line retail stores in the near proximity, and have expanded the product line to have a broader appeal to non-tourist customers for whom a 'vacation state of mind' resonates.

13.     The Debtors initially launched a proprietary website in May 2006 with a limited offering of plus size apparel.  In January of 2009 the assortment was expanded to include the full product offering of Fresh Produce branded apparel and accessories— www.freshproduceclothes.com.  In late 2013, a small assortment of non-Fresh Produce branded product was added to the Debtors' offerings.

14.     As of the Petition Date, the Debtors employed approximately 270 people, excluding temps.  Of these employees, approximately 32 are in Boulder, CO at the company's

main office, 17 are in the Gardena Facility, and the balance are employed in the various retail locations across the United States. Additional employees are hired on a seasonal or as-needed basis, most of whom are fulfilment or finishing personnel.

**b)     The Debtors' Organizational Structure.**

15.     The Debtors consist of a privately owned holding company, FPH, which in turn wholly owns five separate LLCs—the other Debtor entities.

16.     FPH is a Delaware entity.  FPS and Fresh Produce Retail are registered in Colorado.  The remaining Fresh Produce entities are Florida entities.

17.     The Debtors are all LLC entities formed in 2012 in connection with an acquisition of the five Fresh Produce branded entities by FPH.

18.     Prior to 2012, the non-FPH entities existed as discrete entities with distinct ownership.

**c)     The Debtors' Assets and Liabilities.**

19.     The Debtors derive all or substantially all of their revenue through the sale of merchandise in the United States.  During the fiscal year ended September 27, 2014, the Debtors generated net sales from continuing operations of approximately $37.9 million.  As of February 2015, the Debtors had assets totaling approximately $22.2 million at book value.  These assets include $13.3 million in net inventory, $1.3 million in accounts receivable, $2 million in property and equipment, and $2.1 million in other long-term assets.  Liabilities total approximately $15.1 million.  The bulk of the liabilities were total debt outstanding under a credit facility and trade payables.

(a)     *Wells Fargo Credit Facility*

20.     The Debtors are borrowers under a Credit and Security Agreement, dated as of September 26, 2014, as amended pursuant to that certain First Amendment to Credit and Security

Agreement and Forbearance Agreement, dated as of March 2015, with Wells Fargo Bank, National Association ("**Wells Fargo**").

21.     Wells Fargo asserts a first priority lien and security interest in all of the Debtors' assets (the "**Prepetition Collateral**"), including all of the Debtors' cash (the "**Cash Collateral**"), pursuant to a Credit and Security Agreement, dated as of September 26, 2014, by and among (i) Wells Fargo, as lender, (ii) Debtor FPH, as borrower, and (iii) the other Debtors as guarantors (the "**Credit Agreement**").

22.     The Credit Agreement secures the payment of FPH's obligations under a Revolving Note in the amount of $10,000,000, also dated September 26, 2014 (the "**Revolving Note**" and together with the Credit Agreement, and any amendments, modifications, supplements and continuing guarantees thereto, the "**Loan Documents**").  Pursuant to the Credit Agreement and Revolving Note, Wells Fargo agreed to make revolving loans to FPH in an amount not to exceed the lesser of:  (i) the "Maximum Revolver Amount" (defined in the Credit Agreement as $10 million, decreased by permanent reductions pursuant to the terms of the Credit Agreement) less the "Letter of Credit Usage" (i.e., outstanding letters of credit issued by Wells Fargo to or for the benefit of FPH); or (ii) the "Borrowing Base" less the Letter of Credit Usage.  Pursuant to the terms of the Credit Agreement, the Borrowing Base generally equals 85% of FPH's eligible accounts, as adjusted upwards and downwards pursuant to the factors set forth in Schedule 1.1 of the Credit Agreement.  As of the Petition Date, FPH was indebted to Wells Fargo in the approximate amount of $3,941,572.76, exclusive of contingent liabilities, swap liabilities and fees and expenses owed pursuant to the Loan Documents.

(b)     *Capital Lease Obligations*

23.     The Debtors are lessees of certain computer equipment under various long-term capital leases expiring at various dates.  As of the end of fiscal year 2014, the Debtors had total

capital lease obligations, including long-term obligations, of approximately $300,000.   As of February 2015, approximately $125,000 was owing in connection with the capital leases.

