## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| In re: | |
| | Case No. 15-13485-MER |
| FRESH PRODUCE HOLDINGS, LLC, *et al.*[1] | |
| | Chapter 11 |
| Debtors. | |

### ORDER (I) AUTHORIZING AND APPROVING (A) SALE OF ALL OR SUBSTANTIALLY ALL OF DEBTOR'S ASSETS AND (B) THE ASSET PURCHASE AGREEMENT; AND (II) WAIVING THE 14 DAY STAY UNDER FED. R. BANKR. P. 6004(h)

Upon consideration of the *Emergency Motion Of Debtor To Approve Comprehensive Sale Process Relating To Going Out Of Business Sale And Sale To The Highest Bidder And To (A) Approve Agency Agreement, Bid Procedures And Bid Protections, (B) Schedule A Sale Hearing, (C) Approve The Form And Manner Of Notice Related Thereto, D) Authorize Sale Free And Clear Of All Liens, Claims, Interests, And Encumbrances; And (E) Grant Related Relief* [Dkt. No. 13] (the "**Motion**");[2] and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, creditors, and other parties in interest; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that consideration of the Motion and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157; and adequate notice of the Motion having been given, and it appearing that no other notice need be given; and the Debtors and Blue Stripe, LLC (the "**Buyer**") having agreed upon terms and conditions of that certain Asset Purchase Agreement, by and between the Buyer and Debtors, attached hereto as **Exhibit A** (the "**APA**"), pursuant to which Buyer shall purchase substantially all assets of the Debtors ( as defined in the APA, the "**Assets**") for a purchase price of $7,093,000 and other consideration, including, but not limited to, assumption of accrued paid time off and vacation of the Debtors' employees and the waiver

---

[1] The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: Fresh Produce Holdings, LLC (2945); Fresh Produce Retail, LLC (5124); Fresh Produce Sportswear, LLC (1339); Fresh Produce of St. Armands, LLC (2806); FP Brogan-Sanibel Island LLC (2574); and Fresh Produce Coconut Point, LLC (5784). The location of the Debtors' service address is: 2865 Wilderness Place, Boulder, Colorado 80301.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

of Antex Knitting Mills' $2.1 million claim for unshipped purchase order inventory (the "**Sale**"); and hearings having been held on April 29 and May 1, 2015, whereupon the Court entered an Order (A) Approving Bid Procedures and Bid Protections, (B) Agency Agreement Subject to Higher and Better Bids, (C) Scheduling a Sale Hearing, (D) Approving the Form and Manner of Notice Related Thereto and (E) Granting Related Relief [Dkt. No. 170] (the "**Bidding Procedures Order**") that, among other things, approved the break-up fee and expense reimbursement to Yellen Partners, LLC for serving as the Debtors' stalking horse bidder (the "**Stalking Horse Liquidator**"); and an auction pursuant to the Bidding Procedures Order having been held on May 8, 2015, at the offices of Brownstein Hyatt Farber Schreck, 410 17th Street, Ste. 2200, Denver, CO, 80202 (the "**Auction**"); and the Stalking Horse Liquidator and other competing bidders having attended the Auction; and numerous bids having been submitted by means of written submissions and modifications placed on the record; and the transaction represented by the Buyer APA having been determined by the Debtors, in consultation with (i) their prepetition secured lender, Wells Fargo Bank, National Association (the "**Secured Lender**"), and (ii) the Official Committee of Unsecured Creditors (the "**Committee**"), to be the highest and best offer for the Assets at the Auction; and the bid submitted by Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (the "**Hilco Gordon Bid**") having been determined by the Debtor, in consultation with Secured Lender and the Committee, to be the second highest bid; and a sale hearing having been held on May 11, 2015 (the "**Sale Hearing**") to consider the remaining relief requested in the Motion and the APA; and upon all of the proceedings had before the Court (including but not limited to the testimony and other evidence proffered or adduced at the Sale Hearing); and a reasonable opportunity to object or be heard regarding the relief granted herein having been afforded to all parties-in-interest; and the following parties having filed objections to the Motion: (i) CityPlace Retail, LLC and the Prudential Insurance Company of America (Dkt. Nos. 48 and 116]; (ii) Washington Prime Group, Inc. d/b/a WP Glimcher [Dkt. No. 114]; (iii) Dahlmann Periwinkle Place Limited Partnership [Dkt. No. 115]; (iv) Philip J. McCabe Revocable Trust [Dkt. Nos. 119 and 144]; (v)

Alfred D. Hill, Jr. and Gay C. Hill Revocable Trust, UTA dated 11/12/91, Barbara H. Tyler Revocable Trust, and Elizabeth H. Riggs Trust [Dkt No. 121]; (vi) Destin Commons, Ltd. [Dkt. No. 123]; (vii) 400 Duval Retail LLC [Dkt. No. 127]; and (viii) the Taubman Landlords [Dkt. No. 189] (collectively, the "**Landlord Sale Objections**"); and this Court having reviewed and considered (a) the Sale Motion and the exhibits thereto; (b) the arguments of counsel in support of the entry of this Order; and (c) the Landlord Sale Objections; and after due deliberation and sufficient cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT:**

A.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.[3]

B.    This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1134.  This matter is a core proceeding pursuant to 28 U.S.C § 157(b)(2)(N).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    The statutory predicates for the relief sought in the Motion are §§ 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014.

D.    Due and adequate notice of the Motion, the proposed Sale, the Auction, and the Sale Hearing have been given, and the subject matter thereof has been provided to all known parties-in-interest, and no other or further notice is necessary or shall be required.  A reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities.

E.    The ownership structure of Buyer is as follows:

1.    Thom Vernon and Mary Ellen Vernon, 23.75%;

---

[3] To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

    2.      TJ Heyman and Jane McConnell, 23.75%;

    3.      William and Anna Tenenblatt, 31.67%;

    4.      Anne Krizman, 15.83% ; and

    5.      Jo Stone, (proposed), 5.0%.

F.      As of the Debtors' respective Petition Dates, Thom Vernon and May Ellen Vernon were on the Debtors' Board of Managers.  In connection with the Motion and prior to the Auction, Thom Vernon and Mary Ellen Vernon resigned as managers and the Debtors retained the services of r² advisors, LLC, to serve as independent manager (the "**Independent Manager**").  The duties of the Independent Manager included, among other things, attendance at the Auction, evaluation of the competing offers submitted, and selection of the highest and best offer for the Debtors.

G.      The relief requested in the Motion is in the best interests of the Debtors, their estates, creditors, and other parties-in-interest.  The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for the relief requested in the Motion.

H.      The Sale was negotiated and proposed in good faith, from arms-length bargaining positions, and without collusion.  The Buyer is a good-faith purchaser within the meaning of § 363(m) of the Bankruptcy Code and is entitled to the protection thereof.  Neither the Debtors nor the Buyer have engaged in any conduct that would cause or permit the sale of the Assets to the Buyer pursuant to the APA to be avoided under § 363(n) of the Bankruptcy Code.

I.      As demonstrated by:  (i) the evidence proffered or adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtors have thoroughly marketed the Assets through a competitive sale process in accordance with the Bidding Procedures Order, and have conducted the bidding solicitation and Auction fairly, affording a full, fair, and reasonable opportunity for parties that either expressed an interest in

4

acquiring or liquidating the Assets, or who the Debtors believed may have an interest in acquiring or liquidating the Assets, to qualify as bidders, participate in the Auction, participate in the Sale Hearing, and submit their highest or otherwise best offers to purchase the Assets. The Debtors and the Buyer have respectively negotiated and undertaken their roles leading to the Sale in a diligent, noncollusive, fair and good faith manner.

J.      The Debtors have represented that they: (1) have full corporate power and authority to execute the APA (as amended by this Order) and all other documents contemplated thereby, and the sale of the Assets by the Debtors has been duly and validly authorized by all necessary corporate action of the Debtors; (2) have all of the corporate power and authority necessary to consummate the transactions contemplated by the APA; and (3) have taken all corporate action necessary to authorize and approve the APA and the consummation by the Debtors of the transaction.  The Debtors have further represented that no consents or approvals are required for the Debtors to consummate the transactions other than the approval of this Court and those set forth in the APA.  The Debtors have further represented that neither the execution of the APA nor the consummation of the transaction in accordance with its terms will constitute a violation of any provisions of the Debtors' organizational documents or any contract, instrument, law, regulation, or ordinance by which the Debtors are bound.

K.      Except for the liabilities being assumed by Buyer pursuant to the APA, no sale, transfer or other disposition of the Assets pursuant to the APA, or entry into the APA, will subject the Buyer to any liability for claims, obligations, interests, or encumbrances asserted against the Debtors or the Debtors' interests in such Assets by reason of such transfer under any laws, including, without limitation, any bulk-transfer laws or any theory of successor or

transferee liability, antitrust, environmental, product line, de facto merger or substantial continuity or similar theories. The Buyer is not a successor to the Debtors or their estates.

L.      The Debtors have exercised sound business judgment in deciding to sell the Assets to the Buyer under section 363(b) of the Bankruptcy Code.   The Sale is a reasonable exercise of the Debtors' sound business judgment consistent with their fiduciary duties, and is in the best interests of the Debtors, their estates, creditors, and all other parties in interest.

M.      Time is of the essence in effectuating the APA and proceeding with the Sale contemplated therein without interruption.  Based on the record of the Sale Hearing, and for the reasons stated on the record at the Sale Hearing, the Sale under the APA must be closed by May 15, 2015 to maximize the value that the Buyer may realize from the Sale, and the value that the Debtors may realize from entering into the APA.  Accordingly, cause exists to waive the 14-day stay imposed by 6004(h).

N.      The following party has asserted a lien in some or all of the Assets:  Wells Fargo Bank, National Association ("**Secured Lender**"), which claims to hold a valid and perfected first priority lien and security interest in substantially all of the Debtors' assets, securing a debt in the amount of approximately $3,833,234.40 plus fees, interest and expenses of $93,000 (the "**Wells Debt**").

O.      A sale of the Assets other than one free and clear of liens, claims, encumbrances, and defenses (including, without limitation, rights of setoff and recoupment), including, without limitation, security interests of whatever kind or nature, mortgages, conditional sales or title retention agreements, pledges, deeds of trust, hypothecations, liens, encumbrances, assignments, preferences, debts, easements, charges, suits, licenses, options, rights-of-recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, taxes (including

foreign, state and local taxes), licenses, covenants, restrictions, indentures, instruments, leases, options, off-sets, claims for reimbursement, contribution, indemnity or exoneration, successor, product, environmental, tax, labor, ERISA, CERCLA, alter ego and other liabilities, causes of action, contract rights and claims, to the fullest extent of the law, in each case, of any kind or nature (including, without limitation, all "claims" as defined in section 101(5) of the Bankruptcy Code), known or unknown, whether pre-petition or post-petition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, statutory or non-statutory, matured or unmatured, legal or equitable (collectively, "**Encumbrances**"), without the protections of this Order, would hinder the Debtors' ability to obtain the consideration provided for in the APA and, thus, would impact materially and adversely the value that the Debtors' estate would be able to obtain for the sale of such Assets.  But for the protections afforded to the Buyer under the Bankruptcy Code and this Order, the Buyer would not have offered to pay the consideration contemplated in the APA.  In addition, each entity with an Encumbrance upon the Assets, (i) has consented to the Sale or is deemed to have consented to the Sale, (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such interest, or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code, and therefore, in each case, one or more of the standards set forth in section 363(f)(2), (3) and (5) of the Bankruptcy Code has been satisfied.  Those holders of Encumbrances who did not object to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.  Therefore, approval of the APA and the consummation of the Sale free and clear of Encumbrances is appropriate pursuant to section

363(f) of the Bankruptcy Code and is in the best interests of the Debtors' estates, creditors, and other parties in interest.

P.      The APA (as modified by this Order) and ancillary agreements are valid and binding contracts between the Debtors and the Buyer, which are and shall be enforceable according to their terms, and with the same force and effect as this Order.

Q.      The requirements of sections 363(b) and 363(f) of the Bankruptcy Code and any other applicable law relating to the Sale have been satisfied.

R.      The terms of the APA provide Buyer with the right to (i) require the Debtors to assume and assign to Buyer the nonresidential real property leases set forth therein (the "**Assigned Leases**"), and (ii) conduct an inventory reduction, "store-closing" or similar-themed sale with respect to certain of the Debtors' nonresidential real property locations ("**Inventory Reduction Sale**") (together, the Debtors' "**Proposed Lease Actions**").  Buyer has waived, as a condition to close the Sale, Court approval of the Proposed Lease Actions.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Motion is granted as set forth in this Order.

2.      All objections to the Motion or relief provided herein, except for the Landlord Sale Objections solely to the extent they pertain to the Proposed Lease Actions, that have not been withdrawn, mooted, waived or settled, are hereby overruled and denied on the merits.

3.      Pursuant to § 363 of the Bankruptcy Code and the APA, the sale of the Assets to the Buyer is **APPROVED**.  The Debtors are hereby authorized to sell, transfer, and convey the Assets to the Buyer on the terms set forth in the APA (as modified by this Order), together with executing and delivering all additional instruments and documents that may be reasonably necessary or desirable to implement the Sale and to take all further actions as may be reasonably

requested by the Buyer for the purposes of assigning, transferring, granting, conveying and conferring to the Buyer or reducing to possession the Assets, or as may be necessary or appropriate to the performance of the Debtors' obligations as contemplated by the APA (as modified by this Order), or as may be necessary to effectuate the terms of this Order.

4.     Pursuant to section 363(b) of the Bankruptcy Code, the Debtors, the Buyer and each of their respective officers, employees and agents are hereby authorized and directed to execute such documents and to do such acts as are necessary or desirable to carry out the Sale and effectuate the APA and each of the transactions and related actions contemplated or set forth therein.  The Debtors' Independent Manager is specifically authorized to act on behalf of the Debtors in connection with the Sale, and no other consents or approvals are necessary or required for the Debtors to carry out the Sale, effectuate the APA and each of the transactions and related actions contemplated or set forth therein.