        (b)    *Other Indebtedness*

24.    The Debtors are lessees under various operating leases for store locations throughout the United States, with average monthly rental obligations under such leases totaling approximately $450,000.   The Debtors also regularly receive goods, services, and supplies from various vendors and providers in the ordinary course of the Debtors' operations.   As of February 21, 2015, an aggregate amount of more than $9 million was owing to prepetition vendors, service providers, and landlords.

**B.**    **Events Leading to the Filing of the Chapter 11 Cases.**

25.    The Debtors' Cases were necessitated by aggressive overexpansion without the commensurate return on investment.   Expected revenues did not materialize to offset increased spending.   In addition, the Debtors experienced high turnover in key positions in the Debtors' management in a very short period of time.   The Debtors' financial oversight and control suffered as personnel had to be replaced with individuals without sufficient institutional knowledge.   As a result of the decline in the Debtors' operating results in fiscal year 2014 and the first two quarters of fiscal year 2015, the Debtors recognized the critical need to avoid additional losses.   As a result of the preceding, in February 2015, the Debtors terminated previous management and engaged an interim consulting management team, Riderflex Consulting LLC, to aid in the operation and financial management of the Debtors.   In fiscal year 2015, the Debtors have opened no new stores.   The Debtors also closed one underperforming store in March 2015, executed a reduction in force, implemented a 10% base pay decrease across the board, and cut expenses where possible.

26.     To these ends, the Debtors' interim management and the Debtors' advisors performed an analysis of the Debtors' operations and financial performance to identify areas for improvement.  Also, in February 2015, the Debtors engaged Alliance Management ("**Alliance**") as financial advisor.  The Debtors and their advisors, including Alliance, in cooperation with Wells Fargo, have actively explored all available alternatives, including obtaining additional liquidity through the infusion of capital and/or pursuing one or more transactions to restructure existing debt obligations and improve overall financial and operating performance.

27.     Many of the Debtors' most significant suppliers tightened their payment terms, or required cash on delivery, thereby further constricting the Debtors' already-strained liquidity position.

28.     The Debtors and their advisors began discussions with multiple experienced entities to serve as potential liquidation agents for the Debtors in conducting store closing sales of the merchandise, inventory, and owned furniture, fixtures, and equipment at some or all of the Debtors' stores.  The Debtors, in consultation with their advisors, determined that it was in the best interest of all parties to conduct a competitive bidding and auction process to select the liquidation agent with the highest or otherwise best offer for conducting the store closing sales.  Accordingly, the Debtors seek approval of their stalking horse agency agreement with Yellen Partners (the "**Stalking Horse Liquidator**") subject to higher and better offers.

29.     In addition to the potential store closing sales, the Debtors, after careful consideration and consultation with their advisors, also determined that it was necessary to pursue a going concern sale or other restructuring transaction with one or more potential purchasers or other strategic partners with respect to the portion of their assets and business.  Accordingly, the

Debtors, together with their advisors, contacted a number of potential purchasers or strategic partners in connection with a potential sale or other restructuring transaction.

30.     Owing to these efforts, the Debtors contemplate a fulsome marketing process on a dual track:  (i) the Debtors will market the liquidation of all of the Debtors' stores and seek higher and otherwise better liquidation bids than the stalking horse bid, and, at the same time, (ii) the Debtors will seek to market a going concern transaction pursuant to section 363 of the Bankruptcy Code with financial and strategic buyers, many of whom have already been contacted.  In the event that a potential purchaser seeks to purchase certain of the Debtors' stores as part of a going concern transaction, the Debtors have preserved the optionality of pursuing such a going concern transaction (perhaps in conjunction with a liquidation transaction on stores that may have to be closed).

31.     The Debtors carefully reviewed all bids received prior to the filing of their petitions taking into consideration all relevant terms thereof, including compensation terms as well as the experience of the applicable liquidation agent submitting the bid proposal.  The Debtors ultimately determined that the bid submitted by the Stalking Horse Liquidator was the most favorable offer for the Debtors and their estates and currently presents the best opportunity to maximize value for the estates through the store closing sales.