5.     The transfer of the Assets to the Buyer pursuant to the APA constitutes a legal, valid, and effective transfer of the Assets, and shall vest the Buyer with all right, title, and interest of the Debtors in and to the Assets.

6.     Pursuant to section 363(f) of the Bankruptcy Code, the Assets shall be transferred to Buyer, and upon the closing, except for the Debtors' leasehold interests and "personally identifiable information" which are addressed elsewhere in this Order, shall be free and clear of all Encumbrances of any kind or nature whatsoever, and all such Encumbrances shall attach to the net cash proceeds of the transactions in the order of their priority, with the same validity, force and effect that they now have as against the Assets, subject to any claims and defenses the Debtors may possess with respect thereto.

7.     At closing, Secured Lender will be paid the Wells Debt from the net sale

proceeds, subject to the Committee's rights under the *Final Agreed Order Authorizing Use of Cash Collateral and Providing for Adequate Protection* [Dkt. No. 173].

8.      The Sale Motion and Notice in connection therewith shall be deemed to provide sufficient notice as to the sale of the Assets free and clear of all Encumbrances.

9.      The provisions of this Order authorizing the Sale of the Assets free and clear of Encumbrances shall be self-executing, and neither the Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate and implement the provisions of this Order.

10.     Notwithstanding the foregoing, upon the closing, those parties holding an Encumbrance in the Assets, including the Secured Lender, are authorized and directed forthwith to execute such documents and take all other actions as may be necessary to release their Encumbrances in the Assets, if any, as such Encumbrances may have been recorded or may otherwise exist.  The failure of any party to execute such documents shall in no way impair or affect the terms of this Order which provide for the transfer of the Assets free and clear of Encumbrances.

11.     If any party holding an Encumbrance in the Assets, including the Secured Lender, that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Encumbrances in the Debtors of the Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executing by the appropriate parties, termination statements, instruments of satisfaction or releases of all Encumbrances that the person or entity has with respect to the Debtors of the Assets or otherwise, then the Debtors and Buyer are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of that Encumbrance holder with respect to the Debtors or the Assets.

12.     Nothing in this Order or the APA releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) that any entity would be subject to as the owner, lessor, lessee, or operator of the property after the date of entry of this Order.   Nothing contained in this Order or in the APA shall in any way (i) diminish the obligation of any entity to comply with environmental laws, or (ii) diminish the obligations of the Debtors to comply with environmental laws consistent with its rights and obligations as debtor in possession under the Bankruptcy Code.   Nothing herein shall be construed to be a determination that the Buyer is an operator with respect to any environmental law or regulation. Moreover, the Sale shall not be exempt from, and the Buyer shall be required to comply with, laws of general applicability, including, without limitation, public health and safety, criminal, tax, labor, employment, environmental, antitrust, fair competition, traffic and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "**General Laws**").   Nothing in this Order shall alter or affect the Debtors' and Buyer's obligations to comply with all applicable federal safety laws and regulations.   Nothing in this Order shall be deemed to bar any Governmental Unit (as defined in Bankruptcy Code section 101(27)) from enforcing General Laws in the applicable nonbankruptcy forum, subject to the Debtors' or the Buyer's right to assert in that forum or before this Court that any such laws are not in fact General Laws or that such enforcement is impermissible under the Bankruptcy Code, this Order, or otherwise, pursuant to Paragraph 17 hereunder.   Notwithstanding any other provision in this Order, no party waives any rights to argue any position with respect to whether the conduct was in compliance with this Order and/or any applicable law, or that enforcement of

11

such applicable law is preempted by the Bankruptcy Code. Nothing in this Order shall be deemed to have made any rulings on any such issues.

13. This Order shall be binding upon and shall govern the acts of all entities, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Assets. A certified copy of this Order may be filed with the appropriate clerk and/or recorded to act to cancel any Encumbrances.

14. Nothing in this Order shall (a) alter or affect the Debtors' obligations to comply with section 365(d)(3) of the Bankruptcy Code or (b) alter or modify the rights of any lessor or other counterparty to a lease with the Debtors to file an appropriate motion or otherwise seek appropriate relief if the Debtors fail to comply with section 365(d)(3) of the Bankruptcy Code.

15. No "personally identifiable information", as that term is defined in 11 U.S.C. § 101(41A), shall be sold or transferred to Buyer without (i) a separate order of this Court authorizing the same, or (ii) the express consent of the United States Trustee or a consumer privacy ombudsman appointed pursuant to 11 U.S.C. § 332.

16. The Buyer shall accept the Debtors' validly issued gift certificates and gift cards that were issued by the Debtors prior to the Sale. The Buyer shall accept returns of merchandise sold by the Debtors prior to the Sale, provided that such return is otherwise in compliance with the Debtors' return policies in effect as of the date such item was purchased and the customer is

not repurchasing the same item so as to take advantage of the sale price being offered by the Buyer.

17.    The Buyer is a party in interest and shall have the ability to appear and be heard on all issues related to or otherwise connected to this Order, the various procedures contemplated herein, any issues related to or otherwise connected to the Sale, and the APA.

18.    The APA and related documents may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of this Court, provided that the Committee and Secured Lender consent, which consent shall not be unreasonably withheld or delayed.

19.    The Debtors, their management and their Independent Manager, and the Buyer, its members and its officers, directors, employees, agents and representatives, actively participated in the bidding process and acted in good faith.  The APA between the Buyer and the Debtors was negotiated and entered into based upon arm's length bargaining, without collusion or fraud, and in good faith as that term is used in sections 363(m) of the Bankruptcy Code.  The Buyer shall be protected by sections 363(m) of the Bankruptcy Code in the event that this Order is reversed or modified on appeal.  The Debtors were free to deal with any other party interested in buying or selling on behalf of the Debtors' estates some or all of the Assets.  Neither the Debtors nor the Buyer have engaged in any conduct that would cause or permit the Sale, the APA, or any related action or the transactions contemplated thereby to be avoided under section 363(n) of the Bankruptcy Code, or that would prevent the application of sections 363(m) of the Bankruptcy Code.  The Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction.  Specifically, the Buyer has not acted in a collusive manner with any person and was not controlled by any agreement among bidders.  The Buyer's prospective performance and

payment of amounts owing under the APA is in good faith and for valid business purposes and uses.

20.     Upon closing of the Sale, due to Stalking Horse Liquidator not having been approved as the Successful Bidder at the Auction, Stalking Horse Liquidator shall be paid a break-up fee in the amount of $100,000, as well as an expense reimbursement of up to $20,000 for reasonable and documented actual out of pocket costs.

21.     The Sale Hearing shall be continued to **May 22, 2015 at 9:30 a.m. (Mountain) in Courtroom C** with respect to the Proposed Lease Actions and the Landlord Sale Objections solely to the extent they pertain to the Proposed Lease Actions.  The approval or denial of the Proposed Lease Actions shall be the subject of a separate order.  Notwithstanding the foregoing, the Buyer and landlords of the stores where Inventory Reduction Sales are sought to be conducted are authorized to enter into agreements ("**Side Letters**") between themselves modifying Inventory Reduction sale guidelines without further order of the Court, and such Side Letters shall be binding as among the Buyer and any such landlords.  The Sale shall close on or before May 15, 2015.  Upon closing, Buyer shall have the right to occupy the Debtors' nonresidential real property leases pending determination of the Proposed Lease Actions.

22.     On or before May 18, 2015, the Debtors shall file a notice with the Court indicating whether the Sale to Buyer closed.  If necessary, the Debtors will provide evidence and the Court will consider approval of the Agency Agreement between Hilco Gordon and the Debtors at the continued Sale Hearing.  Consistent with the Bidding Procedures Order, the Hilco Gordon Bid is irrevocable until May 29, 2015.

23.     Consistent with their fiduciary duties, the Debtors have demonstrated good, sufficient and sound business reasons and justifications for entering into the Sale and the

performance of their obligations under the APA, including, but not limited to, the fact that (i) the consideration provided by the Buyer under the APA will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative; and (ii) unless the Sale is concluded expeditiously as provided for in the APA, recoveries of creditors will be diminished.

24.     This Court retains jurisdiction to:

(a)     Interpret, implement and enforce the terms and provisions of this Order and the APA, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, with the APA and each of the other foregoing agreements to be enforced with the weight of this Order, and resolve any disputes thereunder, except as otherwise provided therein;

(b)     Adjudicate all issues relating to Buyer successor liability;

(c)     Enter orders in aid or furtherance of the transactions contemplated by the APA;

(d)     Adjudicate all issues relating to any Encumbrances in the Assets;

(e)     Adjudicate any claim of the Debtors, their landlords and/or the Buyer for protection from interference with the Sale;

(f)     Adjudicate any and all issues relating to the Assets, the proceeds of the transactions, the Sale Motion, the Sale, and the APA.

25.     Notwithstanding Bankruptcy Rules 4001 and 6004, or any other law that would serve to stay or limit the immediate effect of this Order, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.  In the absence of any person or entity obtaining a stay pending appeal, the Debtors and the Buyer are free to perform under the APA at any time, subject to the terms of the APA.

26.     To the extent that anything contained in this Order explicitly conflicts with a provision in the APA, this Order shall govern and control.

27.     All creditors of the Debtors and any other person or entity asserting an Encumbrance against the Debtors is hereby forever enjoined from asserting any Encumbrance against the Buyer on account of any such Encumbrance, and this Order shall act as a permanent injunction prohibiting any action against the Buyer.  This Order may be submitted to any person, entity, governmental authority or court as evidence of such permanent injunction.

IT IS SO ORDERED, this 12th day of May, 2015.

BY THE COURT:

Hon. Michael E. Romero, Chief Judge
United States Bankruptcy Court

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is entered into on this 11t$^h$ day of May, 2015, by and among The Bankruptcy Estate of Fresh Produce Holdings, LLC, a Delaware limited liability company, Fresh Produce Retail, LLC, a Colorado limited liability company, Fresh Produce Sportswear, LLC, a Colorado limited liability company, Fresh Produce of St. Armands, LLC, a Florida limited liability company, FP Brogan-Sanibel Island LLC, a Colorado limited liability company, and Fresh Produce Coconut Point, LLC, a Florida limited liability company, (collectively, "*Sellers*" or "*Fresh Produce*"), and Blue Stripe, LLC, a Colorado limited liability company ("*Buyer*").

### W I T N E S S E T H :

WHEREAS, Sellers are engaged in the business of marketing, selling and distributing women's apparel and accessories (the "*Business*"); and

WHEREAS, the Sellers have each filed for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Colorado ("Court"), which said Court has jurisdiction over this transaction; and

WHEREAS, Sellers are in possession of their assets and operating their businesses pursuant to 11 U.S.C. §§1107 and 1108; and

WHEREAS, Buyer desires to purchase the Assets (as defined in Section 1.1 below) and accept assignment of the Assigned Executory Contracts and Sellers desire to sell the Assets to Buyer and to assign the Assigned Executory Contracts to Buyer, on the terms and conditions set forth in this Agreement; and

WHEREAS, Buyer is a qualified bidder and has made an offer.

NOW, THEREFORE, in consideration of the foregoing premises and of the mutual agreements and covenants hereinafter set forth, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF ASSETS

Section 1.1 Purchase and Sale of Assets. Upon and subject to the terms and conditions set forth in this Agreement, on the Closing Date or as otherwise provided in the Sale Order (each as defined in Section 2.4 below), Sellers will sell, assign, convey, transfer and deliver to Buyer, and Buyer will purchase and acquire from Sellers, all of Sellers' right, title and interest in, to and under all of the assets, properties and rights which are owned or leased by Sellers and used or useful in the Business, including, but not limited to, the assets set forth below (collectively, the "*Assets*"), excluding in any event such assets that constitute Excluded Assets (as defined in Section 1.2 below):

(a) all inventory of Sellers, including all finished inventory (firsts, seconds, thirds and scraps), inventory in process and all raw materials (the "*Purchased Inventory*");

(b) all accounts receivable of Sellers including but not limited to all rights to payment from customers in respect of orders as of the Closing Date as set forth on Schedule 1.1(b) (the "*Purchased Receivables*"), as well as all intercompany accounts receivables between or among the Sellers (while purchased such shall not be included in the definition of Purchased Receivables);

(c) all fixed assets of Sellers including but not limited to machinery and equipment, forms and other attachments, spare parts, supplies, furniture and fixtures, store shelving, racking and other retail or wholesale display or warehouse storage fixtures, risers or other display or storage materials, computer equipment and software and other personal property, in each case owned by Sellers;

EXHIBIT
A

(d)  all rights of Sellers under and in connection with the leases and subleases of real property as of the Closing Date as set forth on Schedule 1.1(d) hereto, including all security deposits and other deposits related thereto together with Sellers' interest in all buildings, facilities, fixtures and other improvements thereon and all easements, rights-of-way, transferable licenses and permits and other appurtenances thereto (collectively, other than any of the foregoing which constitute Unassigned Executory Contracts (as defined in Section 1.3 below), the "*Assigned Leases*");

(e)  all rights of Sellers under and in connection with the contracts, commitments, purchase orders, warranty claims, agreements and unexpired leases (other than Assigned Leases) as of the Closing Date as set forth on Schedule 1.1(e) hereto ("*Assigned Contracts*");

(f)  all rights of Sellers in and to all intellectual property owned or used by Sellers, including, but not limited to, all names, service marks, trade names, trademarks, copyrights, patents, trade secrets, domain names, URLs, websites, telephone numbers, facsimile numbers and accounts, email addresses and accounts, processes and methods, trade secrets, Confidential Information, know-how, whether or not patentable, (and all goodwill associated therewith);

(g)  all Sellers' transferable federal, state or local or other governmental and other third party permits (including occupancy permits, certificates, licenses, consents, authorizations, approvals, registrations or franchises (collectively, the "*Assigned Permits*");

(h)  any financial, operational and personnel records of Sellers as of the date immediately preceding the Closing Date;

(i)  all books and records maintained by Sellers through the Closing Date, including, without limitation, product manuals, operating manuals, and records relating to customers, suppliers, personnel, and trade accounts and lists and similar operating data, whether in electronic, computer, paper or other form;

(j)  any causes of action or claims of Sellers arising out of the conduct of the Business or the ownership of the Assets prior to the Closing Date, including, but not limited to, warranty claims assigned to Buyer under Section 1.1(e) (other than Vernon Claims as defined in Section 1.2(h) below); and

(k)  all preference claims as defined under 11 USC §547 of the Bankruptcy Code or other rights or claims of the Sellers to collect and or pursue claims against creditors for payments received from the Seller prior to or after the filing of the bankruptcy by Seller (other than the Vernon Claims).