32.     Time is of the essence in conducting the expected store closing sales during these chapter 11 Cases, as scheduling the store closing sales to coincide with the current pre-summer peak season will ensure maximum value is received for the assets being liquidated.  In addition, conducting the store closing sales promptly in these Cases will stem further losses and minimize administrative expenses in connection with such stores.

## II.      FIRST DAY MOTIONS AND ORDERS[1]

33.      In furtherance of the Debtors' restructuring objectives, and concurrently with the filing of their chapter 11 petitions, the Debtors are seeking orders approving the First Day Motions (collectively, the "**First Day Orders**").  Generally, the First Day Motions have been designed to meet the Debtors' goals of (a) continuing their operations in chapter 11 with as little disruption and loss of productivity as possible, while ensuring preservation of value for the estates, (b) maintaining the confidence and support of their employees, customers, vendors, suppliers and service providers during the Debtors' reorganization process, and (c) establishing procedures for the smooth and efficient administration of these chapter 11 Cases.  The Debtors request that each of the First Day Orders be entered, as each constitutes an integral element in maximizing the value of these estates for the benefit of all parties in interest.

34.      In connection with the preparation of these bankruptcy Cases, I have reviewed those First Day Motions and First Day Orders that are described herein (including the exhibits thereto) with Debtors' counsel.  The First Day Motions were prepared with the input and assistance of myself and my employees and advisors, and the facts set forth therein are true and correct to the best of my knowledge, information, and belief, and based upon the information supplied or verified by various employees of the Debtors.  Furthermore, it is my belief that the relief sought in each of the First Day Motions is tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability preserve and maximize the value of their estates. I also believe that all of the relief requested in the First Day Motions on an interim basis, to the extent applicable, is necessary to prevent immediate and irreparable harm to the Debtors, pending a final hearing.

---

[1] Capitalized terms used but not defined in this Section III shall have the meanings ascribed to them in the applicable First Day Pleading.

### A.      Joint Administration Motion

35.      By the Joint Administration Motion, the Debtors request that the Bankruptcy Court authorize and direct the joint administration of the chapter 11 Cases of the Debtors and the consolidation thereof only for procedural purposes pursuant to Bankruptcy Rule 1015.   In addition, the Debtors request that the Clerk of the Bankruptcy Court make an entry on the docket of the case for each Debtor other than FPH, stating that an order has been entered directing joint administration of these chapter 11 Cases and that all further pleadings and other papers shall be filed in and all further docket entries shall be made in FPH's docket.

36.      The Debtors are related entities and are filing petitions in the same Bankruptcy Court.   I believe that joint administration will be less costly and burdensome than separate procedural administration of the estates due to the combined docket and combined notice to creditors and parties in interest.   Many applications, motions, orders, hearings and notices will be made in these Cases and will affect all Debtors and their estates.   Joint administration will keep all parties informed of matters related to these Cases without the inconvenience and confusion of reviewing separate dockets.   In addition, since the Debtors are seeking only administrative consolidation by this motion, rather than substantive consolidation, I do not believe creditors' interests will be impacted.

37.      I believe that if each Debtor's case was administered independently, there would be a number of duplicative pleadings and overlapping service.   This unnecessary duplication of identical documents would be wasteful of the Debtors' resources, as well as other parties' and this Bankruptcy Court's resources.

38.      The Debtors are run as a single business.   The functions of all entities are interrelated, with creditors typically dealing with the Debtors as one entity.   Further, the Debtors do not maintain separate creditor lists for each of their entities.   Thus, joint administration of these

Cases will not result in any prejudice to the Debtors' creditors or other parties-in-interest. In fact, joint administration of these Cases would facilitate the administration process and would ease the burden and expense of administering the estates, permitting parties to be heard in cases affecting their recovery.

39.     Therefore, I believe that the chapter 11 Cases should be jointly administered for procedural purposes only, and the Joint Administration Motion should be approved.

**B.     Utilities Motion**

40.     By the Utilities Motion, the Debtors are requesting entry of interim and final orders (a) prohibiting utilities from altering, refusing, or discontinuing services to, or discriminating against, the Debtors on account of prepetition invoices, (b) determining that the utilities are adequately assured of future payment, and (c) establishing procedures for determining adequate assurance of payment.