Section 1.2  Excluded Assets.  Notwithstanding anything contained in this Agreement to the contrary, Buyer and Sellers acknowledge and agree that Buyer is not buying and Sellers are not selling the following assets (collectively, the "*Excluded Assets*"):

(a)  all rights of Sellers under this Agreement and to the Purchase Price;

(b)  any shares of capital stock of, or other equity interests in, any of Sellers;

(c)  any refund, rebate, credit or similar claim for taxes paid by Sellers, whether known or unknown on the Closing Date, relating to the Business or any of the Assets other than any such refund, rebate, credit or similar right or claim relating to an Assigned Contract or an Assigned Lease;

(d)  Sellers' corporate seals, minute books, record books, and such other books and records as pertaining to the organization, existence or ownership of Sellers;

(e)  Sellers' contracts or policies of insurance for liability, property and casualty, workers' compensation, disability, medical or health, fire or theft and any rights thereunder;

(f)  any contracts, agreement or leases not specifically assigned hereunder, including but not limited to, all Unassigned Executory Contracts;

(g)  any other assets specifically identified on Schedule 1.2(k); and

(h)  any claims against Thom Vernon and/or Mary Ellen Vernon and/or their affiliates, subsidiaries, family trusts, related parties or other related entities that transacted business with the Debtors prior to Closing (the "*Vernon Claims*") for any period prior to the Closing Date but only to the extent such claims are actually filed within six (6) months of the Closing Date; in the event that no action seeking a remedy in respect of Vernon Claim is commented as of the six month anniversary of the Closing Date and without any further action on the part of any of the Sellers, Sellers shall and shall be deemed to waive, release and discharge any and all claims against Thom Vernon, Mary Ellen, their heirs, executors, administrators, personal representatives, successors and assigns from and against any and all obligations, liabilities, claims, causes of action (whether legal or equitable), harm, injury, damage, loss of any kind or nature, whether known or unknown, contingent or liquidated from the beginning of time to the Closing Date.

Section 1.3  Executory Contracts.   Schedule 1.3 sets forth those agreements listed on Schedule 1.1(d) (Assigned Leases) and Schedule 1.1(e) (Assigned Contracts) that Buyer has determined it wants Sellers to assume and assign to Buyer hereunder as of the Closing Date (each such agreement, an "*Assigned Executory Contract*" and collectively, the "*Assigned Executory Contracts*"). As to each Assigned Executory Contract to be assigned to Buyer hereunder, Buyer and Sellers shall use reasonable efforts to obtain all necessary consents to assignment to Buyer on or before the Closing Date. Any agreement that would otherwise constitute an Assigned Lease or Assigned Contract, except that Buyer does not include such agreement on Schedule 1.3 is referred to as an "*Unassigned Executory Contract*" and all such agreements are collectively referred to as the "*Unassigned Executory Contracts*," which Unassigned Executory Contracts shall expressly include all employment, consulting or similar agreements.

Section 1.4  Assumed Liabilities; Excluded Liabilities. Buyer shall assume and be liable for the Sellers' accrued employee vacation and personal time for all employees employed by Sellers on the Closing Date. With the exception of the forgoing sentence, Buyer shall not assume or otherwise be liable in any way for any debts, obligations or liabilities of Sellers or their affiliates.  Buyer shall assume expenses associated with the Assets and operation of the business after the Closing Date.

## ARTICLE II
### PAYMENT; CLOSING

Section 2.1  Purchase Price.  The total consideration to be paid to Sellers for the Assets at the Closing shall consist of Seven Million Ninety-Three Thousand and No/100 Dollars ($7,093,000.00), (the "*Cash Purchase Price*") which Buyer shall pay as follows:

(a)  Simultaneously with Sellers' execution and   delivery of this Agreement to Buyer, Buyer has deposited Six Hundred Twenty Thousand and no/100 Dollars ($620,000.00) into the trust account for Sellers' counsel and Buyer shall deposit by wire transfer of immediately available funds on or before May 12, 2015, and additional One Million Three Hundred Eighty and No/100 Dollars ($1,380,000.00) for a total deposit of Two Million and No/100 Dollars ($2,000,000.00) as a fully refundable deposit against the Cash Purchase Price except as set forth in Section 9.3 (the "*Deposit*"), and which shall be applied to the Cash Purchase Price at Closing, provided  that Buyer is the purchaser of the Assets at the Closing.

(b)  On the Closing Date, in consideration of the payment of the Cash Purchase Price to Sellers (i) Buyer shall pay to Seller by wire transfer of immediately available funds to the account or accounts designated by Sellers, an amount equal to the Cash Purchase Price less the amount of the Deposit and (ii) the Deposit shall be released to Sellers.

Section 2.2 <u>Final Allocation of Purchase Price</u>.  Buyer shall prepare an allocation of the aggregate purchase price among the Assets (the "*Allocation Statement*") in the ordinary course after the Closing Date and shall provide a copy of such Allocation Statement to Sellers.  Such Allocation Statement shall be prepared by Buyer in accordance with Section 1060 of the Internal Revenue Code of 1986, as amended (the "*Code*") and shall be binding upon Buyer and Sellers for all purposes.

Section 2.3 <u>Sales Taxes</u>.  Although as contemplated by <u>Section 8.2(m)</u> of this Agreement, the transactions contemplated herein may not be subject to tax, Buyer shall be responsible for the payment of any sales, transfer, stamp or similar taxes required to be paid in connection with the transactions contemplated by this Agreement.

Section 2.4 <u>Date, Time and Place of Closing</u>.  The transactions provided for by this Agreement shall be consummated (the "*Closing*") at 10:00 a.m., local time, at the offices of Brownstein Hyatt Farber Schreck, LLP, 410 17th Street, Suite 2200, Denver, Colorado 80202 on the later of (a) one (1) business day following an entry of the Order entered by the United States Bankruptcy Court for the District of Colorado ("*Bankruptcy Court*") authorizing the transactions provided in this Agreement except those specified in the terms of such order (the "*Sale Order*"), which has not been stayed vacated, reversed or stayed or (b) within on (1) business dayfollowing the satisfaction of all of the conditions to the parties obligations set forth in Articles VI, and VII have been satisfied or waived in writing by the appropriate party, or such other date and/or place as may be agreed upon by the parties hereto, which shall be no later than May 15, 2015 unless Buyer and Seller, with consent of Wells Fargo Bank, N.A., agree to a later date.  The date and time of Closing is hereinafter sometimes called the "*Closing Date*."

## ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF SELLERS

As a material inducement to Buyer to enter into this Agreement and purchase the Assets, Sellers hereby, jointly and severally, represent and warrant to Buyer that:

Section 3.1 <u>Status</u>.  Each Seller is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation, and has full power and authority to own its properties and to carry on the business substantially as presently conducted by it.  Each Seller is duly qualified to do business and is in good standing in all other jurisdictions where the conduct of its business so requires, except where the failure to be so qualified and in good standing would not be reasonably likely to have a Material Adverse Effect (as defined below) on the Business taken as a whole.

Section 3.2 <u>Authority; Effective Agreement</u>.  Sellers have the requisite corporate power and authority to execute and deliver this Agreement, to perform their obligations under this Agreement and any and all other agreements, documents or instruments to be executed and/or delivered in connection herewith (collectively, the "*Purchase Documents*") and to consummate the transactions contemplated herein and therein.  Sellers have taken all corporate actions required by Sellers to authorize the execution, delivery and performance of the Purchase Documents and the consummation of the transactions contemplated thereby.  This Agreement has been duly and validly executed and delivered by Sellers and constitutes a legal, valid and binding obligation of Sellers, enforceable against Sellers in accordance with its terms with approval of the Bankruptcy Court.

Section 3.3 <u>Assigned Executory Contracts</u>.  As of the Closing Date, each of the Assigned Executory Contracts will be in full force and effect in all material respects and, other than defaults specified on <u>Schedule 3.3</u>, to Sellers' knowledge there are no material defaults under any of the Assigned Executory Contracts which would prevent their assignment to Buyer.  For purposes of this Agreement, "Sellers' knowledge" or similar terms means the actual knowledge of Jo Stone, without any investigation or inquiry.

Section 3.4 <u>No Restrictions Against Performance</u>.  Neither the execution, delivery or performance of this Agreement by Sellers nor the consummation of the transactions contemplated hereby will, with or without the giving of notice or the passage of time, or both, violate any provisions of, conflict with, or result in the breach of, or result in the creation or imposition of any lien or condition under (a) Sellers' organizational documents, (b) any federal, state or local law, statute, ordinance, regulation or rule which is applicable to Sellers or the Assets, (c) any contract, indenture, instrument, agreement, right or other obligation or restriction to which Sellers are a party or by which Sellers or the Assets are bound, or (d) any order, judgment, writ, injunction, decree, license, franchise, permit or other authorization of any federal, state or local court, arbitration, tribunal or governmental agency by which Sellers or the Assets are bound.

Section 3.5 <u>Brokers or Finders</u>.  Except as set forth on <u>Schedule 3.5</u>, no agent, broker or Person acting on behalf of Sellers or any of its affiliates is, or will be, entitled to any commission, broker's or finder's fees from any party, or from any affiliate of any party, in connection with any of the transactions contemplated by this Agreement.

Section 3.6 <u>Third Party and Governmental Consents</u>.  Subject to consents necessary in respect of Assigned Leases and Assigned Contracts, no approval, consent, order or authorization of, any governmental authority or other third party is required on the part of Sellers in connection with the execution of the Purchase Documents or the consummation of the transactions contemplated thereby.

## ARTICLE IV
### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Sellers that:

Section 4.1 <u>Status</u>.  Buyer is a limited liability company duly formed and subsisting under the laws of the jurisdiction of its formation and has full power and authority to own its properties and to carry on the business presently conducted by it. Buyer is duly qualified to do business and is in good standing in all other jurisdictions where the conduct of its business so requires, except where the failure to be so qualified and in good standing would not be reasonably likely to have a material adverse effect on the Business taken as a whole.

Section 4.2 <u>Authority</u>.  Buyer has the requisite limited liability company power and authority to execute, deliver and perform the Purchase Documents, and to consummate the transactions contemplated therein.  Buyer has taken all limited liability company actions required by Buyer to authorize the execution, delivery and performance of the Purchase Documents and the consummation of the transactions contemplated thereby.  This Agreement has been duly and validly executed and delivered by Buyer and constitutes a legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

Section 4.3 <u>Litigation</u>.  There is no action, suit, proceeding in equity or at law, arbitration or administrative or other proceeding by or before (or, to the knowledge of Buyer, any investigation by) any Person pending or, to the knowledge of Buyer, threatened against or affecting Buyer or Buyer's assets which, if adversely determined, would adversely affect or would prevent, interfere or delay Buyer from performing its obligations under the Purchase Documents or the consummation of the transactions contemplated therein.

Section 4.4 <u>Available Funds</u>. Buyer has sufficient cash available to it to perform all of its obligations under this Agreement, including, without limitation, to pay the Purchase Price in accordance with the terms of this Agreement.

Section 4.5 <u>Brokers or Finders</u>.  No agent, broker or Person acting on behalf of Buyer or any of its affiliates is, or will be, entitled to any commission, broker's or finder's fees from any party, or

from any affiliate of any party, in connection with any of the transactions contemplated by this Agreement.

Section 4.6 <u>No Restrictions Against Performance</u>. Neither the execution, delivery or performance of this Agreement by Buyer nor the transactions contemplated hereby, will, with or without the giving of notice or the passage of time, or both, violate any provisions of, conflict with, result in a breach of, or result in the creation or imposition of any lien or condition under (a) Buyer's organizational documents, (b) any federal, state or local law, statute, ordinance, regulation or rule applicable to Buyer, (c) any contract, indenture, instrument, agreement, right or other obligation or restriction to which Buyer is a party or by which Buyer is bound, or (d) any order, judgment, writ, injunction, decree or other authorization of any federal, state or local court, arbitration, tribunal or governmental agency by which Buyer is bound.

Section 4.7 <u>Third Party and Governmental Consents</u>. No approval, consent, order or authorization of, or registration, qualification, declaration or filing with or notice to, any governmental authority or other third party is required on the part of Buyer in connection with the execution of the Purchase Documents or the consummation of the transactions contemplated thereby.

## ARTICLE V
### FURTHER COVENANTS AND AGREEMENTS

Section 5.1 <u>Access to Information</u>. Subject to existing confidentiality obligations of Buyer to Sellers, between the date of this Agreement and the Closing Date, Sellers shall give to Buyer and its agents reasonable access to the Assets and all of Sellers' documents, books and records relating to its current and past operations of the Business, and shall permit Buyer and its agents to make copies thereof, and Sellers shall permit Buyer to interview Sellers' employees during reasonable business hours and upon reasonable prior written notice.