41.     As mentioned above, the Debtors operate 27 store locations across the United States and maintain executive offices and a support center in Boulder, CO, as well as the Gardena Facility (collectively, the "**Facilities**"), all of which require the continuous provision of utility services, such as electricity, natural gas, oil, water, sewer, telecom, trash collection and/or other services (each, a "**Utility Service**" and collectively, the "**Utility Services**") from local and/or regional utilities (each a "**Utility Company**" and collectively, the "**Utility Companies**").  The Debtors' average monthly obligations to the Utility Companies total approximately $50,000 in the aggregate.

42.     I believe that uninterrupted utility services are essential to the ongoing operations of the Debtors, and therefore, to the successful resolution of these cases.  Any interruption of utility services, even for a brief period of time, would negatively affect the Debtors' operation, thereby seriously jeopardizing the Debtors' restructuring efforts and, ultimately, recoveries for

their creditors.  It is therefore critical that Utility Services continue uninterrupted during these chapter 11 cases.

43.     The Debtors propose to provide "assurance of payment" to Utility Companies, within thirty (30) days after the Petition Date, by placing a cash deposit (the "**Adequate Assurance Deposit**") equal to the cost of Utility Services for a period of two weeks, calculated based on the historical weekly average costs, into a newly created, segregated account (the "**Utility Deposit Account**") for the benefit of any Utility Company, unless any such Utility Company agrees in writing to a lesser amount, is paid in advance for Utility Services, or already holds a deposit equal to or greater than two weeks of Utility Services.  The Debtors estimate that the total amount of such deposit would be approximately $25,000.  The Debtors submit that the establishment of the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for future utility services in the ordinary course of business, constitutes adequate assurance of payment to the Utility Providers.

44.     Finally, the Debtors propose to protect the Utility Providers by establishing the Adequate Assurance Procedures provided in the Utilities Motion, whereby any Utility Provider may request additional adequate assurance in the event that it believes there are facts and circumstances with respect to its providing post-petition services to the Debtors that would merit greater protection.

45.     Therefore, I believe that the Utility Providers have adequate assurance of future performance, and the relief sought in the Utility Motion should be granted.

### C.     Cash Management Motion

46.     By the Cash Management Motion, the Debtors seek entry of an order, among other things, (a) approving the Debtors' continued use of their current cash management system and the Debtors' existing bank accounts and business forms, (b) authorizing the Debtors to open

and close bank accounts as necessary in the ordinary course of business, (c) granting the Debtors a 60-day extension to either comply with the requirements of section 345(b) of the Bankruptcy Code or file a motion seeking an additional extension or waiver of the requirements of section 345(b) of the Bankruptcy Code, and (d) authorizing all banks participating in the Debtors' cash management system to honor certain transfers and charge back fees and certain other amounts.

47.     In the ordinary course of business, the Debtors maintain 36 bank accounts (the "**Bank Accounts**") with 2 different financial institutions (the "**Banks**") that operate in connection with a centralized cash management system (the "**Cash Management System**").  A list of the Bank Accounts is attached to the Cash Management Motion as Exhibit B.  Through the Bank Accounts, the Debtors efficiently collect, transfer and disburse funds generated from their operations on a daily basis.  The Debtors employ various methods to deposit, withdraw, and otherwise transfer funds to, from and between the Bank Accounts, including checks, automated clearing house ("**ACH**") transactions, direct deposits and electronic funds transfers.

48.     Each of the Debtors' store locations maintains a separate deposit account into which each individual store's receipts and collections are deposited daily (the "**Store Deposit Accounts**").  The Store Deposit Accounts are swept regularly into a retail concentration account (the "**Depository Account**") maintained at Wells Fargo.  The frequency of the sweeps into the Depository Account varies for each Store Deposit Account, with some Store Deposit Accounts being swept daily and others being swept weekly.  In addition, certain other funds, such as funds and deposits, credit card settlements, customer charge account payments, desktop deposits, and checks delivered directly to the Debtors' headquarters are deposited directly into the wholesale lockbox account which in turn is swept into the main collection account.  Funds in the main collection account are swept on a daily basis by Wells Fargo, in its capacity as administrative

agent and lender under the Debtors' prepetition revolving credit facility (the "**Revolving Credit Facility**"), and applied towards the Debtors' obligations under the Revolving Credit Facility.