Section 5.2 <u>Confidentiality</u>. Sellers, on the one hand, and Buyer, on the other, each acknowledge and agree that: (a) any and all confidential information of the other, including, without limitation, any and all information or data relating to Sellers' products, services, data, know-how, compositions, processes, inventions and ideas, marketing methods and plans, customer lists, current and anticipated customers, price lists, vendor lists, supplier lists, market studies, business plans, business opportunities, prospects, product and service costs, personnel practices, and the discussions, negotiations, terms and existence of this Agreement and the Purchase Documents (collectively, "*Confidential Information*"), are all valuable, special and unique assets; (b) each party shall keep, in the strictest confidence, at all times any and all Confidential Information; and (c) each party shall not use, for the benefit of itself (other than for purposes of consummating the transactions contemplated hereunder and under the Purchase Documents), as applicable, or any other person or entity, any Confidential Information learned or obtained before, on or after the date hereof. Each party hereto confirms that it, its affiliates, agents and other representatives (collectively, "*Representatives*") are bound by and will comply with their respective obligations under this <u>Section 5.2</u> and that information obtained in connection with this Agreement and the investigations and reviews undertaken in connection therewith will be subject to the terms of this <u>Section 5.2</u>. Notwithstanding anything to the contrary contained herein, and with the advice and consent of the other party (which consent shall not be unreasonably withheld, conditioned or delayed), Sellers, on the one hand, and Buyer, on the other (and the respective Representatives of Sellers and Buyer) shall be entitled to discuss the existence of this Agreement and the Purchase Documents and the transactions contemplated hereby and thereby with suppliers, vendors, customers, employees and consultants of Sellers in order to affect an orderly, efficient and expeditious closing of the transactions contemplated hereby and under the Purchase Documents. Sellers and Buyer each acknowledge and agree that at the Closing, Buyer shall acquire all of Sellers' Confidential Information and Buyer shall own all rights in and to Sellers' Confidential Information.

Section 5.3 <u>Conduct of the Business</u>.

(a)  From the date hereof until the Closing Date, Sellers shall:

(i)     use commercially reasonable efforts to conduct the Business in the ordinary course of business, consistent with its past custom and practice;

(ii)    use commercially reasonable efforts to keep available the services of the current officers and key employees of the Business and to preserve the relationships with customers and suppliers of the Business;

(iii)   not enter into, renew, modify or terminate any of the Assigned Contracts or Assigned Leases;

(iv)    pay all wages and taxes thereon, commissions and taxes thereon and sales taxes in the ordinary course of business, consistent with its past custom and practice; and

(v)     otherwise report periodically to Buyer concerning the status of the Business.

(b)  Except as otherwise expressly permitted by this Agreement, from the date hereof until the Closing Date, Seller will not, without the prior consent of Buyer (which consent, with respect to conduct in furtherance of the Business being conducted, shall not be unreasonably withheld, conditioned or delayed), take any affirmative action, or fail to take any reasonable action within its control, that would be reasonably likely to result in a Material Adverse Effect (as defined below).

Section 5.4  Cooperation.

(a)  Buyer and Sellers agree to execute and deliver all other instruments and take all such other actions that either party may reasonably request from time to time, before or after Closing and without payment of further consideration, to effectuate the transactions provided in the Purchase Documents and to confer to the parties hereto the benefits intended by such transactions.  The parties shall cooperate fully with each other and with their respective counsel and accountants in connection with any steps required to be taken as part of their respective obligations under the Purchase Documents.

(b)  Buyer agrees that following Closing, it will provide Sellers, Sellers statutory Creditors' Committee and any subsequent appointed trustee or plan agent ("*Sellers Related Parties*") with reasonable access to the documents, books, records and personnel (including without limitation all such books of account and tax records) as Sellers or any of the Sellers' Related Partiesmay reasonably interview personnel and reasonably request and to make copies of documents in connection with (i) the preparation of tax returns or information returns, (ii) reports or other obligations by Sellers to governmental agencies, or (iii) with respect to the administration of the Debtors' bankruptcy estates, the Excluded Assets or Unassumed Liabilities.  Buyer shall preserve all such books and records for a period of seven years after the Closing; *provided, however*, that Buyer shall have the right at any time to request in writing that Sellers take any of such records and if they do not agree to take the records within 10 business days after receipt of the request, Buyer may dispose of the records.

Section 5.5  Employment of Employees.  Subject to Buyer's normal employment practices, Buyer shall have the right but not the obligation to extend employment offers to any of the employees of Seller has Buyer determined in its sole and absolute discretion.  Sellers agree to take no action which would interfere with any employment by Buyer, and shall take all action required by law or otherwise to cause the valid termination of employment at the Closing Date of such employees of Sellers who are to be employed by Buyer following the Closing Date.  Nothing in this Agreement is intended to confer upon any employee of Sellers or other third parties any rights or remedies, including, without limitation, any rights of employment of any nature or kind whatsoever.

Section 5.6  Employee Benefit Plans.  Sellers shall remain responsible for any liability in respect of, any salary, commission, bonus, deferred compensation, profit sharing, pension, retirement, severance pay, stock option, employee stock purchase or any other similar plan, arrangement or

program ("*Employee Benefit Plans*") established by Sellers for the benefit of their employees. Notwithstanding any provision contained in this Agreement to the contrary, Buyer shall not assume or be responsible in any manner for any liabilities or obligations arising under or as a result of any Employee Benefit Plans sponsored by Sellers or in which Sellers or their employees participate.

Section 5.7 <u>Consents</u>.  Buyer and Sellers will use reasonable efforts to obtain all necessary third party or governmental consents necessary to consummate the transactions provided for in this Agreement.

Section 5.8 <u>Disclosure to Parties</u>.  If either of the parties becomes aware, prior to the Closing Date, that any of its representations, warranties or covenants is inaccurate or incapable of being performed in any material respect, such party shall promptly give written notice of such inaccuracy or incapability to the other party; *provided, however*, that nothing contained in this <u>Section 5.9</u> shall relieve the party bound by such representation, warranty or covenant from complying with such representation, warranty or covenant.

Section 5.9 <u>Consummation of Transaction; Time is of the Essence</u>.  The parties shall each use reasonable efforts to cause the transactions contemplated by the Purchase Documents to be consummated in accordance with the terms thereof and, without limiting the generality of the foregoing, shall use reasonable efforts to obtain all necessary approvals, waivers, consents, permits, licenses, registrations and other authorizations required in connection with the Purchase Documents. With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

Section 5.10      <u>Governmental Approvals</u>.  The parties shall each use reasonable efforts and proceed diligently and in good faith to, as promptly as practicable, obtain all consents, approvals or actions of, make all filings with and give all notices to, governmental authorities required to consummate the transactions contemplated by the Purchase Documents, if any.

Section 5.11      <u>Approval of Bankruptcy Court</u>.  Sellers shall obtain entry of the Sale Order permitting transfer of assets free and clear of all liens and encumbrances and obtain a finding by the Bankruptcy Court that Buyer is a good faith purchaser.  Furthermore, Sellers shall obtain within the order from the Bankruptcy Court, an order authorizing the right to occupy, the right to direct motions to assume and assign Executory Contracts and Unexpired Leases and to conduct store closing sales and inventory liquidation sales at the retail store locations that are not Assumed Leases (the rejected leases) for a period of up to three (3) months following the Closing Date.  Buyer will notify the Sellers on or before the Closing Date of the required length of the term the Buyer will occupy the reject lease space.

Section 5.12 <u>Post Sale Expenses related Assigned Leases</u>.  Buyer shall be responsible for and shall pay directly to the respective landlords or otherwise reimburse the Sellers for all rent obligations accruing immediately following the Closing with respect to all leases for the period of time of Buyer's occupancy and possession of such rejected lease space.  For clarity, the obligation of Buyer pursuant to this Section 5.12 includes reimbursement to Sellers for May 2015 rent attributable to the period after Closing.

**Section 5.13**      <u>Waiver of Antex Knitting Mills, Inc. Claim</u>.  Upon a successful closing of the transactions contemplated hereby by Buyer, Buyer shall cause Antex Kitting Mills, Inc. to waive its additional claims for approximately Two Million One Hundred Thousand and no/100 Dollars ($2,100,000.00) related to specific purchase orders not yet invoiced or shipped to Sellers ("Antex Claim").  Such waiver shall specifically exclude and shall in no way waive, limit, restrict or impede any claims related to accounts receivables of Antex Knitting Mills, Inc. with respect to accounts receivables previously factored by Antex Kitting Mills, Inc. in the approximate amount of $3,200,000.00.

**ARTICLE VI**
**CONDITIONS TO OBLIGATIONS OF BUYER**

The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any or all of which Buyer may waive in writing:

Section 6.1 Representations and Warranties. Each of the representations and warranties of Sellers set forth in this Agreement and any exhibit or schedule hereto shall be true and correct in all material respects on and as of the Closing Date (except for the representations and warranties which speak as of a specific date or time, which representations and warranties need only be true and correct as of such other date or time).

Section 6.2 Performance of Agreements. Sellers shall have performed and complied in all material respects with all of their covenants and agreements contained in this Agreement which are required to be performed or complied with on or prior to the Closing Date.

Section 6.3 Absence of Certain Changes or Events. There shall not have been any event, change, occurrence or circumstance since the date this Agreement was executed that has had, or could reasonably be expected to have, a Material Adverse Effect. "*Material Adverse Effect*" means any material adverse effect on (a) the business or assets of Sellers (taken as a whole), or (b) the right or ability of any Seller to consummate or perform its obligations under this Agreement, in each case described in clause (a) and (b) other than an effect resulting from any one or more of the following: (i) the effect of any change in the United States or foreign economies (including changes arising from or related to the price of gas, oil or other natural resources) or securities or financial markets in general that does not have a disproportionate effect on Sellers; (ii) the effect of any change that generally affects any industry in which any of Sellers conducts business that does not have a disproportionate effect on Sellers; (iii) the effect of any change arising in connection with hostilities, acts of war, sabotage, or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage, or terrorism or military actions existing or underway as of the Closing Date; (iv) any natural disaster that does not have a disproportionate effect on Sellers; (v) the effect of any action taken by Buyer or its affiliates in connection with the Transaction; (vi) the effect of any changes in laws or accounting rules; or (vii) any effect directly resulting from the public announcement of this Agreement, compliance with the terms of this Agreement or the consummation of the Transaction (provided, that nothing in this Section 6.3 shall alter Buyer's rights under Section 9.1 to terminate this Agreement).

Section 6.4 No Injunctions. No court or governmental authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, judgment, decree, injunction or other order that is in effect on the Closing Date and prohibits the consummation of the transactions contemplated hereby.

Section 6.5 Deliveries. All documents required to be delivered by Sellers at or prior to Closing shall have been delivered to Buyer at Closing.

Section 6.6 Order of the Bankruptcy Court. Bankruptcy Court shall have entered an order which has not been stayed or vacated or reversed on appeal (a) for the sale of the Assets free and clear of all liens and encumbrances to the extent authorized by 11 U.S.C §363(f), (b) with appropriate motion and notice the ability to assume and assign the Assigned Executory Contracts, (c) declaring the Buyer to be a good faith purchaser, and (d) authorizing store closing liquidation sales at the retail store locations that are not Assumed Leases (the rejected leases) as provided herein, which order shall not have been stayed, vacated or reversed on appeal.

## ARTICLE VII
### CONDITIONS TO OBLIGATIONS OF SELLERS

The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any or all of which Sellers may waive in writing:

Section 7.1 <u>Representations and Warranties</u>. Each of the representations and warranties of Buyer set forth in this Agreement and any exhibit or schedule hereto shall be true and correct in all material respects on and as of the Closing Date (except for the representations and warranties which speak as of a specific date or time, which representations and warranties need only be true and correct as of such other date or time).

Section 7.2 <u>Performance of Agreements</u>. Buyer shall have performed and complied in all material respects with all of its covenants and agreements contained in this Agreement which are required to be performed or complied with on or prior to the Closing Date.

Section 7.3 <u>Consents</u>. All authorizations, consents, and approvals of any Persons necessary for the consummation of the transactions contemplated by this Agreement shall have been obtained.

Section 7.4 <u>No Injunctions</u>. No court or governmental authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, judgment, decree, injunction or other order that is in effect on the Closing Date and prohibits the consummation of the transactions contemplated hereby.

Section 7.5 <u>Deliveries</u>. All documents required to be delivered by Buyer at or prior to Closing shall have been delivered to Sellers at Closing.

## ARTICLE VIII
### CLOSING

Section 8.1 <u>Sellers' Deliveries</u>. At the Closing (except where provided by the Sale Order), Sellers shall deliver to Buyer:

(a) in a form reasonably satisfactory to Buyer's and Sellers' counsel, such bills of sale, certificates of title for vehicles, endorsements of transfer, conveyances, assignments and subleases and other documents and agreements as shall vest in Buyer the Sellers' right, title and interest in and to the Assets;

(b) in a form reasonably satisfactory to Buyer's and Sellers' counsel, one or more duly executed general assignment agreements with respect to the Assigned Executory Contracts (the "*Assignment Agreement*");

(c) copies of all authorizations, consents, and approvals necessary to consummate the transactions contemplated by this Agreement;

(d) such other documents or instruments as Buyer shall reasonably request to further evidence consummation of the transactions contemplated by this Agreement; and

(e) entry of the orders set forth in Section 6.6 of this Agreement.

Section 8.2 <u>Buyer's Deliveries</u>. At the Closing Buyer shall deliver or cause to be delivered to Sellers:

(a) the Purchase Price in the form and manner provided for in <u>Section 2.1</u> hereof;

(b) the Assumption Agreement duly executed by Buyer (except as provided in the Sale Order, which will provide for a later delivery date);

(c) resolutions, certified by Buyer's secretary, evidencing Buyer's authority to (i) execute and deliver this Agreement and the Purchase Documents, and (ii) consummate the transactions contemplated herein and therein;

(d) an incumbency certificate of Buyer, certified by such Buyer's secretary, certifying the accuracy of the specimen signature of the authorized representative of such entity executing this Agreement and the Purchase Documents; and

(e) such other documents or instruments as Sellers shall reasonably request to further evidence consummation of the transactions contemplated by this Agreement.