49.     On a regular basis, the Debtors request draws under the Revolving Credit Facility, with the availability of funds dependent upon the Debtors' borrowing base under the applicable loan documents.  Funds drawn by the Debtors under the Revolving Credit Facility are deposited into an operating account maintained by the Debtors (the "**Operating Account**").

50.     In addition to the operating account, the Debtors maintain three disbursement accounts at Wells Fargo (the "**Disbursement Accounts**").  One is used for check disbursements to satisfy obligations relating to accounts payable, the second for wires/ACH to satisfy obligations relating to accounts payable, and the third for payroll to the Debtors' employees.   The Disbursement Accounts are zero-balance accounts, and a sufficient amount of funds necessary to make such payments are regularly transferred from the Operating Account to the Disbursement Accounts.

51.     Any excess funds remaining in the Operating Account after all such disbursements are made are swept by Wells Fargo, in its capacity as administrative agent and lender under the Revolving Credit Facility, and applied towards the Debtors' obligations under the Revolving Credit Facility.

52.     I believe that by using the existing Cash Management System, Bank Accounts and investment practices, the Debtors will avoid unnecessary expense and delay that would disrupt the ordinary financial affairs and business operations of the Debtors, delay the administration of the Debtors' estates, and increase the costs to the estates.  I believe that the relief requested in the Cash Management Motion will help to ensure the Debtors' orderly entry into chapter 11 protection and will avoid many of the possible disruptions and distractions that

could divert the Debtors' attention from more pressing matters during the initial days of these chapter 11 cases. Any disruption in the Debtors' cash management procedures will hamper the Debtors' efforts to preserve and enhance the value of their estates, and altering the Cash Management System may disrupt payments to key vendors and employees.

53.     I believe that preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that inevitably would be associated with any substantial changes to the Cash Management System will (a) facilitate the Debtors' stabilization of their post-petition retail operations and (b) assist the Debtors in their efforts to reorganize and preserve value. In addition, allowing the Debtors to continue to use their prepetition Bank Accounts will assist the Debtors in accomplishing a smooth transition to operating in chapter 11 and help avoid any disruption in the Debtors' relationships with critical customers and suppliers.

54.     I believe that the relief requested in the Cash Management Motion is essential to avoid unnecessary and potentially costly disruptions to the Debtors' operations, is in the best interest of the estates and, therefore, should be granted.

### D.     Wage Motion

55.     By the Wage Motion, the Debtors are requesting the entry of an order authorizing, but not directing, the Debtors to pay certain pre-petition wages, salaries, and other compensation, maintain, continue, and pay certain amounts in connection with employee benefits and programs, and authorizing and directing financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payments requests relating to the foregoing.

56.     As of the Petition Date, the Debtors employed a total of approximately 270 employees in the Debtors' stores, Gardena Facility, and corporate headquarters. Of these, approximately 110 employees are full-time employees, and approximately 160 are part-time or

seasonal employees (collectively, the "**Permanent Employees**"), all of whom are located in the United States.  The Debtors' employees are not subject to any collective bargaining agreements.

57.     In addition to the Permanent Employees, the Debtors also use temporary employees (the "**Temp Employees**" and together with the Permanent Employees, the "**Employees**") who primarily assist in the Gardena Facility.   The Temp Employees are hired by a temporary employee agency, Coastal Employment, Inc. and are paid directly by Coastal Employment, Inc.

58.     In the ordinary course of business, the Debtors utilize the services of certain employment agencies (the "**Agencies**") to engage a supplemental workforce to work for the Debtors, primarily in administrative support functions. The Debtors also employ certain independent contractors (the "**Independent Contractors**").  The Independent Contractors are employed on nearly a full-time basis for extended periods of time and often work in the Debtors' corporate office.  The Debtors do not pay wages, withhold taxes, or provide benefits for the Independent Contractors.  Rather, the Debtors make payments to the Agencies based upon the number of hours worked by the Independent Contractors and, in turn, the Agencies pay the Independent Contractors' wages and other amounts to which they are entitled.  As of the Petition Date, the Debtors employed four (4) Independent Contractors, and estimate that approximately $10,000 accrued in respect of the prepetition services of the Independent Contractors.