Section 8.3 Parties to Bear Own Expenses.  Buyer and Sellers shall each bear their respective expenses relating to or arising out of this Agreement, including, but not limited to, fees for attorneys, accountants and other advisors.

## ARTICLE IX
### TERMINATION OF AGREEMENT

Section 9.1 Termination.  This Agreement may be terminated, and the transactions contemplated hereby may be abandoned, by written notice promptly given to the other parties hereto, at any time prior to the Closing Date:

(a) by mutual written consent of Buyer and Sellers;

(b) by either Buyer or Sellers if any permanent injunction or other order of a court or competent authority or government agency which prevents the consummation of the transaction shall have become final and not appealable;

(c) by Buyer if any permanent or temporary injunction or other order of a court or competent authority or government agency which prevents the consummation of the transactions as contemplated herein;

(d) by Sellers if any of the conditions specified in Article VII have not been met or waived by Sellers at any such time as such conditions can no longer be satisfied;

(e) by Buyer if any of the conditions specified in Article VI have not been met or waived by Buyer at any such time as such conditions can no longer be satisfied; or

(f) by Seller if the transaction contemplated hereby is not closed by May 15, 2015 and by Buyer if not closed by May 22, 2015

Section 9.2 Status of Agreement after Termination.  Subject to Section 9.3, upon any termination of this Agreement pursuant to Section 9.1, this Agreement shall be void and have no effect, without any liability on the part of any party hereto or any shareholders, members, directors, managers or officers thereof or any Seller, Buyer or any of their respective affiliates; *provided, however*, such termination shall not affect the liability of any party for the breach of any provision of this Agreement.

Section 9.3 Return of Deposit.  In the event that this Agreement shall be terminated pursuant to Section 9.1, the Deposit shall be immediately returned to Buyer; provided, however, in the event Buyer is unable to perform as a result of (i) Buyer's inability to pay the Cash Purchase Price at Closing or (ii) as a result of a failure of a condition precedent as set forth in Articles VII or Section 8.2, Sellers

shall be entitled to retain the Deposit as liquidated damages, which shall be the Sellers' sole and exclusive remedy and Sellers shall waive all other rights or remedies Sellers may have in law or at equity.

## ARTICLE X
SURVIVAL; LIMITATION OF REPRESENTATIONS AND WARRANTIES

Section 10.1        Survival of Representations and Warranties.    The representations, warranties and agreements set forth in this Agreement or in any exhibit or schedule attached hereto are made as of the date of this Agreement and shall be true and correct on and as of the Closing Date.  The representations and warranties of Sellers set forth in this Agreement or in any exhibit or schedule attached hereto shall terminate on the Closing Date.

Section 10.2        Limitation of Representation and Warranties.  Buyer understands that none of Sellers, any of their respective members, stockholders or direct or indirect affiliates nor any of their officers, directors, employees or representatives (all of the foregoing, collectively, the "*Seller Related Parties*") is making any other  representation or warranty relating to Sellers or any of their assets, liabilities or operations or the transactions contemplated hereby whatsoever, express or implied, except that Sellers are making those representations and warranties explicitly set forth in Article III of this Agreement.  Buyer represents and acknowledges that it has entered into this Agreement on the basis of its own examination, personal knowledge, and opinion of the value of the Assets.  Except as specifically set forth in the representations and warranties in Article III of this Agreement, Buyer is not relying on the accuracy or completeness of any information regarding Sellers or any of their assets, liabilities or operations or the transactions contemplated hereby, and Buyer further agrees that no Seller Related Party shall have or be subject to any liability to Buyer or any other Person resulting from the distribution to Buyer or Buyer's use of any such information.  Buyer further acknowledges that Sellers have made no agreement or promise to repair or improve any of the Assets being sold to Buyer, and that Buyer takes all such Assets in the condition existing on the Closing Date "AS IS, WHERE IS," except as otherwise specifically provided in this Agreement.    SELLERS SPECIFICALLY DISCLAIM ANY IMPLIED WARRANTY OF MERCHANTABILITY AND/OR SATISFACTORY QUALITY AND ANY IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE.

## ARTICLE XI
GENERAL

Section 11.1        Notices.  All notices and other communications hereunder shall be in writing and shall be sent by certified mail, postage prepaid, return receipt requested; by an overnight express courier service that provides written confirmation of delivery; or by facsimile with confirmation, addressed as follows:

| | |
|---|---|
| If to Sellers: | 2865 Wilderness Place<br>Boulder, CO 80301<br>Attn: Jo Stone<br>Email: jstone@fpcolor.com |
| With a copy to: | Brownstein Hyatt Farber Schreck, LLP<br>410 17th Street, Suite 2200<br>Denver, CO 80202<br>Attn: Michael J. Pankow<br>Email: mpankow@bhfs.com |
| If to Buyer: | Blue Stripe, LLC<br><br>2865 Wilderness Place |

018059\0002\12200877. 312

Boulder, CO 80301
Attn: Thom Vernon
Email: tvernon888@gmail.com

With a copy to:      Minor & Brown, P.C.
650 South Cherry Street, Suite 1100
Denver, Colorado 80246
Attn: Lisa A. D'Ambrosia and David M. Rich
Email: ldambrosia@minorbrown.com
drich@minorbrown.com

Any party may change its address for receiving notice by giving notice of a new address in the manner provided herein. Any notice so given, shall be deemed to be delivered on the second business day after the same is deposited in the United States mail, on the next business day if sent by overnight courier, or on the same business day if sent by facsimile before the close of business, or the next business day, if sent by facsimile after the close of business.

Section 11.2     Schedules. Each matter set forth in any of the schedules attached to this Agreement (or any agreement, instrument or other documents specifically referenced in such schedule to the extent a copy of the same has been delivered to Buyer prior to the execution of this Agreement) shall be deemed to be disclosed for purposes of every other schedule. The schedules shall in all respects constitute a part of the representations and warranties of Sellers herein, and are expressly made a part of this Agreement. The inclusion of any information in any of the schedules shall not be deemed to be an admission or acknowledgement, in and of itself, that such information is material for purposes of this Agreement or for any other purpose. Schedules that expressly contain information "as of the Closing Date" or qualifications made in respect of representations made "as of the Closing Date" or using a similar phrase or construction shall be delivered in draft form to Buyer not less than 3 days nor more than 5 days prior to the Closing Date for review purposes only and shall be delivered in final form on the Closing Date and shall contain information accurate in all respects as of the Closing Date or such other date specified on such Schedule as accepted by Buyer.

Section 11.3     Headings. The descriptive article, section and paragraph headings set forth herein are inserted for convenience of reference only, do not constitute a part of this Agreement and shall not control or affect the meaning or construction of any provision of this Agreement.

Section 11.4     Entire Agreement. This Agreement, the other Purchase Documents and the Confidentiality Agreement, together with exhibits and schedules attached to this Agreement, constitute the entire agreement between the parties pertaining to this subject matter and supersede all prior or contemporaneous agreements and understandings of the parties relating to the same. This Agreement may be amended only in writing signed by the parties hereto.

Section 11.5     Severability. If any term or provision of this Agreement or any application thereof shall be invalid or unenforceable, the remainder of this Agreement and any other application of such term or provision shall not be affected thereby.

Section 11.6     Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Colorado without reference to choice or conflicts of law principles thereof.

Section 11.7     JURISDICTION; WAIVER OF JURY TRIAL.

(a) THE COURTS OF THE STATE OF COLORADO AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED THE STATE OF COLORADO WILL HAVE SOLE

018059\0002\12200877. 313

JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

(b) EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 11.8      Waiver.  Any of the terms or conditions of this Agreement may be waived at any time by the party entitled to the benefit thereof, but only by written notice signed by the party waiving such terms or conditions.

Section 11.9      Further Assurances.  Both parties will take such reasonable steps as are necessary to consummate the transactions contemplated herein.

Section 11.10      Assignability; Binding Effect.  This Agreement may not be assigned by any party without the prior written consent of the other parties hereto.  This Agreement shall be binding upon the parties hereto, and their successors and permitted assigns.

Section 11.11      Counterpart Execution.  This Agreement may be executed in any number of counterparts, including by facsimile or electronic signature included in an Adobe PDF file, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.  This Agreement shall become effective when counterparts have been signed by each party and delivered to the other parties, it being understood that the parties need not sign the same counterpart.

*<Signature page follows>*

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement on the day and year first above written.

**BLUE STRIPE, LLC**

A Colorado limited liability company

By:
Name: Thom Verner
Title: Manager

[Seller(s)]

**FRESH PRODUCE HOLDINGS, LLC,**
a Delaware limited liability company

By:_____
Name:
Title:

**FRESH PRODUCE RETAIL, LLC,**
a Colorado limited liability company

By:_____
Name:
Title:

**FRESH PRODUCE SPORTSWEAR, LLC**
a Colorado limited liability company

By:_____
Name:
Title:

**FRESH PRODUCE OF ST. ARMANDS, LLC,**
a Florida limited liability company

By:_____
Name:
Title:

**FP BROGAN-SANIBEL ISLAND LLC**
a Colorado limited liability company

By:_____
Name:
Title:

018059\0002\12200877.315

**FRESH PRODUCE COCONUT POINT, LLC,**
a Florida limited liability company

By:_____
Name:
Title:

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement on the day and year first above written.

**BLUE STRIPE, LLC**

**A Colorado limited liability company**

By:_____
Name:
Title:

[Seller(s)]

**FRESH PRODUCE HOLDINGS, LLC,**
**a Delaware limited liability company**

By:_____
Name:   Thomas M. Kim
Title:   Manager

**FRESH PRODUCE RETAIL, LLC,**
**a Colorado limited liability company**

By:_____
Name:   Thomas M. Kim
Title:   Manager

**FRESH PRODUCE SPORTSWEAR, LLC**
**a Colorado limited liability company**

By:_____
Name:   Thomas M. Kim
Title:   Manager

**FRESH PRODUCE OF ST. ARMANDS, LLC,**
**a Florida limited liability company**

By:_____
Name:   Thomas M. Kim
Title:   Manager

**FP BROGAN-SANIBEL ISLAND LLC**
**a Colorado limited liability company**

By:_____
Name:   Thomas M. Kim
Title:   Manager

018059\0002\12200877. 315

**FRESH PRODUCE COCONUT POINT, LLC,**
a Florida limited liability company

By: _____

Name:  Thomas M. Kim

Title:  Manager

Schedule 1.1(b)
Purchased Receivables
As of 4/25/2015 (to be updated to actuals as of Closing Date)

**FRESH PRODUCE**

**ACCOUNTS RECEIVABLE AGING REPORT**

| Customer | Customer Name | Future/ Current | 1-30 | 31-60 | 61-90 | 90-120 | 120+ | 5/2/2015 Total | % Total |
|---|---|---|---|---|---|---|---|---|---|
| M7339 | MARSHALLS/TJ MAXX | $ - | $260,823 | $ - | $ - | $ - | $ - | $ 260,823 | 12.5% |
| Z7265 | ZULILY, INC | $ 138,187 | $ 48,227 | $ - | $ - | $ - | $ (14) | $ 186,399 | 9.0% |
| F4333 | FRESH PRODUCE LB/MB | $ 173,519 | $ 9,917 | $ (228) | $ - | $(979) | $ - | $ 182,229 | 8.8% |
| D7382 | DILLARDS INC | $ 74,354 | $ 86,653 | $ - | $ - | $ - | $ - | $ 161,007 | 7.7% |
| F7377 | FP HANDPICKED FRESH PICKED | $ 19,088 | $ 35,737 | $14,584 | $40,523 | $ - | $ - | $ 109,932 | 5.3% |
| F7347 | FP HANDPICKED HILTON HEAD | $ 95,088 | $ (222) | $ - | $ (232) | $ - | $ (580) | $ 94,054 | 4.5% |
| Z7267 | ZAPPOS MERCHANDISING | $ 79,812 | $ - | $ - | $ - | $ - | $ - | $ 79,812 | 3.8% |
| M7361 | MACY*S | $ 66,403 | $ 10,090 | $ - | $ - | $ - | $ 3,063 | $ 79,556 | 3.8% |
| S7438 | SUNNY DAYS RETAIL INC | $ 75,226 | $ 2,458 | $ 5 | $ 9 | $ - | $ 1,244 | $ 78,941 | 3.8% |
| C4518 | COLORS | $ 59,339 | $ 3,299 | $ - | $ - | $ - | $ - | $ 62,639 | 3.0% |
| M1000 | **INACTIVE**THE PINK PALM OF S | $ - | $ - | $ - | $ - | $ - | $ 60,494 | $ 60,494 | 2.9% |
| G7326 | GO FISH | $ 46,399 | $ 1,890 | $ - | $ - | $ - | $ - | $ 48,289 | 2.3% |
| R7474 | RUE LALA | $ 3,308 | $ 29,902 | $ - | $ - | $ - | $ - | $ 33,210 | 1.6% |
| B3387 | BASIC CONCEPTS | $ 18,256 | $ 8,753 | $ - | $ - | $ - | $ - | $ 27,009 | 1.3% |
| D2934 | DAFFODIL ENTERPRISE INC | $ 15,887 | $ 10,666 | $ - | $ - | $ - | $ - | $ 26,553 | 1.3% |
| P0250 | PERIWINKLES | $ 10,074 | $ 13,958 | $ 155 | $ (38) | $ - | $ - | $ 24,150 | 1.2% |
| G2756 | GRAY*S | $ 12,947 | $ 8,139 | $ - | $ - | $ - | $ - | $ 21,086 | 1.0% |
| M4000 | MARINE CORPS | $ 16,777 | $ 3,109 | $ - | $ - | $ - | $ - | $ 19,887 | 1.0% |
| V6043 | VON MAUR | $ 12,348 | $ 7,084 | $ - | $ - | $ - | $ (9) | $ 19,423 | 0.9% |
| P7394 | GHKH, INC | $ - | $ - | $ - | $ - | $ - | $18,066 | $ 18,066 | 0.9% |
| B5694 | BAREFOOT IMAGE | $ 14,764 | $ 1,004 | $ - | $ - | $ - | $ - | $ 15,768 | 0.8% |