59.     The Debtors' Employees are paid bi-weekly.  Approximately 83% of the Debtors' Employees are paid via direct deposits to the Employees' bank accounts, and the balance are paid by paper checks.  The Debtors process payroll and payroll taxes through ADP.  Employees are paid from one of the Debtors' disbursement accounts maintained at Wells Fargo which is a zero balance account, whereby funds are transferred from the Main Operating Account to the Payroll

Disbursement account as checks or direct deposit is submitted.  For Employees receiving checks, the Debtors, via ADP, issue and distribute paper drawn checks against the applicable disbursement account.

60.     In connection with the salaries and wages paid to Employees, the Debtors are required by law to withhold from their Employees' wages amounts related to federal, state, and local income taxes, as well as FICA, social security, state disability, unemployment, workers' compensation, Medicare, and other taxes (collectively, the "**Withholding Taxes**") and to remit the withheld amounts to the appropriate taxing authorities (collectively, the "**Taxing Authorities**").  All of the calculation is handled by the company's payroll processing partner, ADP.  All payroll taxes are automatically paid from the Debtors' controlled disbursement account at Wells Fargo via an ACH debit.

61.     In addition, the Debtors are required to make matching payments from their own funds on account of, *inter alia*, Social Security and Medicare taxes, and to pay, based on a percentage of gross payroll (and subject to state-imposed limits), additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (collectively, the "**Employer Payroll Taxes**" and, together with the Withholding Taxes, the "**Payroll Taxes**").  As of the Petition Date, the Debtors estimate that they owe approximately $25,000 in accrued Payroll Taxes.

62.     Finally, the Debtors estimate that approximately $65,000 in payroll checks issued to current Employees prior to the Petition Date may not have been presented for payment or may not have cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date.

63.     As of the Petition Date, the Debtors estimate that approximately $268,000 in wages, commissions, and salaries (inclusive of Allowances, Payroll Taxes and payroll checks not yet presented for payment) have accrued, but remain unpaid.  This amount represents about one week of payroll, as the Debtor pays payroll one week in arrears.  For instance, the bi-weekly payroll for the pay period that begins on March 29, 2015 and ends on April 11, 2015 is to be paid on Thursday, April 16, 2015.

64.     As of the Petition Date, to the best of my understanding, there are no Employees or Independent Contractors owed more than $12,475 in accrued and unpaid prepetition wages or salaries, excluding outstanding and uncashed payroll checks.

65.     The Debtors also make payments to certain benefits vendors each month and then deduct from their Employees' paychecks for Employee contributions to various such benefit plans.[2]   In certain cases, the Debtors make additional payments in connection with the following programs:  (a) medical, dental, vision, and prescription drug plans, (b) long and short-term disability insurance, (c) life insurance plans and (d) flexible spending accounts (collectively, the "**Benefits Deductions**").  Because the Debtors make payment to various benefits providers for the aggregate monthly amount of the benefits, the Debtors may have accrued certain amounts on account of the benefits payments that were not yet billed to the Debtors as of the Petition Date.  Such amounts may have been collected as deductions from the Employees' paychecks, but not yet paid to the various benefits providers on account of such benefits.  In addition to the above benefits, the Debtors provide the Employees with certain leave policies and benefits (including military duty leave, jury duty leave, maternity leave, workers' compensation leave, medical leave

---

[2] The descriptions of the Debtors' benefit programs contained herein are provided for convenience only and are qualified in all respects by the actual terms of such programs.  Nothing contained herein shall have the effect of modifying the terms of the benefit programs or altering any party's rights and obligations thereunder.

and family medical leave, employee assistance, and store discounts), some of which are mandated or encouraged by law and some of which may have pay or benefits components.

66.     The Debtors also provide their Employees with paid holidays, paid personal days and paid bereavement leave.  The Debtors also provide their Employees with the ability to participate in a 401(k) retirement savings plan, administered by Donohue Feiman Retirement Plan Services, with John Hancock as the recordkeeper/carrier.  The Debtors do not currently match 401(k) savings payments.  Also, as of March 28, 2015, the Employees have accrued approximately $275,000 in unused vacation time, paid time off, and personal days.