**FRESH PRODUCE**

**ACCOUNTS RECEIVABLE AGING REPORT**

| Customer | Customer Name | Future/Current | 1-30 | 31-60 | 61-90 | 90-120 | 120+ | 5/2/2015 Total | % Total |
|---|---|---|---|---|---|---|---|---|---|
| O7047 | ON DECK CLOTHING CO INC | $ 15,542 | $ - | $ - | $ - | $ - | $ - | $ 15,542 | 0.7% |
| F7361 | FP HANDPICKED SAUGATUCK | $ 9,616 | $ 1,768 | $ 4,124 | $ - | $ - | $ - | $ 15,508 | 0.7% |
| T7324 | TROPIC AL*S | $ 1,676 | $ 3,971 | $ - | $ 39 | $8,036 | $ - | $ 13,722 | 0.7% |
| P6303 | PORTS OF CALL | $ 7,281 | $ 2,307 | $ 3,366 | $ 386 | $ - | $ - | $ 13,341 | 0.6% |
| C2342 | COCONUTS | $ 3,810 | $ 8,835 | $ - | $ - | $ - | $ - | $ 12,644 | 0.6% |
| C3280 | COASTAL SPORTSWEAR INC | $ 8,100 | $ 4,126 | $ - | $ - | $ - | $ - | $ 12,226 | 0.6% |
| M6004 | MAUI CLOTHING COMPANY | $ 1,153 | $ 4,292 | $ 6,302 | $ - | $ - | $ - | $ 11,747 | 0.6% |
| C7218 | COTTON GARDEN OF CAMDEN | $ - | $ - | $ - | $ - | $ (329) | $ 12,034 | $ 11,705 | 0.6% |
| F5950 | FIVE FISH | $ 3,014 | $ 6,435 | $ 2,250 | $ - | $ - | $ - | $ 11,699 | 0.6% |
| M5396 | MARTINS CASUALS | $ 11,610 | $ - | $ - | $ - | $ - | $ - | $ 11,610 | 0.6% |
| W5395 | WEBERS | $ 9,290 | $ 2,086 | $ - | $ - | $ - | $ - | $ 11,377 | 0.5% |
| F7368 | FAMOUS BRANDS INC | $ 5,397 | $ 4,924 | $ - | $ - | $ - | $ - | $ 10,321 | 0.5% |
| C2912 | CANNERY | $ - | $ - | $ - | $ - | $ - | $ 9,908 | $ 9,908 | 0.5% |
| S6297 | SEA STORES INC | $ 4,909 | $ 4,815 | $ - | $ - | $ - | $ - | $ 9,724 | 0.5% |
| I7341 | **INACTIVE**PAPAYA ISLAND | $ - | $ - | $ - | $ - | $ - | $ 9,587 | $ 9,587 | 0.5% |
| B7476 | BEACHCOMBER | $ 9,506 | $ - | $ - | $ - | $ - | $ - | $ 9,506 | 0.5% |
| B7450 | BEACH GRAPHICS INC | $ 9,449 | $ - | $ - | $ - | $ - | $ - | $ 9,449 | 0.5% |
| C7354 | COTTON GARDEN OF PORTLAND | $ - | $ - | $ - | $ - | $ - | $ 9,130 | $ 9,130 | 0.4% |
| E7278 | JOSEPH'S DEPT STORE, LLC | $ 4,012 | $ 2,571 | $ 2,543 | $ - | $ - | $ - | $ 9,125 | 0.4% |
| C5164 | COMBELLACKS | $ 7,009 | $ 1,785 | $ - | $ - | $ - | $ - | $ 8,794 | 0.4% |
| C7345 | CALYPSO | $ 7,735 | $ 995 | $ - | $ - | $ - | $ - | $ 8,729 | 0.4% |
| H9997 | LS TRAVEL RETAIL NORTH AMERICA | $ 63 | $ - | $ 9,045 | $ (672) | $ - | $ (34) | $ 8,402 | 0.4% |
| B7420 | BORREGO OUTFITTERS | $ 7,283 | $ - | $ 944 | $ - | $ - | $ - | $ 8,227 | 0.4% |
| B7475 | **INACTIVE**BEST ISLAND | $ - | $ - | $ - | $ - | $ - | $ 8,180 | $ 8,180 | 0.4% |

# FRESH PRODUCE

## ACCOUNTS RECEIVABLE AGING REPORT

|  |  |  |  |  |  |  |  | 5/2/2015 |  |
|---|---|---|---|---|---|---|---|---|---|
| Customer | Customer Name | Future/ Current | 1-30 | 31-60 | 61-90 | 90-120 | 120+ | Total | % Total |
|  | COLORS |  |  |  |  |  |  |  |  |
| I7383 | ISLAND RETAIL INC | $ 6,937 | $ - | $ - | $ - | $ - | $ - | $ 6,937 | 0.3% |
| C7472 | CARA HOLDINGS LLC | $ 6,923 | $ - | $ - | $ - | $ - | $ - | $ 6,923 | 0.3% |
| C6997 | CAROLANN*S | $ 3,568 | $ 2,798 | $ - | $ 67 | $ 77 | $ - | $ 6,509 | 0.3% |
| C7452 | CATE & SALLY | $ 1,857 | $ 4,409 | $ - | $ - | $ - | $ (2) | $ 6,264 | 0.3% |
| R6129 | ROB-CIND INC | $ 2,621 | $ 3,605 | $ - | $ - | $ - | $ (96) | $ 6,129 | 0.3% |
| S7473 | SUNDANCE CLOTHING | $ 572 | $ 3,286 | $ 2,070 | $ - | $ - | $ - | $ 5,928 | 0.3% |
| H7330 | **INACTIVE**HANNAH BAY*S | $ - | $ - | $ - | $ - | $ - | $ 5,754 | $ 5,754 | 0.3% |
| F7344 | FOOD PANTRY LTD | $ 4,330 | $ 1,412 | $ - | $ - | $ - | $ 0 | $ 5,741 | 0.3% |
| M7411 | MIN D'S BOUTIQUE | $ 5,695 | $ - | $ - | $ - | $ - | $ - | $ 5,695 | 0.3% |
| P9537 | PEPPERTREE KLASSICS | $ - | $ - | $ 3,662 | $ - | $ - | $ 2,019 | $ 5,681 | 0.3% |
| B6674 | PINEAPPLE PATCH | $ 3,720 | $ 1,869 | $ - | $ - | $ - | $ - | $ 5,589 | 0.3% |
| C5579 | CAROUSEL, THE | $ 4,003 | $ 1,226 | $ - | $ - | $ - | $ - | $ 5,229 | 0.3% |
| C3751 | CHATEAU STE SHIRTS | $ 2,604 | $ 2,593 | $ (85) | $ - | $ - | $ - | $ 5,112 | 0.2% |
| P7400 | KIWI-SEEDS | $ 2,297 | $ 1,852 | $ 818 | $ - | $ - | $ - | $ 4,967 | 0.2% |
| B7466 | BEACH SHOP, THE | $ 68 | $ 1,446 | $ 3,414 | $ - | $ - | $ - | $ 4,928 | 0.2% |
| H6662 | MISSION FRESH PRODUCE | $ 4,838 | $ - | $ - | $ - | $ - | $ - | $ 4,838 | 0.2% |
| S7433 | SEA OF COTTON INC | $ 3,597 | $ 1,157 | $ - | $ - | $ - | $ - | $ 4,754 | 0.2% |
| C7351 | CBO CORPORATION | $ 2,172 | $ 2,330 | $ - | $ - | $ - | $ - | $ 4,502 | 0.2% |
| C6432 | COMMON THREADS | $ 4,398 | $ - | $ - | $ - | $ - | $ - | $ 4,398 | 0.2% |
| C7323 | COTTON CLUB, THE | $ 818 | $ 1,010 | $ 2,368 | $ - | $ (83) | $ 65 | $ 4,178 | 0.2% |
| I7387 | ISLAND STYLES | $ 624 | $ - | $ 563 | $ 691 | $ - | $ 1,974 | $ 3,853 | 0.2% |
| R0943 | RIGHT ANGLE, THE | $ 3,843 | $ - | $ - | $ - | $ - | $ - | $ 3,843 | 0.2% |
| L7436 | LEMON DROPS | $ - | $ - | $ - | $ - | $ - | $ 3,824 | $ 3,824 | 0.2% |
| O7034 | OCEAN GROVE TRADING LLC | $ 1,407 | $ 840 | $ 1,520 | $ - | $ - | $ - | $ 3,767 | 0.2% |
| H0978 | HANSEN*S | $ 3,577 | $ - | $ - | $ - | $ - | $ - | $ 3,577 | 0.2% |
| C9774 | CORIANDER | $ - | $ 2,636 | $ 898 | $ - | $ - | $ - | $ 3,534 | 0.2% |

018059/00021220087

7. 319

**FRESH PRODUCE**

**ACCOUNTS RECEIVABLE AGING REPORT**

| Customer | Customer Name | Future/ Current | 1-30 | 31-60 | 61-90 | 90-120 | 120+ | Total 5/2/2015 | % Total |
|---|---|---|---|---|---|---|---|---|---|
| B1961 | BRAVE NEW WORLD | $ 1,876 | $ 1,519 | $ - | $ - | $ - | $ 66 | $ 3,461 | 0.2% |
| W7348 | **INACTIVE**WILLITS SALES LLC | $ - | $ - | $ - | $ - | $ - | $ 3,457 | $ 3,457 | 0.2% |
| C7436 | COM-FORT-A-BLE | $ 3,411 | $ - | $ - | $ - | $ - | $ - | $ 3,411 | 0.2% |
| W7347 | C & L ENTERPRISES | $ 1,743 | $ - | $ - | $ - | $ - | $ 1,400 | $ 3,144 | 0.2% |
| M1519 | MERINGER ENTERPRISES | $ 3,090 | $ - | $ - | $ - | $ - | $ - | $ 3,090 | 0.1% |
| W7332 | **INACTIVE** WILSON'S INC | $ - | $ - | $ - | $ - | $1,125 | $ 1,940 | $ 3,065 | 0.1% |
| S9723 | SNUG | $ (25) | $ 33 | $ 3,048 | $ - | $ - | $ - | $ 3,056 | 0.1% |
| C7464 | CLOTHES TREE INC, THE | $ 1,472 | $ 384 | $ 1,083 | $ 11 | $ - | $ - | $ 2,949 | 0.1% |
| M7404 | METROPOLIS ENTERPRISES | $ - | $ 2,680 | $ - | $ - | $ - | $ - | $ 2,680 | 0.1% |
| A7344 | APROPOS | $ 2,342 | $ 316 | $ - | $ - | $ - | $ - | $ 2,658 | 0.1% |
| C7474 | CLASSIC WOMAN II PORTFOLIO | $ 1,018 | $ 1,523 | $ - | $ - | $ - | $ - | $ 2,540 | 0.1% |
| B7490 | BLISS BOUTIQUE OF MUSKOKA | $ - | $ - | $ - | $ 2,460 | $ - | $ - | $ 2,460 | 0.1% |
| D7364 | ATTITUDES & LATITUDES | $ - | $ - | $ 2,424 | $ - | $ - | $ - | $ 2,424 | 0.1% |
| I9003 | IMPRESSIONS | $ - | $ - | $ 2,297 | $ - | $ - | $ - | $ 2,297 | 0.1% |
| G5315 | GLASS BUTTERFLY | $ 609 | $ 1,635 | $ - | $ (3) | $ - | $ - | $ 2,241 | 0.1% |
| C6367 | CRUZ BAY CLOTHING | $ 1,136 | $ 1,066 | $ - | $ - | $ - | $ - | $ 2,202 | 0.1% |
| V7235 | VICTORIAN CHARM INC | $ 746 | $ 1,407 | $ - | $ - | $ - | $ - | $ 2,152 | 0.1% |
| A9858 | SMAO, LLC | $ 12,712 | $ (10,404) | $ (223) | $ - | $ - | $ - | $ 2,085 | 0.1% |
| A7945 | ACTON CLOTHING INC | $ 1,971 | $ - | $ - | $ - | $ - | $ - | $ 1,971 | 0.1% |
| B7399 | BAYSHORE CLOTHING | $ 1,989 | $ - | $ - | $ (33) | $ - | $ - | $ 1,956 | 0.1% |
| C5270 | **INACTIVE**COUNTRY SHOP, THE | $ - | $ - | $ - | $ - | $ - | $ 1,801 | $ 1,801 | 0.1% |
| M7359 | BUYERS FAIR | $ 1,222 | $ 564 | $ - | $ - | $ - | $ - | $ 1,786 | 0.1% |
| G7338 | GREGORY CLAXTON INT*L INC | $ 1,156 | $ 627 | $ - | $ - | $ - | $ - | $ 1,783 | 0.1% |
| W7211 | WILSON*S INC | $ 1,581 | $ 177 | $ - | $ - | $ 9 | $ - | $ 1,768 | 0.1% |
| P7401 | PENNY'S CLOSET | $ 1,209 | $ 400 | $ - | $ - | $ 91 | $ - | $ 1,701 | 0.1% |
| C7089 | COLLINS KIDS & WOMENS | $ 1,737 | $ (60) | $ - | $ - | $ - | $ - | $ 1,677 | 0.1% |