67.     The Debtors' Employees and Independent Contractors are essential to the orderly and successful reorganization of the Debtors.  The Employees and Independent Contractors have an intimate knowledge of the operation of the Debtors' businesses, and any deterioration in employee morale and welfare at this critical time undoubtedly would adversely impact the Debtors, the Debtors' ability to continue operating stores and serving customers, the value of the Debtors' assets and businesses, and, ultimately, their ability to reorganize.

68.     For these reasons, and for the reasons and legal arguments set forth in the Wage Motion, I believe that the relief sought in the Wage Motion should be granted.

**E.    Customer Practices and Credit Card Transactions Motion**

70.     By their motion to authorize continuation of customer practices and credit card transactions, the Debtors seek entry of an order authorizing them to (i) honor their prepetition obligations to customers and (ii) receive, process, and honor credit card transactions.

71.     The Debtors have long sold pre-paid gift cards and gift certificates for use at its physical and online stores.  Customers buy these gift cards at face value with the expectation that they be redeemable at the Debtors' stores.  Failure to honor gift cards previously issued by the

Debtors would quickly result in strong negative publicity for the Debtors, which would jeopardize their ability to liquidate or reorganize as a going concern.

72.     The Debtors' customers have long had the benefit of a return, refund, and exchange policy.   Such a policy is consistent with the expectations of retail customers nationwide.  The Debtors believe that their ability to continue to provide refunds, returns, and exchanges to customers is critical to maintaining customer goodwill and maximizing value for the benefit of creditors and the estate.

73.     The Debtors' customers make eighty-five to ninety percent of their purchases of the Debtors' retail goods with credit cards and substantially all purchases from the Debtors' online store are made with credit cards. Additionally, a small portion of the Debtor's wholesale customers pay via credit card.   The Debtors' ability to maximize the value of its inventory and business is thus highly dependent upon the patronage and loyalty of its credit card customers. The Debtors thus request first day relief for honoring their credit card processing and fees.

74.     The Debtors would be severely hindered by any delay in their ability to honor their obligations under their customer programs and credit card processing agreements.  Failure to honor these programs and agreements would drive away valuable customers.

**F.     Application to Employ Brownstein Hyatt Farber Schreck, LLP as Counsel for Debtors in Possession**

75.     Concurrently herewith, the Debtors have filed a motion to retain Brownstein Hyatt Farber Schreck, LLP ("**BHFS**") as bankruptcy counsel with regard to the filing and administration of these Cases. In March of 2015, BHFS was retained by the Debtors to represent them in connection with an out-of-court restructuring and negotiations with the Debtors' creditors.   As those negotiations progressed, the BHFS engagement transitioned into BHFS representing Debtors in connection with general restructuring matters, including the preparation

for and potential commencement of these Cases. The Debtors desire to employ BHFS in order to continue providing such restructuring advice as is necessary and requested by the Debtors, including, without limitation, bankruptcy, debt restructuring, and related corporate and litigation services. BHFS has become familiar with the Debtors' operations and business due to the legal services it provided to the Debtors prepetition.  Accordingly, I believe BHFS is well-qualified to represent the Debtors in these Cases.

     **G.**     **Application of the Debtors for an Order Authorizing the Employment and Retention of BGA Management, LLC d/b/a Alliance Management as Financial Advisor for the Debtors and Debtors in Possession Effective *Nunc Pro Tunc* to the Petition Date**

76.     In addition, the Debtors have also filed a motion to retain Alliance as financial advisor with regard to the contemplated Sale during the pendency of these Cases. Alliance was retained by the Debtors prepetition to assess and evaluate the Debtors' financial and operational condition.  Among other services, Alliance has prepared a 13-week cash flow for review by the Debtors' lender, advised the Debtors regarding business planning issues and financial management, and assisted the Debtors with their strategic plan and bidding procedures in the contemplated Sale.  Alliance regularly serves as financial and restructuring advisor to troubled businesses in marketing and selling their assets.  Accordingly, I believe Alliance is well-qualified to advise the Debtors in these Cases.

IV.     **CONCLUSION**

Accordingly, for the reasons stated herein and in each of the First Day Motions, the

Debtors request that the relief sought in the First Day Motions be approved and granted.

I swear under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information, and belief.


Dated:      April 6, 2015
            Boulder, CO                                  *s/ Jo Stone*_____
                                                        Jo Stone