**FRESH PRODUCE**

**ACCOUNTS RECEIVABLE AGING REPORT**

| Customer | Customer Name | Future/ Current | 1-30 | 31-60 | 61-90 | 90-120 | 120+ | Total 5/2/2015 | % Total |
|---|---|---|---|---|---|---|---|---|---|
| | FASHIONS | | | | | | | | |
| H7344 | HARBOR WEAR OF MARTIN COUNTY | $ 683 | $ 955 | $ - | $ - | $ - | $ - | $ 1,638 | 0.1% |
| C5730 | CALIFORNIA BEACH HUT | $ 853 | $ 744 | $ - | $ - | $ - | $ - | $ 1,596 | 0.1% |
| C10000 | CABIN SAVVY | $ 1,588 | $ - | $ - | $ - | $ - | $ - | $ 1,588 | 0.1% |
| A9000 | AMOS & ANDES | $ 1,312 | $ - | $ - | $ - | $ - | $ - | $ 1,312 | 0.1% |
| F7372 | FOOTSIES INC. | $ - | $ - | $ 90 | $ 433 | $ 755 | $ - | $ 1,278 | 0.1% |
| C7359 | COUNTRY WOOLENS INC | $ 1,298 | $ (40) | $ - | $ - | $ - | $ - | $ 1,258 | 0.1% |
| S7400 | SUSAN MARIE*S | $ - | $ - | $ - | $ - | $ - | $ 1,233 | $ 1,233 | 0.1% |
| A0745 | ATLANTIC SOFTWEAR | $ 1,213 | $ - | $ - | $ - | $ - | $ - | $ 1,213 | 0.1% |
| S2096 | SINK *R SWIM | $ 1,168 | $ - | $ - | $ - | $ - | $ - | $ 1,168 | 0.1% |
| E7283 | E JONES & CO CORP | $ - | $ 111 | $ 1,053 | $ - | $ - | $ - | $ 1,164 | 0.1% |
| E7488 | EMERALD ISLE, THE | $ - | $ - | $ - | $ 1,144 | $ - | $ - | $ 1,144 | 0.1% |
| T7123 | TER HAR*S | $ 845 | $ - | $ 98 | $ - | $ - | $ - | $ 943 | 0.0% |
| D1608 | DAYDREAMS & HATTERAS | $ 908 | $ - | $ - | $ - | $ - | $ - | $ 908 | 0.0% |
| P9543 | PINSTRIPES LADIES FASHIONS | $ - | $ 863 | $ - | $ - | $ - | $ - | $ 863 | 0.0% |
| D0601 | DOCK SQUARE CLOTHIERS | $ 837 | $ - | $ - | $ - | $ - | $ - | $ 837 | 0.0% |
| F7343 | FRESH IMAGE | $ 826 | $ - | $ - | $ - | $ - | $ - | $ 826 | 0.0% |
| T7356 | TWO OLD GALS | $ - | $ - | $ 821 | $ - | $ - | $ - | $ 821 | 0.0% |
| G7437 | GONDWANA | $ 937 | $ - | $ - | $ - | $ - | $ (126) | $ 811 | 0.0% |
| H7302 | HARBOR WEAR OF HOLLAND | $ 800 | $ - | $ - | $ - | $ - | $ - | $ 800 | 0.0% |
| W7375 | WEAVER'S | $ 306 | $ 484 | $ - | $ - | $ - | $ - | $ 790 | 0.0% |
| S7502 | SUITS YOU SWIMWEAR INC | $ - | $ - | $ - | $ 781 | $ - | $ - | $ 781 | 0.0% |
| E7267 | EVE*S LEAVES | $ - | $ 353 | $ 366 | $ - | $ - | $ - | $ 719 | 0.0% |
| P4761 | PANACHE - MA | $ 265 | $ 123 | $ - | $ - | $ - | $ 321 | $ 709 | 0.0% |
| C6509 | CHRISTINE*S CROSSING | $ 674 | $ - | $ - | $ - | $ - | $ - | $ 674 | 0.0% |
| S7484 | SOMETHING EXTRA | $ - | $ 632 | $ - | $ - | $ - | $ - | $ 632 | 0.0% |
| P7418 | PRAIRIE ROSE CLOTHERS | $ - | $ - | $ 534 | $ (32) | $ - | $ - | $ 503 | 0.0% |

**FRESH PRODUCE**

**ACCOUNTS RECEIVABLE AGING REPORT**

| Customer | Customer Name | Future/Current | 1-30 | 31-60 | 61-90 | 90-120 | 120+ | 5/2/2015 Total | % Total |
|---|---|---|---|---|---|---|---|---|---|
| C6957 | GYPSY ROSE | $ - | $ - | $ - | $ - | $ - | $ 486 | $ 486 | 0.0% |
| B5846 | BLUM*S | $ 381 | $ - | $ - | $ - | $ - | $ - | $ 381 | 0.0% |
| T7390 | TIERRA DEL SOL | $ - | $ - | $ - | $ - | $ 434 | $ (80) | $ 354 | 0.0% |
| R7119 | RHINEBECK DEPARTMENT STORE | $ 331 | $ - | $ - | $ - | $ - | $ - | $ 331 | 0.0% |
| A7988 | ANNIE'S ACCENTS & ACCESSORIES | $ - | $ - | $ - | $ 320 | $ - | $ - | $ 320 | 0.0% |
| E0000 | EMPLOYEE SALES | $ - | $ - | $ - | $ - | $ - | $ 302 | $ 302 | 0.0% |
| A7984 | ADDY BLUE | $ - | $ - | $ - | $ - | $ - | $ 286 | $ 286 | 0.0% |
| S9734 | SUZANNE*S | $ - | $ - | $ - | $ - | $ - | $ 233 | $ 233 | 0.0% |
| H7336 | HERON*S SWIM & SPORT INC | $ - | $ - | $ - | $ - | $ - | $ 181 | $ 181 | 0.0% |
| S4377 | SEA QUEST | $ - | $ - | $ 169 | $ - | $ - | $ - | $ 169 | 0.0% |
| L7447 | THE LEMON TREE, LLC | $ - | $ - | $ - | $ 162 | $ - | $ - | $ 162 | 0.0% |
| F0000 | FPSW | $ - | $ 16 | $ 59 | $ 61 | $ - | $ - | $ 136 | 0.0% |
| M7408 | MEGHAN TRAINOR | $ - | $ - | $ - | $ - | $ - | $ 107 | $ 107 | 0.0% |
| O7042 | OVERBOARD CLOTHING INC | $ - | $ - | $ 58 | $ - | $ - | $ 42 | $ 100 | 0.0% |
| S7225 | SONNIES TRENDS & TRADITIONS | $ - | $ - | $ - | $ - | $ - | $ 95 | $ 95 | 0.0% |
| W7378 | WIGHT HOUSE, THE | $ - | $ - | $ - | $ - | $ - | $ 79 | $ 79 | 0.0% |
| P7406 | PLUNKETT'S OFFICE PRODUCTS | $ - | $ - | $ - | $ - | $ - | $ 53 | $ 53 | 0.0% |
| P7417 | PREMIER INCENTIVE GROUP LLC | $ - | $ - | $ - | $ - | $ - | $ 41 | $ 41 | 0.0% |
| D5005 | DB SALES | $ - | $ - | $ - | $ 32 | $ - | $ - | $ 32 | 0.0% |
| G7325 | GWK ENTERPRISES INC | $ - | $ - | $ - | $ - | $ - | $ 26 | $ 26 | 0.0% |
| H7346 | HIGHWAY 1 EMPORIUM | $ - | $ 22 | $ - | $ - | $ - | $ - | $ 22 | 0.0% |
| C7486 | CARL RUST | $ - | $ - | $ - | $ - | $ - | $ 13 | $ 13 | 0.0% |
| H7324 | HEATHCLIFF | $ 66 | $ - | $ - | $ - | $ - | $ (64) | $ 2 | 0.0% |
| C3540 | CONFETTI DESIGN | $ - | $ - | $ - | $ - | $ - | $ 0 | $ 0 | 0.0% |
| A7978 | A SUMMER PLACE | $ - | $ - | $ - | $ - | $ - | $ 0 | $ 0 | 0.0% |

018059\00021\2290877. 322

**FRESH PRODUCE**

**ACCOUNTS RECEIVABLE AGING REPORT**

| Customer | Customer Name | Future/Current | 1-30 | 31-60 | 61-90 | 90-120 | 120+ | 5/2/2015 Total | % Total |
|---|---|---|---|---|---|---|---|---|---|
| F0001 | FP RETAIL PROMO | $ - | $ - | $ - | $ - | $ - | $ - | $ - | 0.0% |
| T7363 | T MICHELLE CLOTHIERS | $ - | $ - | $ (0) | $ - | $ - | $ - | $ (0) | 0.0% |
| V6856 | VELVET GOOSE, THE | $ - | $ - | $ - | $ - | $ - | $ (0) | $ (0) | 0.0% |
| C9993 | COUNTRY PICKIN'S | $ - | $ - | $ - | $ - | $ - | $ (0) | $ (0) | 0.0% |
| A7987 | ARMCHAIR COTTAGE | $ - | $ - | $ - | $ - | $ - | $ (1) | $ (1) | 0.0% |
| F7350 | FRESH PICKED | $ - | $ - | $ - | $ - | $ - | $ (1) | $ (1) | 0.0% |
| C7161 | COTTONSEED | $ - | $ - | $ - | $ - | $ - | $ (6) | $ (6) | 0.0% |
| S7415 | SURF BEACH SHOP - INACTIVE | $ - | $ - | $ - | $ - | $ - | $ (6) | $ (6) | 0.0% |
| A2256 | AVALON BAY COMPANY | $ - | $ - | $ - | $ - | $ - | $ (9) | $ (9) | 0.0% |
| G7431 | GIFT BASKET, THE | $ - | $ - | $ - | $ - | $ - | $ (10) | $ (10) | 0.0% |
| G7443 | GOURMET AU BAY INC | $ - | $ - | $ - | $ - | $ - | $ (12) | $ (12) | 0.0% |
| W7386 | WILLY & BABBISH BOUTIQUE LLC | $ - | $ - | $ - | $ - | $ - | $ (14) | $ (14) | 0.0% |
| C7476 | COUNTRY LADY, THE | $ - | $ - | $ - | $ - | $ - | $ (15) | $ (15) | 0.0% |
| U9107 | UBU FASHIONS | $ - | $ - | $ - | $ - | $ - | $ (18) | $ (18) | 0.0% |
| P7402 | PEDDLER, INC | $ - | $ - | $ - | $ - | $ - | $ (21) | $ (21) | 0.0% |
| P6417 | VICTORIA'S BY THE LAKE - CLOSD | $ - | $ - | $ - | $ - | $ - | $ (22) | $ (22) | 0.0% |
| C7406 | CHARLES DEPARTMENT STORE | $ - | $ - | $ - | $ - | $ - | $ (23) | $ (23) | 0.0% |
| B3338 | B & B DEPARTMENT STORES NORTH | $ - | $ - | $ - | $ - | $ - | $ (24) | $ (24) | 0.0% |
| K7356 | KENDALL'S HALLMARK | $ - | $ - | $ - | $ - | $ - | $ (25) | $ (25) | 0.0% |
| C7488 | CASANOVA'S DOWNFALL | $ - | $ - | $ - | $ (25) | $ - | $ - | $ (25) | 0.0% |
| F9314 | FISHERMAN'S DAUGHTER | $ - | $ - | $ - | $ - | $ - | $ (27) | $ (27) | 0.0% |
| H7349 | HONOKAA MARKETPLACE | $ - | $ - | $ - | $ - | $ - | $ (27) | $ (27) | 0.0% |
| P7395 | PAMELA*'S | $ - | $ - | $ - | $ - | $ - | $ (27) | $ (27) | 0.0% |
| F9310 | 406 SPORTSWEAR LTD | $ - | $ - | $ - | $ (30) | $ - | $ - | $ (30) | 0.0% |
| D7380 | DAISY'S | $ - | $ - | $ - | $ (31) | $ - | $ - | $ (31) | 0.0% |

018059(0002)122200877.323

**FRESH PRODUCE**

**ACCOUNTS RECEIVABLE AGING REPORT**

| Customer | Customer Name | Future/Current | 1-30 | 31-60 | 61-90 | 90-120 | 120+ | Total | % Total |
|---|---|---|---|---|---|---|---|---|---|
| R7462 | ROSSLOW*S INC | $ - | $ - | $ - | $ - | $ - | $ (32) | $ (32) | 0.0% |
| S4436 | SAVINGS ON SUNGLASSES | $ - | $ - | $ - | $ - | $ (39) | $ - | $ (39) | 0.0% |
| J5289 | JUDY WEST LLC | $ - | $ - | $ - | $ - | $ - | $ (50) | $ (50) | 0.0% |
| P7407 | PALMS ON THE PIER BOUTIQUE | $ - | $ - | $ - | $ - | $ - | $ (50) | $ (50) | 0.0% |
| R7340 | ROLAND MARTIN MARINA & RST | $ - | $ - | $ - | $ - | $ - | $ (51) | $ (51) | 0.0% |
| H0721 | HE SHAW INC | $ - | $ - | $ - | $ - | $ - | $ (52) | $ (52) | 0.0% |
| J7344 | JETTY, THE | 95 | $ - | $ - | $ - | $ - | $ (148) | $ (53) | 0.0% |
| B7393 | BOUNDARY WATERS CLOTHING CO | $ - | $ - | $ - | $ - | $ - | $ (59) | $ (59) | 0.0% |
| G9613 | GRACE | $ - | $ (63) | $ - | $ - | $ - | $ - | $ (63) | 0.0% |
| H7299 | HOTHEADS | $ - | $ - | $ - | $ - | $ - | $ (66) | $ (66) | 0.0% |
| G2580 | GONE BONKERS | $ - | $ - | $ - | $ (69) | $ - | $ - | $ (69) | 0.0% |
| S9736 | SUNROOM BOUTIQUE | $ - | $ - | $ - | $ - | $ - | $ (71) | $ (71) | 0.0% |
| U7187 | UNCONVENTIONAL MOOSE | $ - | $ - | $ - | $ - | $ - | $ (72) | $ (72) | 0.0% |
| S7344 | SHIPWRECK SHOPS N.V. | $ - | $ (74) | $ - | $ - | $ - | $ - | $ (74) | 0.0% |
| P7413 | PGC - PCI SAN DIEGO LLC | $ - | $ - | $ - | $ - | $ - | $ (77) | $ (77) | 0.0% |
| K7298 | KLASSY KLOTHING | $ - | $ - | $ (77) | $ - | $ - | $ - | $ (77) | 0.0% |
| J7088 | JUST BECAUSE | $ - | $ - | $ - | $ - | $ - | $ (79) | $ (79) | 0.0% |
| P7154 | PARADISE COVE | $ - | $ - | $ - | $ - | $ - | $ (85) | $ (85) | 0.0% |
| H7347 | HUMMING ROCK GIFTS | $ - | $ - | $ - | $ - | $ - | $ (87) | $ (87) | 0.0% |
| N7358 | NO 9 BOUTIQUE | $ - | $ (89) | $ - | $ - | $ - | $ - | $ (89) | 0.0% |
| L7441 | LOCAL COLOR | $ - | $ - | $ - | $ - | $ - | $ (98) | $ (98) | 0.0% |
| O7030 | OUTFITTERS | $ - | $ - | $ - | $ - | $ - | $ (106) | $ (106) | 0.0% |
| H0378 | KSL HOTEL DEL CORONADO | $ - | $ - | $ - | $ - | $(107) | $ - | $ (107) | 0.0% |
| S7369 | STEVE & CO - INACTIVE | $ - | $ - | $ - | $ - | $ - | $ (108) | $ (108) | 0.0% |
| M7403 | MAIN PLACE | $ - | $ - | $ - | $ - | $ - | $ (111) | $ (111) | 0.0% |
| F7380 | FABU | $ - | $ - | $ - | $ - | $ - | $ (116) | $ (116) | 0.0% |

5/2/2015

018059\0002112200877. 324

**FRESH PRODUCE**

**ACCOUNTS RECEIVABLE AGING REPORT**

| Customer | Customer Name | Future/Current | 1-30 | 31-60 | 61-90 | 90-120 | 120+ | Total | % Total |
|---|---|---|---|---|---|---|---|---|---|
| C6385 | TABONY INDUSTRIES | $ - | $ - | $ - | $ - | $ - | $ (117) | $ (117) | 0.0% |
| B7500 | BESITOS | $ - | $ - | $ - | $ - | $ - | $ (120) | $ (120) | 0.0% |
| S7497 | SIMPLY CHARMED BOUTIQUE LLC | $ - | $ - | $ (124) | $ - | $ - | $ - | $ (124) | 0.0% |
| R7107 | RED RABBIT BOUTIQUE | $ - | $ - | $ - | $ - | $ - | $ (128) | $ (128) | 0.0% |
| J7359 | JAX STORE FOR MEN & WOMEN | $ - | $ - | $ - | $ - | $ - | $ (130) | $ (130) | 0.0% |
| C9775 | COUNTY LINE, THE | $ - | $ (131) | $ - | $ - | $ - | $ - | $ (131) | 0.0% |
| R7471 | ROBERTS & COMPANY | $ - | $ - | $ (5) | $ (62) | $ - | $ (74) | $ (141) | 0.0% |
| T7389 | TOWN AND COUNTRY SHOP | $ - | $ - | $ - | $ - | $(141) | $ - | $ (141) | 0.0% |
| I7386 | IMMANUEL ENTERPRISES, LTD | $ - | $ (143) | $ - | $ - | $ - | $ - | $ (143) | 0.0% |
| S7374 | SEA BARN, THE | $ - | $ - | $ - | $ - | $ (55) | $ (95) | $ (150) | 0.0% |
| F9315 | FRENCH RIVER TRADING POST | $ - | $ - | $ - | $ - | $ - | $ (153) | $ (153) | 0.0% |
| S7447 | SPORTS EAST INC | $ - | $ - | $ - | $ - | $ - | $ (178) | $ (178) | 0.0% |
| H1142 | HUNTER JUNCTION | $ - | $ - | $ - | $ - | $ - | $ (187) | $ (187) | 0.0% |
| N7363 | NUGGET ALASKAN OUTFITTER | $ - | $ - | $ - | $ - | $(187) | $ - | $ (187) | 0.0% |
| J7312 | J CHRISTY*S | $ - | $ - | $ - | $ - | $ - | $ (209) | $ (209) | 0.0% |
| T7391 | TRI CITY MEDICAL CENTER | $ - | $ - | $ - | $ - | $ - | $ (216) | $ (216) | 0.0% |
| I7377 | IN FULL SWING | $ - | $ - | $ - | $ - | $ - | $ (217) | $ (217) | 0.0% |
| C7348 | CATHERINE*S COLLECTIBLES - INAC | $ - | $ - | $ - | $ - | $ - | $ (230) | $ (230) | 0.0% |
| H7332 | HAYSTACKS | $ - | $ - | $ - | $ - | $ - | $ (233) | $ (233) | 0.0% |
| K4899 | **INACTIVE**KEY WEST EXPRESS | $ - | $ - | $ (22) | $ - | $ - | $ (215) | $ (237) | 0.0% |
| C7484 | COLOR WEAR | $ - | $ - | $ - | $ - | $ - | $ (241) | $ (241) | 0.0% |
| W7387 | WINK BOUTIQUE | $ - | $ - | $ - | $ - | $(243) | $ - | $ (243) | 0.0% |
| C7479 | A COURTYARD QUAIL COMPANY | $ - | $ - | $ - | $ - | $ - | $ (250) | $ (250) | 0.0% |
| T7317 | **INACTIVE** TOP DECK | $ - | $ - | $ - | $ - | $ - | $ (270) | $ (270) | 0.0% |

018059\0002\122\0877.325

**FRESH PRODUCE**

**ACCOUNTS RECEIVABLE AGING REPORT**

| Customer | Customer Name | Future/ Current | 1-30 | 31-60 | 61-90 | 90-120 | 120+ | Total (5/2/2015) | % Total |
|---|---|---|---|---|---|---|---|---|---|
| | SUNWEAR- | | | | | | | | |
| C7478 | CREEK SIDE BOUTIQUE | $ - | $ - | $ - | $ - | $ - | $ (290) | $ (290) | 0.0% |
| G4053 | GRASSHOPPER SHOP | $ - | $ - | $ - | $ - | $ - | $ (296) | $ (296) | 0.0% |
| S7477 | SHELDON'S FOR WOMEN | $ - | $ - | $ - | $ - | $ - | $ (297) | $ (297) | 0.0% |
| T7380 | THREE MOUNTAIN OUTFITTERS | $ - | $ - | $ - | $ - | $ - | $ (358) | $ (358) | 0.0% |
| A7982 | ABSOLUTELY ABIGAILS | $ - | $ - | $ - | $ - | $ - | $ (388) | $ (388) | 0.0% |
| T9356 | TWISTED SISTER | $ - | $ - | $ - | $ - | $(453) | $ - | $ (453) | 0.0% |
| F7384 | FRENCHYS FASHIONS | $ - | $ - | $ - | $ - | $ - | $ (499) | $ (499) | 0.0% |
| B7451 | BLUE SKY MUSIC CORP | $ - | $ - | $ - | $ - | $ - | $ (506) | $ (506) | 0.0% |
| W7371 | WYATT WEST INC | $ - | $ - | $ - | $ - | $ - | $ (512) | $ (512) | 0.0% |
| A7985 | **INACTIVE**ALLURE CASUAL BOUT | $ - | $ - | $ - | $ - | $ - | $ (544) | $ (544) | 0.0% |
| J7346 | J TUPY*'S ON WATER ST | $ - | $ - | $ - | $ - | $ - | $ (606) | $ (606) | 0.0% |
| B7494 | BLOSSOM OF CADILLAC LLC | $ - | $ - | $ - | $ - | $ - | $ (614) | $ (614) | 0.0% |
| P7374 | POPPY | $ - | $ - | $ - | $ - | $ - | $ (716) | $ (716) | 0.0% |
| D7374 | DAZZL'IN DI'Z BOUTIQUE | $ - | $ - | $ - | $ - | $ - | $ (845) | $ (845) | 0.0% |
| B7401 | BARBARA ELECTRIC | $ - | $ - | $ - | $ - | $ - | $ (860) | $ (860) | 0.0% |
| B7497 | BEALLS INC | $ - | $ (1,369) | $ - | $ - | $ - | $ - | $ (1,369) | -0.1% |
| | **TOTAL ACCOUNTS RECEIVABLE** | $1,185,079 | $627,125 | $69,968 | $45,893 | $7,912 | $144,109 | $2,080,086 | 100% |
| | | 57.0% | 30.1% | 3.4% | 2.2% | 0.4% | 6.9% | 100% | |

018059/0002/12200877. 326

Schedule 1.1(d)

Assigned Leases

| Landlord | Real Property Lease |
|---|---|
| Alfred D. Hill, Jr. & Gay C. Hill Revoc Trust c/o Robert A. Collins 7830 Fay Avenue La Jolla, CA 92037 | Fresh Produce Retail, LLC Lessee of Nonresidential Real Property La Jolla, CA Store |
| Boca Grande Partners P.O. Box 1364 Boca Grande, FL 33921 | Fresh Produce of St. Armands, LLC Lessee of Nonresidential Real Property Boca Grande, FL Store |
| Casas Adobes Plaza LLC c/o Partners Management 5055 East Broadway Blvd., C-220 Tucson, AZ 85711 | Fresh Produce Retail, LLC Lessee of Nonresidential Real Property Tucson, AZ Store |
| Charleston Center LLC 200 East Long Lake Road Bloomfield Hills, MI 48303 | Fresh Produce Retail, LLC Lessee of Nonresidential Real Property Charleston, SC Store |
| Coconut Point Town Center LLC 225 West Washington St. Indianapolis, IN 46204 | Fresh Produce of Coconut Point, LLC Lessee of Nonresidential Real Property Estero/Coconut Point, FL Store |
| COROC/RIVIERA LLC 1251 Avenue of the Americas, 44th Floor New York, NY 10020 | Fresh Produce Retail, LLC Lessee of Nonresidential Real Property Foley, AL Outlet Store |
| Dahlman Periwinkle Pl Ltd Ptnshp 300 S. Thayer Ann Arbor, MI 48104 | FP Brogan Sanibel Island, LLC Lessee of Nonresidential Real Property Sanibel, FL Store |
| Duval Street Retail Center, LLC 336 Duval Street Key West, FL 33040 | Fresh Produce Retail, LLC (Assignor) Fresh Produce Holdings, LLC (Assignee and/or Tenant) Lessee of Nonresidential Real Property Key West, FL Store |
| El Paseo Collection Promenade, LLC 73-601 El Paseo, Suite 200 Palm Desert, CA 92260 | Fresh Produce Retail, LLC Lessee of Nonresidential Real Property Palm Desert, CA Store |
| FIFTH CORNER REALTY, LLC P.O. Box 803 Katonah, NY 10536 | Fresh Produce Retail, LLC Lessee of Nonresidential Real Property Delray Beach, FL Store |
| Great Lakes Developments 4606 Trails Drive Sarasota, FL 34232 | Fresh Produce of St. Armands, LLC Lessee of Nonresidential Real Property Sarasota, FL Store |
| Mirtha V. Pacetti Trust 75 Sorrento Blvd. Hanahan, SC 29410 | Fresh Produce Retail, LLC Lessee of Nonresidential Real Property St. Augustine, FL Store |
| Railhead Properties LLC 845 11th Street Boulder, CO 80302 | Fresh Produce Holdings, LLC Lessee of Nonresidential Real Property Boulder, CO Corporate Office |

| Landlord | Real Property Lease |
|---|---|
| The Las Holas Holding Co Inc<br>600 Sagamore Road<br>Ft. Lauderdale, FL  33301 | Fresh Produce Retail, LLC<br>Lessee of Nonresidential Real Property<br>Ft. Lauderdale, FL Store |
| Universal City Development Ptnrs<br>1000 Universal Studios Plaza<br>Orlando, FL  32819 | FP Brogan-Sanibel Island, LLC<br>Lessee of Nonresidential Real Property<br>Orlando, FL Store |
| William L. Cassio & Carole F. Cassio<br>1065 5th Street<br>Boulder, CO  80302 | Fresh Produce Retail, LLC<br>Lessee of Nonresidential Real Property<br>Boulder, CO Store |
| DLL Operating Co Inc<br>P.O. Box 21878<br>Charleston, SC  29413 | Fresh Produce Retail, LLC<br>Lessee of Nonresidential Real Property<br>Charleston, SC Store |

### Undecided Lease*

| Landlord | Real Property Lease |
|---|---|
| Realty Associates Fund V, LP (SPW-Gardena)*<br>SVF Broadway Center, Gardena Corporation<br>18201 Von Karmen Ave., Suite 1055<br>Irvine, CA  92612 | Fresh Produce Sportswear, LLC (Tenant)<br>Fresh Produce Holdings, LLC (Assignee)<br>Lessee of Nonresidential Real Property<br>Gardena, CA Distribution Center |

* Buyer reserves the right to request the Sellers to assume and assign the above-referenced lease within the time frames set forth in the Bankruptcy Code.

Schedule 1.1(e)

Assigned Contracts

None.

Schedule 1.2(k)

Excluded Assets

Cash in transit with respect to credit card purchases occurring prior to the Closing Date.

Schedule 1.3

See Assigned Leases on Schedule 1.1(d)

Schedule 3.3
Assigned Executory Contracts

[To be provided by Debtor]

Schedule 3.5
Brokers or Finders

[To be provided by Debtor]